No. 24-1082

IN THE
United States Court of Appeals for the Eighth Circuit

———————

PENGUIN RANDOM HOUSE LLC, ET AL.,

*Plaintiffs-Appellees*,

v.

JOHN ROBBINS, in his official capacity as President of the Iowa State
Board of Education, ET AL.,

*Defendants-Appellants*,

———————

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:23-cv-478
(The Honorable Stephen H. Locher)

———————

**BRIEF OF STATE DEFENDANTS-APPELLANTS**

———————

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

DANIEL JOHNSTON
*Assistant Attorney General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov
daniel.johnston@ag.iowa.gov

March 11, 2024                    *Counsel for Defendants-Appellants*

## SUMMARY OF CASE
## AND STATEMENT ON ORAL ARGUMENT

Plaintiffs are a publisher, several authors, the Iowa State Education Association, and some school employees. They challenged Iowa Senate File 496—an Iowa law that sets educational standards and protects parental rights in education. Plaintiffs claim the law violates their First and Fourteenth Amendment rights. Defendants here are the state officials named in the action.

The district court enjoined enforcement of sections that (1) require school library materials be age appropriate by not containing descriptions or visual depictions of sex acts, and (2) forbid school districts from providing instruction on sexual orientation and gender identity until after sixth grade. The district court held these laws violate the Free Speech Clause and the Due Process Clause. But regulation of school libraries is government speech not private speech. It does not trigger the Free Speech Clause. Even if it did, the library regulation satisfies the levels of scrutiny courts apply in school contexts. And all parts of these laws are definite enough to satisfy due process. The district court abused its discretion when it enjoined the law.

This case requires this Court's careful attention and warrants oral argument. The State Defendants request twenty minutes for oral argument.

# TABLE OF CONTENTS

SUMMARY OF CASE AND STATEMENT ON ORAL
ARGUMENT .................................................................................. i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ............................................................ v

STATEMENT OF JURISDICTION ............................................... 1

STATEMENT OF THE ISSUES ..................................................... 2

INTRODUCTION .......................................................................... 4

STATEMENT OF THE CASE ....................................................... 6

SUMMARY OF THE ARGUMENT ............................................ 13

ARGUMENT ............................................................................... 16

    I.    The Library Program is Constitutional when
        Reviewed under the Proper Analytic Framework. ............... 16

        A.    The government speech doctrine properly
            frames the First-Amendment issues here ................... 16

            1. The government-speech doctrine protects
            the government's role as communicator, and
            it applies to public schools ........................................... 17

            2. The government has editorial discretion
            over the third-party speech it shows to the
            public, and this is government speech ......................... 19

            3. The Free-Speech Clause does not enable
            citizens to control the content of government
            speech ............................................................................ 20

            4. A forum analysis does not apply to public
            libraries or government speach ................................... 22

5. These Principles apply with greater force to school libraries ........................................... 25

6. SF496 survives scrutiny under even Pico and Pratt .......................................................... 26

    i. Even Pico's fractured decisions support SF496 ................................................ 26

    ii. Pratt does not apply, yet SF496 passes its standard ........................................ 29

    iii. Pico and Pratt are procedurally distinguishable ............................................ 30

7. The Library Program passes any reasonably applied standard ........................................ 32

    i. SF496 regulates pure government speech and should be reviewed under the lowest standard .............................................. 33

    ii. Even if SF496 implicates the Free Speech Clause, it prevails at the threshold step of the analysis ........................................ 34

    iii. SF496 survives a nonpublic-forum-like prong-2 analysis .................................... 36

    iv. SF496 survives a standard following Hazelwood ...................................... 37

    v. SF496 survives a standard enacting Pico's plurality .................................................. 39

    vi. SF496 survives a standard reviving Pratt .......................................................... 39

B.    Many errors followed from the district court's analytic misstep. ............................... 40

       1. The district court's First
Amendment approach missed the mark ..................... 41

       i. A Miller obscenity analysis is
inappropriate here ....................................................... 41

       ii. The district court's creative
approach fails to grapple with binding
precedent ..................................................................... 43

       2. The Library Program is neither
overbroad nor vague in violation of due
process .......................................................................... 46

II.    The Instruction Section of SF496 violates neither
the Due Process clause nor the First Amendment ............... 48

III.   The injunction here was an abuse of discretion. ................... 55

CONCLUSION ......................................................................... 59

CERTIFICATE OF COMPLIANCE ........................................... 61

CERTIFICATE OF SERVICE ................................................... 62

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fl., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009)........................................26, 38
*Arkansas Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998)................................................20, 21, 22
*Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees*,
  37 F.4th 1386 (8th Cir. 2002) ............................................59
*Behlmann v. Century Sur. Co.*,
  794 F.3d 960 (8th Cir. 2015)...............................................52
*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986)....................... 25, 36, 39, 40, 42, 43, 58
*Board of Education v. Pico*,
  457 U.S. 853 (1982)............... 2, 13, 27, 28, 31, 35, 36, 39, 43, 56, 57, 58
*Board of Regents of Univ. of Wis. System v. Southworth*,
  529 U.S. 217 (2000).......................................................18
*Brown v. Entertainment Merchants*,
  564 U.S. 786 (2011).......................................................45
*C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022)................................3, 56
*Chiras v. Miller*,
  432 F.3d 606 (5th. Cir. 2005)...2, 5, 14, 19, 21, 24, 25, 26, 33, 35, 38, 47
*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985).......................................................37
*Dean v. Warren*,
  12 F.4th 1248 (11th Cir. 2021) ...........................20, 21, 35, 46
*Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*,
  880 N.W.2d 212 (Iowa 2016) ..........................................2, 53
*Doe ex rel. Doe v. Governor of N.J.*,
  783 F.3d 150 (3d Cir. 2015) ..............................................20
*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006)...................................................51, 52
*Dubin v. United States*,
  599 U.S. 110 (2023)...................................................2, 51
*Elrod v. Burns*,
  427 U.S. 347 (1976).......................................................56

v

*Epperson v. Arkansas*,
393 U.S. 97 (1968) .......................... 26, 29, 30, 31, 32, 35, 56

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)........................................ 44, 45, 53

*Escudero-Corona v. I.N.S.*,
244 F.3d 608 (8th Cir. 2001)................................ 16, 48

*Esteban v. Central Missouri State Coll.*,
415 F.2d 1077 (1969) ........................................ 50

*Farkas v. Miller*,
151 F.3d 900 (8th Cir. 1998)................................ 52, 53

*FCC v. Pacifica Found.*,
438 U.S. 726 (1978).............. 25, 29, 36, 38, 39, 40, 41, 42, 58

*Fleming v. Jefferson Cnty. Sch. Dist. R-1*,
298 F.3d 918 (10th Cir. 2002).............................. 34

*Gember v. City of Lincoln, Neb.*,
2007 WL 2904091 (D. Neb. Sept. 26, 2007) ............... 22, 36

*Ginsberg v. State of New York*,
390 U.S. 629 (1968)........................................ 43

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...................................... 49, 50, 53

*Griswold v. Connecticut*,
381 U.S. 479 (1965)........................................ 35

*Griswold v. Driscoll*,
625 F.Supp.2d 49 (D. Mass. 2009)............... 13, 14, 18, 19, 32, 33, 34

*Gundy v. City of Jacksonville Fla.*,
50 F.4th 60 (11th Cir. 2022) ....................... 22, 35, 36, 47

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)....................... 14, 19, 25, 37, 38

*Keeton v. Anderson Wiley*,
644 F.3d 865 (11th Cir. 2011)....................... 21, 35, 47

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)........................................ 19, 23

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)........................................ 50

*Knights of Ku Klux Klan v. Curators of the Univ. of* Missouri,
203 F.3d 1085 (8th Cir. 2000)............................. 24

*L.H. v. Indep. Sch. Dist.*,
2023 WL 2192234 (W.D. Mo. Feb. 23, 2023)................. 57

*Lankford v. Sherman,*
 451 F.3d 496 (8th Cir. 2006)...............................................................54

*McDonnell v. United States,*
 579 U.S. 550 (2016)............................................................................51

*Miller v. California,*
 413 U.S. 15 (1973) ........................................................................41, 42

*Montgomery v. Bremer County Board of Supervisors,*
 299 N.W.2d 687 (Iowa 1980) .............................................................31

*Nat'l Endowment for Arts v. Finley,*
 524 U.S. 569 (1998).....................................................................18, 23

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
 434 U.S. 1345 (1977).......................................................................3, 59

*Ng v. Bd. of Regents of Univ. of Minnesota,*
 64 F.4th 992 (8th Cir. 2023) ...........................................................3, 58

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.,*
 83 F.4th 658 (8th Cir. 2023) ...........................................2, 48, 49, 50

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
 414 F.3d 23 (D.C. Cir. 2005)........................................... 19, 20, 33

*Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds,*
 530 F.3d 724 (8th Cir. 2008).......................... 3, 16, 48, 54, 55

*Pleasant Grove City, Utah v. Summum,*
 555 U.S. 460 (2009)....................................... 17, 18, 21, 26, 33

*Powell v. Nobel,*
 798 F.3d 690 (8th Cir. 2015)..............................................................56

*Pratt v. Independent Sch. Dist. No. 831,*
 670 F.2d 771 (8th Cir. 1982)............................ 2, 13, 29, 30, 35, 39, 40

*Reno v. Am. Civ. Liberties Union,*
 521 U.S. 844 (1997)....................................................................44, 45

*Richenberg v. Perry,*
 73 F.3d 172 (8th Cir. 1995)..............................................................55

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
 515 U.S. 819 (1995).....................................................................18, 20

*Sanborn Mfg. Co., v. Campbell Hausfeld/Scott Fetzer Co.,*
 997 F.2d 484 (8th Cir. 1993)............................................................54

*Stanley v. Georgia,*
 394 U.S. 557 (1969).........................................................................35

*State v. Anderson,*
 2005 WL 3115469 (Iowa Ct. App. 2005).........................................48

*State v. Whetstine,*
  315 N.W.2d 758 (Iowa 1982) ............................................. 47
*Stephenson v. Davenport Cmty. Sch. Dist.,*
  110 F.3d 1303 (8th Cir. 1997).................................... 49, 50
*Tinker v. Des Moines Sch. Dist.,*
  393 U.S. 503 (1969)................................... 25, 26, 34, 37
*U.S. v. Am. Libr. Ass'n, Inc.,*
  539 U.S. 194 (2003)............................... 2, 14, 22, 23, 34, 36
*United States v. Barraza,*
  576 F.3d 798 (8th Cir. 2009)......................................... 49
*United States v. Stevens,*
  559 U.S. 460 (2010)................................................ 46
*Virgil v. Sch. Bd. of Columbia County,*
  862 F.2d 1517 (11th Cir. 1989)..................................... 38
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015)................................................ 24
*Ward v. Hickey,*
  996 F.2d 448 (1st Cir. 1993) ...................................... 14
*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)................................................ 50
*Wash. St. Grange v. Wash. St. Repub. Party,*
  552 U.S. 442  (2008)............................................... 46
*West Virginia Board of Education v. Barnette,*
  319 U.S. 624 (1943)............................................ 28, 29
*Widmar v. Vincent,*
  454 U.S. 263 (1981)................................................ 18
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................. 54
*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016)..................................... 57
*Young v. Am. Mini Theaters, Inc.,*
  427 U.S. 50 (1976) .............................................. 2, 53

## Statutes

Iowa Code § 216.2(10) ...................................... 3, 11, 49
Iowa Code § 216.2(14) ............................................. 3
Iowa Code § 256.1(19) ........................................ 2, 3, 9
Iowa Code § 256.11................................................ 8, 9, 10

Iowa Code § 256.11(9) ............................................................... 11, 12
Iowa Code § 256.11(9)(a)(1)........................................................ 2, 3, 9
Iowa Code § 256.11(9)(a)(2)........................................................... 11
Iowa Code § 279.50.......................................................................... 9
Iowa Code § 279.80 ..................................................... 3, 10, 49, 51
Iowa Code § 4.4(1) ..................................................................... 3, 52
Iowa Code § 601.1(2) ................................................................. 3, 52
Iowa Code § 702.17..................................................... 2, 3, 10, 47, 48
Iowa Code section 216.2 ........................................... 10, 11, 49
U.S. Const. amend. I .................................................................. 2, 3
U.S. Const. amend. IV ................................................................ 2, 3

## JURISDICTIONAL STATEMENT

Plaintiffs commenced this action under 42 U.S.C. section 1983. The district court had jurisdiction under 28 U.S.C. section 1331. On December 29, 2023, the district court filed its order granting Plaintiffs' motion for a preliminary injunction. App. 1065–1111, R. Doc. 56. On January 12, 2024, Defendants timely filed their notice of appeal. R. Doc. 59. This court has jurisdiction to review interlocutory orders granting preliminary injunctions. 28 U.S.C. § 1292(a)(1); *Planned Parenthood Minnesota, N. Dakota v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008).

# STATEMENT OF THE ISSUES

**I.    Whether the Library Program of Senate File 496 violated the First and Fourteenth Amendments to the United States Constitution.**

### Authorities

*Cases*

*Board of Education v. Pico*, 457 U.S. 853 (1982)
*Chiras v. Miller*, 432 F.3d 606 (5th. Cir. 2005)
*Pratt v. Independent Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982)
*U.S. v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003)

*Statutory Sections*

Iowa Code § 702.17
Senate File 496 § 2 (Iowa Code § 256.11(9)(a)(1))
Senate File 496 § 4 (Iowa Code § 256.1(19))

*Constitutional Sections*

U.S. Const. amend. I
U.S. Const. amend. IV

**II.   Whether the Instruction Section of Senate File 496 is void for vagueness.**

### Authorities

*Cases*

*Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212 (Iowa 2016)
*Dubin v. United States*, 599 U.S. 110 (2023)
*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)
*Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50 (1976)

*Statutory Sections*

Iowa Code § 4.4(1)

Iowa Code § 216.2(10)
Iowa Code § 216.2(14)
SF496 § 16 (Iowa Code § 279.80)
SF 496, § 24 (Iowa Code § 601.1(2))

*Constitutional Sections*

U.S. Const. amend. IV

## III. Whether the district court abused its discretion in granting Plaintiffs' motion for a preliminary injunction.

Authorities

*Cases*

*C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906 (E.D. Mo. 2022), *appeal dismissed*, No. 22-2885, 2023 WL 2180065 (8th Cir. Jan. 17, 2023).

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (Rehnquist, J., in chambers)

*Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992 (8th Cir. 2023)

*Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008)

*Statutory Sections*

Iowa Code § 216.2(10)
Iowa Code § 216.2(14)
Iowa Code § 702.17
Senate File 496 § 2 (Iowa Code § 256.11(9)(a)(1))
Senate File 496 § 4 (Iowa Code § 256.1(19))
Senate File 496 § 16 (Iowa Code § 279.80)
Senate File 496 § 24 (Iowa Code § 601.1(2))

*Constitutional Sections*

U.S. Const. amend. I
U.S. Const. amend. IV

# INTRODUCTION

Iowa Senate File 496 sets educational standards and protects parental rights in education. This law addresses a real problem the Legislature identified in Iowa schools: districts that refuse to remove books describing sexual activity despite objections from concerned parents. And those depictions are often graphic—they illustrate many types of sexual activity, including oral and anal sex. Iowa voters decided through their elected representatives to fix this problem by ensuring school library material and curricula remain age appropriate. But now the democratic process has been thwarted by a preliminary injunction.

The Plaintiffs are a publisher, several authors, the Iowa State Education Association, and some school employees. They challenge two parts of SF496: first, a section that requires public schools to adopt a library program that provides age-appropriate materials ("Library Program"), and second, a section that forbids school districts from adopting curricula relating to sexual orientation and gender identity until after sixth grade ("Instruction Section"). Defendants in the action included three state officials ("State Defendants"), several school districts, and a school superintendent. Defendants-Appellees here are the State Defendants.

Plaintiffs allege the challenged sections violate their First and Fourteenth Amendment rights. But their legal theories allow students,

authors, and publishers to control the content of school libraries and curricula. That invades State's authority to set educational standards.

Although States have broad discretion "in the field of public education" "to establish public school curricula" and accomplish "the states' educational objectives," *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005), the district court enjoined the two challenged sections. The court analyzed the law under the wrong framework—that framework did not account for developments in First-Amendment law beyond old authorities limiting State authority to set school curricula and remove library-book. And an injunction against the Instruction Section relied on misinterpreting SF496 to find constitutional violations.

SF496 regulates public school educational standards; it does not regulate private speech. The district court evaluated the law under free-speech principles as though it directly regulated private speech. But SF496 doesn't do that. This is not a case about a law that tells private citizens what they can and cannot say. It is rather a case about the State's right to say what public schools may provide to the school-age children entrusted to their tutelage. This is government speech, and it does not violate the First or Fourteenth Amendments.

## STATEMENT OF THE CASE

Before Senate File 496, school districts refused to remove library books that explicitly described or depicted sexual activity, despite objections from concerned parents. App. 855–866, 884–919, 929–948, R. Doc. 45-1, Exs. C, G, H, I, L. Some books graphically illustrated oral sex:



App. 895, R. Doc. 45-1, Ex. H. Other books illustrated more:









App. 935–47, R. Doc. 45-1, Ex. L. And other school library books included literary descriptions of sexual activity, including scenes of child rape. App. 848–886, 884–919, 929–948, R. Doc. 45-1, Exs. B, C, G, H, I, L. Yet when confronted with the explicit nature of this content, some schools refused to remove those books from library shelves under the existing law. *See*, *e.g.*, App. 911–919, 929–948, R. Doc. 45-1, Exs. I, L.

So the Iowa Legislature passed SF496. That bill required school curricula and educational programs to provide "age appropriate and re-search-based information." SF496 §§ 1–3 (Iowa Code § 256.11). "'Age

appropriate' means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group" ("Age-Appropriate Standard"). SF496 § 4 (Iowa Code § 256.1(19)); *see also* SF496 § 9 (Iowa Code § 279.50). The law also required schools to adopt a Library Program that "contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum." SF496 § 2 (Iowa Code § 256.11(9)(a)(1)). But Age Appropriate does not include "descriptions or visual depictions of a sex act." *Id.*

Although "sex act" may be read broadly without context, SF496's statutory definition is specific. SF496 excludes materials with "descriptions or visual depictions" of the following:

- the "penetration of the penis into the vagina or anus;"

- "contact between the mouth and genitalia or mouth and anus" or "contact between the genitalia of one person and the genitalia or anus of another person;"

- "contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of an examination or treatment by" certain licensed professionals;

- an "ejaculation onto the person of another;"

- the "use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus;"

- and "the touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another."

Iowa Code § 702.17; *see* SF496 § 4 (Iowa Code § 256.11) (incorporating identical definition of "sex act" from Iowa Code § 702.17).

Plaintiffs' challenge to the Library Program focused on SF496 excluding those "sex acts" from the Age-Appropriate Standard. The district court described the standard as "staggeringly broad." App. 1101, R. Doc. 56, at 36. But SF496 incorporated the definition of "sex acts" from the existing criminal statute. *See* Iowa Code § 702.17. No other court interpreting Section 702.17 has described its definition of "sex acts" as "staggeringly broad." *Id.*

The Instruction Section prohibits teaching sexual orientation and gender identity in kindergarten through sixth grade. SF496 § 16 (Iowa Code § 279.80). It forbids school districts from providing "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students" in those grades. *Id.* It adopted the definitions of "gender identity" and "sexual orientation" from Iowa Code section 216.2 of the Iowa Civil Rights Act. "Gender identity" refers to "a gender-related identity of a person, regardless of the

person's assigned sex at birth." Iowa Code § 216.2(10). And "sexual orientation" refers to "actual or perceived heterosexuality, homosexuality, or bisexuality." *Id.* § 216.2(14).

The Iowa Senate introduced SF496 on March 2, 2023. *See* Bill History for SF496, http://perma.cc/WU74-P3A9 (accessed March 6, 2024). SF496 passed both chambers in late April. *Id.* Governor Reynolds signed SF496 into law on May 26. *Id.* The bill had anti-bullying sections that went into effect immediately. *See* SF496 § 22. The Age-Appropriate Standard became effective on July 1, 2023, including for the 2023–2024 school year.

SF496 was in effect for over six months when Plaintiffs challenged it on November 30, 2023. Only one part of the law had yet to go into effect on January 1, 2024. That enforcement section applied to school districts and their employees. *See* SF496 § 2 (Iowa Code § 256.11(9)(a)(2)).

Under that section, a school district or employee could face discipline for knowingly allowing age-inappropriate material in a school library. SF496 § 2 (Iowa Code § 256.11(9)). But before any discipline, first the Department of Education must investigate to determine whether a violation occurred. *Id.* If the school or employee did violate SF496, the first violation results only in a written warning. *Id.* For a second or subsequent violation, disciplinary action "may result," but only for a "knowing violation" as determined by the Board of Educational Examiners at a hearing. *Id.* Only an employee "who holds a license, certificate,

authorization, or statement of recognition issued by the board of educational examiners" can be subject to a hearing and potential discipline. *Id.* And that is only if they are a knowing repeat offender, after multiple investigations, warnings, and hearings. *Id.* No Defendant can enforce SF496 against the publisher, authors, or student.

On December 29, 2023, the district court entered its order granting Plaintiffs' motion for preliminary injunction. App. 1065–1111, R. Doc. 56. Defendants timely appealed this order. R. Doc. 59.

## SUMMARY OF THE ARGUMENT

The applicable standards for First Amendment challenges to laws governing public schools' discretion over school library inventory and curriculum are a mess.

In *Board of Education v. Pico*, the U.S. Supreme Court tried to articulate a First Amendment standard applying to school library book removal. 457 U.S. 853 (1982). But no majority agreed on either the nature of the First Amendment right at issue or a governing standard. *Id.* Five justices there joined opinions to remand the case for factual development on whether the book removal at issue was motivated by a desire to suppress ideas. *Id.*

A few months before *Pico*, *Pratt v. Independent Sch. Dist. No. 831*, concerned a film removed from school. 670 F.2d 771,773 (8th Cir. 1982). Evidence there showed that the removal was religiously and ideologically motivated. *Id.* at 776.

Those cases give this Court little guidance here. They are procedurally inapposite, and they do not account for later precedents developing First Amendment jurisprudence. Courts observe that *Pico* predates important developments in the government-speech doctrine. *See*, *e.g.*, *Griswold v. Driscoll*, 625 F.Supp.2d 49, 54 (D. Mass. 2009), *aff'd*, 616 F.3d 53 (1st Cir. 2010) (In the years post-*Pico*, the Supreme Court clarified "that when the State is the speaker it can decide the content of its message," and public-school curriculum "is a fully protected form of state speech.").

13

And Courts now hold that a First Amendment forum analysis is inapt for libraries, school-sponsored speech, classroom instruction, and textbooks removed from curricula. *See id.* at 63; *Chiras*, 432 F.3d at 616; *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993); *see also U.S. v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205–207 (2003); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267–273 (1988).

This Court must read *Pico* and *Pratt* in concert with those later developments—especially the government speech doctrine—and apply them cautiously to state-level education regulations.

The Library Program is a constitutional regulation of government speech. It does not regulate private speech. Much of the district court's analysis was misguided because it assessed the law under the wrong framework. The court's overbreadth and due-process-vagueness analyses also missed the mark.

Even if this Court decides not to apply the government-speech doctrine and instead adopts a different standard, SF496 survives those levels of scrutiny, too. The alternative standards are discussed below. They include (1) the *Pico* plurality's dated approach to a school board's library book removal; (2) *Pratt's* textbook removal standard; (3) the school-sponsored speech standard from *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267–273 (1988); and (4) the nonpublic forum standard.

The district court found that the Instruction Section violated due process by inviting arbitrary enforcement. But the court improperly construed the SF496 to entail absurdities the text did not require.

Finally, the injunction was improper. Analyzed under the right standard, SF496 satisfies constitutional scrutiny. Plaintiffs have no likelihood of success on the merits.

But the district court's assessment of the law also required this result. The court admitted the level of scrutiny is "unclear" under current precedent. So the court could not have determined Plaintiffs' likelihood of success. Plaintiffs also waited six months to litigate—that counsels against their alleged irreparable harm. And the balance of equities and public interest favor SF496's policies. The district court abused its discretion by improperly thwarting Iowa's presumptively valid democratic process.

# ARGUMENT

## I. The Library Program is Constitutional when Reviewed under the Proper Analytic Framework.

SF496 is constitutionally sound under the First and Fourteenth Amendments. The district court read SF496 as though it were a direct, private-speech regulation. That was wrong. The court's novel *Miller*-obscenity-light standard is misguided. The correct framework must account for the government speech doctrine and other post-*Pico* developments in the First Amendment. Importantly, SF496 does not trigger the Free Speech Clause, because it regulates government speech, not private speech.

*Standard of review.* Courts review injunction orders for an abuse of discretion. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008). They review constitutional issues de novo. *Escudero-Corona v. I.N.S.*, 244 F.3d 608, 614 (8th Cir. 2001).

### A. The government speech doctrine properly frames the First-Amendment issues here.

School library curation lies at the intersection of four streams of recent First-Amendment jurisprudence. First, the government speech doctrine that courts now regularly apply applies to public schools. Second, courts now hold the government speech doctrine protects the government's editorial discretion over the third-party speech it compiles to shows the public. Third, courts now hold that citizens may not use their

16

"right to receive information" under the First Amendment as a sword to control government speech. And fourth, courts now recognize that a First Amendment forum analysis is inapt for the public library context. And any expectation of heightened scrutiny is lessened where the government must have wide discretion over material it furnishes to the public.

Government-speech principles apply more forcefully to school libraries where young children have diminished First Amendment rights. *Pico* and *Pratt* predate later jurisprudential developments teasing that out. So this Court should either revise their standards or construe them in favor of the State's discretion to regulate school libraries.

Otherwise, book publishers and students will unsheathe their sword to control government speech with a never-adopted-by-the-Supreme-Court right to receive information through school library books. That is not the law. And this case illustrates why: Iowa is now powerless to require schools to remove books that describe or visually depict "the use of artificial sex organs" or penises penetrating "into the vagina or anus." The First Amendment does not compel that strange result.

1. **The government-speech doctrine protects the government's role as communicator, and it applies to public schools.**

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). Under the government

speech doctrine, "a government entity has the right to 'speak for itself.'" *Id.* (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). "It is entitled to say what it wishes." *Id.* (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)). Viewpoint neutrality does not constrain government speech, because "it is the very business of government to favor and disfavor points of view." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring in judgment). "When the State is the speaker, it may make content-based choices." *Rosenberger*, 515 U.S. at 833.

When State funded and operated public schools speak that is government speech. Courts do not "question the right of public universities to make academic judgments" about how to best allocate scarce resources." *Rosenberger*, 515 U.S. at 833 (quoting *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)). And "when the University determines the content of the education it provides, it is the University speaking," and courts "have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Id.*

Public officials may require what curriculum "will be taught in public school classrooms," and "doing so is a form of government speech, which is not generally subject to First Amendment scrutiny." *Griswold*, 625 F.Supp.2d at 54. They can decide "what should be taught . . . to prepare students for citizenship," and "there is no requirement that such

government speech be balanced or viewpoint neutral." *Id.* "The selection and use of textbooks in public school classrooms constitutes government speech." *Chiras*, 432 F.3d at 616. "Except in limited circumstances, decisions concerning what should be taught must be made by state and local school boards rather than by federal judges." *Id.*

Even when school employees speak under "their official duties," the Free Speech Clause does not protect them, "because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). And even student speech "may fairly be characterized as part of the school curriculum," when the public "might reasonably perceive it to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271.

> **2. The government has editorial discretion over the third-party speech it shows to the public, and this is government speech.**

The State does not trigger the Free Speech clause when it communicates its own message. That is because the State speaking impairs no one's First Amendment Rights. And that principle extends to compilations of third-party speech that government presents to the public.

Government speech can take various forms. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005) ("The government may . . . run museums, libraries, television and radio stations, primary and secondary schools, and universities."). When

speaking, the government may engage "in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech." *Id.* That is because "the First Amendment Free Speech Clause does not limit the government as speaker." *Id.* (citing *Rosenberger*, 515 U.S. at 833).

Likewise, when the government "compiles the speech of third parties"—such as building and stocking a library—that is a "communicative act." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). That includes "editorial discretion in the selection and presentation of" third-party speech the government shows the public. *Gittens*, 414 F.3d at 30 (quoting *Forbes*, 523 U.S. at 674). One circuit noted in an aside about public libraries that "the government speaks through its selection of which books to put on the shelves and which books to exclude." *Gittens*, 414 F.3d at 29. That must be even truer when considering public *school* libraries.

### 3. The Free-Speech Clause does not enable citizens to control the content of government speech.

The First Amendment does not give Plaintiffs the ability to tell the State what it can and cannot say. *See Dean v. Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021). Their asserted "right to receive information" is reciprocal to the speaker's "right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015). But that reciprocal right does not attach to government speech, because the State has plenary authority

over its own message. *See Summum*, 555 U.S. at 467. When a State "devises the state curriculum" and "selects the textbooks" the teachers will use, "it is the state speaking, and not the textbook author." *Chiras*, 432 F.3d at 614. Thus there is no paired right to receive any message other than what the State says.

Plaintiffs may not wield a "reciprocal right" to control school library inventory. *See Warren*, 12 F.4th at 1264; *see also Keeton v. Anderson Wiley*, 644 F.3d 865, 877 (11th Cir. 2011). That inventory is the government's compilation of third-party speech—a communicative act that the government speech doctrine protects. *Forbes*, 523 U.S. at 674.

Requiring the State to commission books for its schools would be an absurd limitation on the ability for a school to decide its curriculum. That is why, although a state may use "private textbook authors, it does so to facilitate transmission of its own approved message, not a message of the authors' choosing." *Chiras*, 432 F.3d at 616. Students likewise have "no constitutional right to compel school boards to select curricular materials of their choosing." *Id.* at 620.

Plaintiffs' First Amendment approach would prohibit the State from communicating its own message or regulating curricular standards. And simultaneously Plaintiffs would empower authors, publishers, and students to control school library inventory. But "the First Amendment works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the

government to speak for them." *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023). Such an approach is inconsistent with allowing elected officials to control the curriculum and what information is available to students.

### 4. A forum analysis does not apply to public libraries or government speech.

A forum analysis under the First Amendment is "incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Am. Libr. Ass'n*, 539 U.S. at 205. Forum principles do not apply to the "exercise of judgment in selecting the material the library provides to its patrons." *Id.* at 205. Public library staff must "necessarily consider content in making collection decisions." And that requires them to have "broad discretion." *Id.* Courts in this circuit follow this rule. *Gember v. City of Lincoln, Neb.*, 2007 WL 2904091, at *2 (D. Neb. Sept. 26, 2007) (quoting *Am. Lib. Ass'n*, 539 U.S. at 205).

The State's discretion over content-based judgments is not subject to a forum analysis when that exercised discretion is government speech. For example, forum principles seldom apply to public television stations' discretion to make content-based judgments about what they present to the public. *Forbes*, 523 U.S. at 672. The Supreme Court holds, "broad rights of access for outside speakers would be antithetical . . . to the discretion that public stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations." *Id.* at 673. Likewise,

a National Endowment of the Arts funding program did not violate the First Amendment despite having content-based criteria for funding decisions. *Finley*, 524 U.S. at 569. A forum analysis was unnecessary there because of the "inherently content-based 'excellence' threshold" required for the funding. *Id.* at 568.

In *American Library Association*, the United States Supreme Court extended *Forbes* and *Finley*'s rationale to public libraries and their "exercise of judgment in selecting material they provide to their patrons." 539 U.S. at 205 (plurality op.) (cleaned up). "Just as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Id.*

*American Library Association* upheld the "Child Internet Protection Act," which addressed "problems associated with the availability of internet pornography in public libraries." *Id.* at 198–99. That Court held a forum analysis would be "out of place." *Id.* at 205. The plurality also rejected heightened scrutiny and explained a "library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak." *Id.* at 206. Because the library's internet access was "no more than a technological extension of the book stack," heightened scrutiny did not apply. *Id.* at 207.

This Circuit follows suit. In *Knights of Ku Klux Klan v. Curators of the Univ. of Missouri*, a not-for-profit public radio station rejected a financial gift from the KKK, because the station operated under an "enhanced underwriting program" that required it to broadcast acknowledgements of their donors. 203 F.3d 1085, 1088 (8th Cir. 2000). Applying *Forbes*, this Court upheld the station's rejection, holding that "forum requirements are for the most part inapplicable" when broadcasters have "substantial discretion . . . over the daily operation of their stations." *Id.* at 1093, 1096. But another basis also supported the station's act: "first and foremost, the station's underwriting acknowledgements constitute governmental speech." *Id.*

The Supreme Court recently reaffirmed the principle that government speech is not assessed under a forum analysis. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (rejecting a challenge to Texas's specialty license plates, holding they were "meant to convey and have the effect of conveying a government message").

As to school contexts, courts recognize that (1) educational institutions have "the discretion to promote policies and values of their own choosing free from forum analysis or viewpoint-neutrality requirements," and (2) they "retain this discretion even where it chooses to employ private speakers to transmit their message." *Chiras*, 432 F.3d at 613. So when the State exercises "editorial judgment in choosing among private

speakers to facilitate the its own message, the State's decision is not subject to forum analysis or the viewpoint neutrality requirements." *Id.* at 613, 615.

### 5. These Principles apply with greater force to school libraries.

The First Amendment allows States to protect children from "offensive expression" to better support "parents' claim to authority in their own household." *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978). States may even regulate speech that is "indecent but not obscene" when it can reach a minor audience. *Id.* at 729. Students in a school environment do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969). But the "First Amendment Rights of students in the public school 'are not automatically coextensive with the rights of adults in other settings.'" *Hazelwood*, 484 U.S. at 266 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).

Even when regulating private speech, the Supreme Court limits "the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 684. The State shares with parents "the obvious concern . . . to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." *Id.*

Those standards apply even when a law triggers the free-speech clause. So the State may protect children from "indecent," "offensive," "lewd," or "sexually explicit" content when the challenged law does not trigger the free speech clause. And government speech does not trigger that clause. *Summum*, 555 U.S. at 467.

So federal courts may not "intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Indeed, "public education in our Nation is committed to the control of state and local authorities." *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507 (1969). State authorities have broad discretion "in the field of public education," which encompasses "the authority to establish public school curricula" to accomplish "the states' educational objectives." *Chiras*, 432 F.3d at 611.

### 6. SF496 survives scrutiny under even *Pico* and *Pratt*.
### i. Even *Pico*'s fractured decisions support SF496.

*Pico* sets no binding standard. Indeed, the Eleventh Circuit explained that *Pico* is "a badly fractured decision" that has "no precedential value as to the application of the First Amendment as to these issues," and it "establishes no standard" for future courts. *ACLU of Fl., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199–1200 (11th Cir. 2009) ("*Pico* is a non-decision so far as precedent is concerned") (quotations omitted).

Yet even *Pico*'s limited guidance—along with the few unanimous parts of the decision—allows Iowa to remove sexually explicit content from school libraries. *Pico* assessed whether the First Amendment limited local school boards' discretion to remove library books from high school and middle school libraries. *Pico*, 457 U.S. at 855–56 (1982). The Court struggled to determine the nature of the First Amendment right at issue, which resulted in seven opinions led by a three-Justice plurality. *See id.* Ultimately, those three Justices created a right-to-receive under the First Amendment that it has never fully adopted.

While admitting "local school boards have broad discretion in the management of school affairs," *Pico*'s plurality found that book removal on narrowly partisan grounds can invade students' First Amendment "right to receive information." *Id.* at 863, 866–67, 870. The plurality recognized schools' "absolute discretion in matters of curriculum" because of their "duty to inculcate community values," but distinguished this from "wholly optional" library materials that provide students the "opportunity at self-education and individual enrichment." *Id.* at 869.

Schools thus have "significant discretion to determine the content of their school library," but it "may not be exercised in a narrowly partisan or political manner." *Id.* at 870. And *Pico* set a low bar for a State to justify removing inappropriate books. It explained "that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal

to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (quoting *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943)).

*Pico* feared the specific scenario in which "a Democratic school board, motivated by party affiliation" could order "the removal of all books written by or in favor of Republicans." *Id.* at 871. Likewise, "an all-white school board, motivated by racial animus," could "remove all books authored by blacks or advocating racial equality and integration." So the plurality adopted a guiding principle that disallowed suppressing partisan ideas. *Id.* at 871.

*Pico* would forbid book removal if the school board's intent to suppress ideas was the "decisive factor in the" board's decision. *Id.* But a decision to remove books that "were pervasively vulgar" would not violate *Pico*—nor would a decision based on "the 'educational suitability' of the books in question." *Id.* Indeed, under *Pico* those removals are "perfectly permissible." *Id.*

Separate opinions in *Pico* sharply divided over many issues, including the plurality's threshold recognition of a special "right to receive" ideas in the context of a school library. *See id.* at 910–920 (Rehnquist, C.J., dissenting). But the Court unanimously agreed that schools must have considerable authority to determine curriculum and library inventory; and schools must retain the power to remove library material that is vulgar and educationally unsuitable. *Id.* at 859–860, 869, 71, 883, 890.

### ii. *Pratt* does not apply and even if it did SF496 passes its standard.

The district court also relied on *Pratt* despite *Pratt* being distinguishable, predating *Pico*, and predating the relevant government speech doctrine jurisprudence. *Pratt* concerned the removal of a film from school curriculum rather than books from the school library. *Id.* at 773. And evidence showed the school board intended to suppress the ideas contained in the film due to objections to the film's religious and ideological content. *Id.* The case offers little help in evaluating a statute that regulates educational standards by mandating removal of sexually explicit material from school libraries.

Yet *Pratt* acknowledged that "public education in our Nation is committed to the control of state and local authorities." *Pratt*, 670 F.2d at 775 (quoting *Epperson*, 393 U.S. at 104). And "courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems that do not directly and sharply implicate basic constitutional values." *Id.* (quoting *Epperson*, 393 U.S. at 104).

*Pratt* recognized the narrow rule that "the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Id.* at 776. *Pratt* held the students there "had a right to be free from official conduct that was intended to suppress the ideas expressed" in the removed film. *Id.*

*Pratt* described a two-prong approach: first, a school board's challenged action must "sharply implicate basic constitutional values;" *id.* at 775 (quoting *Epperson*, 393 U.S. at 104); if the action fails under that prong, then second, "the board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Id.* at 777.

This Court found that the board's decision in *Pratt* failed the first prong, because opponents of the film focused on its religious and ideological impact, and the board—acting "obviously in response to the citizens' objections"—failed to give "any reasons for its action" when it removed the film. *Id.* And because the board did not "act so that the reasons for its decision were apparent to those affected," it could not make a showing under the second prong to uphold the removal. *Id.* So the record showed that the "board eliminated the films . . . because the majority of the board agreed with those citizens who considered the films' ideological and religious themes to be offensive." *Id.* at 778.

This case does not involve suppression of religious or ideological viewpoints; it involves a statute that keeps sex acts out of school libraries without any regard for politics or religion.

### iii. *Pico* and *Pratt* are procedurally distinguishable.

Both *Pico* and *Pratt* assessed decisions by local school boards, not State laws that govern educational standards. But neither dealt with materials that those school boards had determined were inappropriate for

students. And *Pratt* did not involve books at all. Because their analyses do not naturally extend to this challenge to a State regulation, this Court should follow those cases cautiously.

As *Pratt* acknowledged, when school boards remove materials from a school curriculum, the "board must act so that the reasons for its decision are apparent to those affected." *Id.* This is like a findings-of-fact, conclusions-of-law requirement. *Id.* Such requirements apply when local tribunals act in a quasi-judicial capacity. *Montgomery v. Bremer County Board of Supervisors*, 299 N.W.2d 687, 694 (Iowa 1980) (discussing quasi-judicial action and written findings requirements). Explicit findings and conclusions presuppose a particular evidentiary environment—both in the creation of the record, and in the board's explanation of the reasons for its action. *See id.* That evidentiary framework allows a reviewing court to then conduct the subjective-motivations analysis to determine whether a board's action was motivated by an intent to suppress ideas. *See, e.g.*, *Pico*, 457 U.S. at 871. But there is normally no requirement to produce "legislative facts as a precondition to legislative action." *Montgomery*, 299 N.W.2d at 694. So a *Pico/Pratt* standard furnishes little guidance when evaluating State-level legislation that governs educational standards.

Even if these Plaintiffs—or any future plaintiff—believes that a given book is improperly removed from a school library the proper course is first to try to work with the school to remedy the dispute and then to

seek an as-applied remedy in courts. A facial challenge to a State law that removes much age-inappropriate materials from the shelves is improper, even if some schools improperly remove some books.

### 7. The Library Program passes any reasonably applied standard.

This Court does not have on-point precedent as to what standard should review SF496, but SF496 passes all available options that could apply.

The Court should review SF496 as a pure government-speech regulation—which does not trigger the free speech clause—and uphold it as rationally advancing a legitimate state interest while not overstepping other constitutional boundaries.

But if this Court declines to apply the government speech doctrine, then it should follow a two-part inquiry into the Library Program's constitutionality: first, the regulation must "sharply implicate basic constitutional values;" and, if it does, this Court must apply the applicable standard. *See Epperson*, 393 U.S. at 104; *Griswold*, 625 F.Supp.2d at 49. Although there is no uniform guidance on what that standard would be, there are several contenders from analogous contexts: the *Pico* "standard," the *Pratt* standard, the *Hazelwood* standard, and the nonpublic-forum standard.

A state law that forbids public schools from providing books with precisely defined "sex acts" to school-aged children satisfies any of these standards.

### i. SF496 regulates pure government speech and should be reviewed under the lowest standard.

The above shows how developments in the government speech doctrine have changed the First Amendment landscape. Questions about school-library curation must now be analyzed with updated precedent and fresh presuppositions unavailable when *Pico* and *Pratt* were decided.

SF496 regulates government speech. When an act "is clearly government speech based on the principles applied by the Supreme Court in *Rust*, *Rozenberger*, *Forbes*, *Finley*, and *ALA*," no elaborate multifactor test applies to determine whether it is government speech. *Chiras*, 432 F.3d at 618. Library curation involves government discretion over the selection and removal of third-party speech provided to a minor audience. That is government speech. *See id.* "The government speaks through its selection of which books to put on the shelves and which books to exclude." *Gittens*, 414 F.3d at 29.

Because the Age-Appropriate Standard regulates government speech, it does not trigger the Free Speech clause. *Summum*, 555 U.S. at 467. It "is not generally subject to First Amendment scrutiny." *Griswold*, 625 F.Supp.2d at 54. SF496 reasonably advances the State's legitimate goal of keeping sexually explicit content away from children in public

school libraries. Indeed, the U.S. Supreme Court holds that protecting the young from inappropriate material "is legitimate, and even compelling." *Am. Libr. Ass'n*, 539 U.S. at 215 (Kennedy, J., concurring).

Although SF496 does not trigger the Free-Speech clause, the State's power in this domain is not boundless. Like any State law, government speech regulations must be rationally related to legitimate governmental objectives. They cannot be arbitrary or capricious. And they cannot overstep other constitutional boundaries, "such as the Establishment Clause, the Free Exercise Clause, the Equal Protection Clause, and substantive due process." *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 934 (10th Cir. 2002). Other doctrinal constraints apply as well. For example, government speech cannot compel private speech or restrict student expression unless it "'materially and substantially interfered with the requirements of appropriate discipline in the operation of the school.'" *Griswold*, 625 F.Supp.2d at 60 (quoting *Tinker*, 393 U.S. at 505).

Under rational basis review for government speech the Library Program and Age Appropriate standard are both constitutional and enforcement of neither should be enjoined.

### ii. Even if SF496 implicates the Free Speech Clause, it prevails at the threshold step of the analysis.

If this Court rejects the government-speech doctrine and moves on to assess SF496's constitutionality under the First Amendment, its first step should consider whether the law "directly and sharply implicates

basic constitutional values." *Epperson*, 393 U.S. at 104; *Pratt*, 670 F.2d at 775. But the alleged right here does not implicate basic constitutional values. *Pico* could not agree whether a right to receive even exists. "'The right to receive information and ideas' . . . does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Pico*, 457 U.S. at 888 (Burger, C.J., dissenting) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). And "the government does not 'contract the spectrum of available knowledge.'" *Id.* (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)). Indeed, "it is perfectly clear that, unwise as it would be, a school board could wholly dispense with the school library, so far as the First Amendment is concerned." *Id.* at 887 n.3.

*Pico*'s plurality suggested "the government through its schools must be the courier" of an author's message. *Id.* at 887. But "it does not follow . . . that a school board must affirmatively aid the speaker in his communication with the recipient." *Id.* And subsequent law clarified that neither authors nor students may wield a right-to-distribute or a right-to-receive to compel government speech. *See Warren*, 12 F.4th at 1264; *Keeton*, 644 F.3d at 877; *Chiras*, 432 F.3d at 615; *see also Gundy*, 50 F.4th at 71 (holding "the First Amendment works as a shield to protect private persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them").

Even if SF496 reached a constitutional right, Plaintiffs cannot show the law "directly and sharply implicates" it. Indeed, "the ready availability of the books elsewhere" is "the most obvious reason" that library book removal does not violate a right to receive information. *Id.* at 915 (Rehnquist, J., dissenting). "The government as educator does not seek to reach beyond the confines of the school." *Id.* And where a book's "contents are fully accessible to any inquisitive student" elsewhere, its removal from a public-school library does not sharply implicate a right to receive information. *See id.*

Finally, students have diminished First Amendment expectations in school. States may ban speech that is "sexually explicit" where "the audience may include children." *Fraser*, 478 U.S. at 684. And States may ban speech that is "indecent but not obscene." *FCC*, 438 U.S. at 749. No basic constitutional value safeguards a student's right to receive descriptions or visual depictions of sex acts in public school libraries.

### iii.   SF496 survives a nonpublic-forum-like analysis.

A forum analysis "and heightened judicial scrutiny are incompatible . . . with the discretion that public libraries must have to fulfill their traditional missions." *Gember*, 2007 WL 2904091, at *2 (quoting *Am. Lib. Ass'n*, 539 U.S. at 205). The above shows it is less apt for school libraries. Yet even if school libraries are nonpublic fora, SF496 survives under that standard.

In a nonpublic forum, content-based restrictions are permissible and need only be reasonable and viewpoint neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Keeping "sex acts" out of school libraries is reasonable given the purpose of the forum, where school libraries support the education of Iowa's youth. *Hazelwood*, 484 U.S. at 266 ("applying scrutiny in light of the special characteristics of the school environment (quoting *Tinker*, 393 U.S. at 511)).

And nothing in SF496 requires removal of library books because of viewpoint. Books including "sex acts" are removed regardless of the author's viewpoint or the ideas they express. SF496 passes a nonpublic forum analysis. If this Court chooses not to apply the government speech doctrine and applies a standard like that of a nonpublic forum, it should find that SF496 is viewpoint-neutral, and affirm its Constitutionality.

### iv.    SF496 survives a standard following *Hazelwood*.

SF496 is unlike the school-sponsored student speech in *Hazelwood*, yet it is "reasonably related to legitimate pedagogical concerns," so it passes a *Hazelwood*-like test.

*Hazelwood* involved a school's removal of articles from a school newspaper that concerned "students' experiences with pregnancy" and "the impact of divorce on students at the school." 484 U.S. at 263. *Hazelwood* held that educators may exercise editorial control over school-sponsored student speech that "the public might reasonably perceive to bear the imprimatur of the school" in a nonpublic forum "so long as their

actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

Some courts question where *Hazelwood* applies. *See*, *e.g.*, *Chiras*, 432 F.3d at 615–17. The Fifth Circuit held that *Hazelwood* does not apply to curriculum selection, because "the selection and use of textbooks in the public school classrooms constitutes government speech." *Id.* Although the Eleventh Circuit used to apply *Hazelwood* to textbook removal—*Virgil v. Sch. Bd. of Columbia County*, 862 F.2d 1517, 1521 (11th Cir. 1989)—that case predated "*Rust*, *Rosenberger*, *Forbes*, *Finley*, and *ALA*," and so did not benefit from later clarity on "the government's authority over its own message," even when "it speaks through its own employees or through a private party." *Chiras*, 432 F.3d at 617. And more recently, the Eleventh Circuit did not materially rely on *Virgil* in upholding a school board's "educational suitability criteria" in a library book removal case but distinguished it. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1219–1220, 1221 (11th Cir. 2009).

SF496 regulates educational standards to advance a legitimate goal—schools may restrict sexually explicit or indecent speech to shield children from inappropriate material and affirm the parent's role in their education. *FCC*, 438 U.S. at 729, 749. SF496 is "reasonably related to legitimate pedagogical concerns," and passes a *Hazelwood*-like test.

To the extent this Court wants to go one step further than finding school libraries are a nonpublic forum, *Hazelwood* is the most reasonable

rule to assess SF496 and this Court should vacate the preliminary injunction because even under *Hazelwood* it survives.

### v. SF496 survives a standard enacting *Pico*'s plurality.

Even if the court followed a *Pico*-plurality-like standard, SF496 satisfies it. The above shows that the subjective-motivations analysis does not apply to legislative action, especially at the state level. The other *Pico* factor, then, was that schools may not remove books "in a narrowly partisan or political manner"—like "a democratic school board" removing "all books written by or in favor of republicans." *Pico*, 457 U.S. at 870–71. But there is nothing partisan or political about an educational standard that requires the removal of books that describe or visually depict a penis penetrating a mouth or anus. The Supreme Court holds schools may restrict such speech anyway. *Fraser*, 478 U.S. at 684; *FCC*, 438 U.S. at 729.

### vi. SF496 survives a standard reviving *Pratt*.

Even if the court followed a *Pratt*-like standard, SF496 satisfies it. *Pratt* held a school must show that "a substantial and reasonable governmental interests exists for interfering with the students' right to receive information" if the school implicates "a basic constitutional value." *Pratt*, 670 F.2d at 777. In essence, *Pratt* followed the rule that "the first amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Id*. at 776. *Pratt*'s

overarching concerns were school boards targeting—and suppressing—religion and ideology. *Id.*

Those concerns are not present here. A law that requires schools to remove books with "sex acts" imposes no religious doctrine or ideological viewpoint. The Legislature enacted a law that withholds sexually explicit materials from children, regardless of their faith commitments or ideological preferences. And shielding children from that smut is a substantial governmental interest. *Fraser*, 478 U.S. at 684; *FCC*, 438 U.S. at 729.

To the extent *Pratt* limits the ideological or religious removal of materials to school libraries—and to the extent *Pratt* is extended to books—this more limited and nonpartisan limiting to Age Appropriate materials should survive *Pratt* scrutiny. *Pratt*, 670 F.2d at 773.

## B. Many errors followed from the injunction's analytic misstep.

Because the district court created a new framework to analyze SF496 that differs from Supreme Court and this Court's precedents, much of its ruling was off target. Its core problem was reviewing SF496 like a private speech regulation—instead of a government speech regulation—and adopting a modified *Miller* analysis. Those missteps carried over into its overbreadth and vagueness analyses, too.

1. **The district court's First Amendment approach missed the mark.**

    i. **A *Miller* obscenity standard is inappropriate here.**

*Miller v. California*'s limit on regulating obscenity is unworkable in many school contexts. 413 U.S. 15 (1973). That is likely why, although both post-dated *Miller*, neither *Pico* nor *Pratt* cited to it. That is because *Miller* is used to review laws that regulate private speech. *Miller*, 413 U.S. at 18–19. It does not regulate government speech, and courts do not impose its burdens on schools where children have diminished First Amendment rights.

The Supreme Court has disclaimed a contextual obscenity review for some contexts involving minor audiences. In *FCC v. Pacifica Foundation*, the Supreme court upheld the Federal Communications Commission's regulation of public radio broadcasts that were "indecent but not obscene" when those broadcasts could reach a minor audience. 438 U.S. at 729–730, 748–49. That case concerned public broadcast media, which the court observed to have a "uniquely pervasive presence" in Americans' lives while also being "uniquely accessible to children." *Id.* at 748–49. The court did not apply a special obscenity standard given that accessibility. *See id.*

*Pacifica Foundation*'s reasoning applies with greater force schools. Children in school are not the potential recipients of "indecent but not obscene" material on school libraries' shelves; they are the target

audience. Children have diminished First Amendment rights in schools, and schools may "protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." *Fraser*, 478 U.S. at 684.

Schools must often censor otherwise "protected" speech. In *Bethel Sch. Dist. No. 403 v. Fraser*, the Supreme Court upheld disciplining a high school student for giving a lewd speech at a school assembly. 478 U.S. at 684. The Court acknowledged the interest of "protecting minors from exposure to vulgar and offensive" speech, which may be regulated when it is "indecent but not obscene." *Id.* at 684 (quoting *FCC*, 438 U.S. at 729).

Practically, schools cannot assess every indecent, lewd, violent, or otherwise inappropriate speech under *Miller*. For example, students now use school-issued laptop computers, and schools heavily regulate their use. Under the district court's legal theory, the State could not pass a law requiring schools to forbid students' access to violent, sexually explicit, or otherwise age-inappropriate material on those computers, unless the school first analyzed every website or game blocked to determine whether it lacked "serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24.

That is unworkable. Indeed, under the district court's approach, the State could not require the removal of Playboy magazines from a school library if a school board acknowledged some of their articles had literary

merit. Even *Pico* did not go so far—"All members of the Court in *Pico*, otherwise sharply divided, acknowledged that the school board has the authority to remove books that are vulgar." *Fraser*, 478 U.S. at 648 (citing *Pico*, 457 U.S. at 871–72).

ii. **The district court's creative approach fails to grapple with binding precedent.**

The district court supported its "obscenity-light" standard with inapposite authority. None of *Ginsberg*, *Erznoznik*, *Reno*, or *Brown* apply. None of those cases involved public school regulation, government speech regulation, or even school-sponsored speech regulation. All of them concerned laws that directly regulated private speech.

*Ginsberg v. State of New York* concerned a criminal law that prohibited bookstores from selling certain books to minors and found that law constitutional. 390 U.S. 629, 631 (1968). It addressed the narrow issue of whether the constitution allowed New York to "accord minors under 17 a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see." *Id.* at 637–38. Before *Miller*, the Court concluded the statute did not "invade the area of freedom of expression constitutionally secured to minors." *Id.* at 637. The case even recognized "that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Id.* at 639. And the Court recognized that "the state also has an independent interest in the well-being of its youth." *Id.*

at 640. The parents elected the Legislature that enacted SF496—a law intended to protect children.

*Erznoznik v. City of Jacksonville*, concerned a city ordinance that prohibited drive-in movie theaters from showing films with nudity, punishing the offense as a criminal nuisance. 422 U.S. 205, 206–207 (1975). But the ordinance "sweepingly forbade all films containing any uncovered buttocks or breasts," extending even to "a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous." *Id.* at 213. So even though it was "well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths," the ordinance swept too broadly. *Id.* at 212.

*Reno v. American Civil Liberties Union*, concerned two federal statutes that criminalized the knowing transmission of "'indecent' and 'patently offensive' communications on the Internet." 521 U.S. 844, 849 (1997). The statute threatened private persons "with penalties including up to two years in prison for each act of violation." *Id.* at 871–82. The Court observed the statute involved in *Ginsberg* was narrower and so distinguishable. *Id.* at 865. The terms "indecent" and "patently offensive" were undefined. *Id.* They were not bound by the full obscenity standard that applies to private speech regulations. *Id.* at 872–73. And the statutes even had diverging "linguistic forms" that made them more ambiguous. *Id.* at 870–72. So although the Court "has repeatedly recognized the governmental interest in protecting *children* from harmful materials . . .

that interest does not justify an unnecessarily broad suppression of speech addressed to *adults*." *Id.* at 875 (emphasis added).

*Brown v. Entertainment Merchants Association* concerned a State law that prohibited "the sale or rental of 'violent video games' to minors, and required their packaging to be labeled '18.'" 564 U.S. 786, 789 (2011). It created a new speech regulation category applying only to minors, which had a saving clause that would exempt games with "serious literary, artistic, political, or scientific value." *Id.* It also included a civil penalty of up to $1,000 for a violation. *Id.* The Court granted that the "State possesses legitimate power to protect children from harm," but the power to do so by regulating private speech does not allow suppression of "ideas or images that a legislative body thinks unsuitable for them." *Id.* at 794–95 (quoting *Erznoznik*, 422 U.S. at 213–14). The law there was "seriously underinclusive" and "seriously overinclusive" at the same time, despite advancing the legitimate aims of "addressing a serious social problem" and "helping concerned parents control their children." *Id.*

None of those cases support applying *Miller* to school libraries or curriculum. An "obscenity-light" standard for public school regulation is novel—neither the district court nor Plaintiffs have pointed to a case that takes that approach before. This Court should instead apply the modern government speech doctrine to assess SF496's constitutionality.

### 2. The Library Program is neither overbroad nor vague in violation of due process.

By applying an improper framework, the district court concluded SF496 violated Plaintiffs' First Amendment right to be free from overbroad restrictions. App. 1090, R. Doc 56, at 25. The court held the law was overbroad because the Legislature did not incorporate its preferred *Miller*-obscenity-light standard. App. 1101, R. Doc. 56, at 36. The above shows that was wrong.

As to the Publisher-Author Plaintiffs, the court misinterpreted SF496 and applied the wrong framework to conclude enforcement must be enjoined. A court may set aside a law that violates the First Amendment "as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. St. Grange v. Wash. St. Repub. Party*, 552 U.S. 442 449 n.6 (2008)). But SF496 regulates government speech, not private speech. So it does not trigger the Free Speech clause, and it has no swath of unconstitutional applications. Even if it did, there are millions of books and at most hundreds of books removed from shelves. There is no likelihood of success on the merits at this stage that justifies enjoining the Library Program.

Plaintiffs also cannot wield a right-to-distribute to compel government speech—not even with the overbreadth doctrine. *See Warren*, 12

F.4th at 1264; *Keeton*, 644 F.3d at 877; *Chiras*, 432 F.3d at 615; *see also Gundy*, 50 F.4th at 71 (First Amendment is a shield not a sword).

In a similar context, courts acknowledge that "the state may utilize private textbook authors," but "it does so to facilitate transmission of its own approved message, not a message of the authors' choosing." *Chiras*, 432 F.3d at 616. Permitting a government-speech work-around via over-breadth to permit authors and publishers to control school library inventory makes no sense.

That aside, the Age-Appropriate Standard is not "staggeringly over-broad;" it is precise. And that precision defeats the Educators' due-process vagueness claim, too. The district court read the phrase "sex acts" in an illogical way to find its application overly broad. But forbidding "descriptions and visual depictions" of the "use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus," is not over-broad. SF496 incorporated the definition of "sex acts" from the existing criminal statute. *See* Iowa Code § 702.17. No other court interpreting that statute has viewed its definition of "sex acts" as overly broad in violation of the First Amendment or vague in violation of due process.

Indeed, overbreadth and vagueness challenges to Iowa Code section 702.17 have failed in Iowa courts. *See*, *e.g.*, *State v. Whetstine*, 315 N.W.2d 758, 764 (Iowa 1982) (finding Iowa Code section 702.17 "constitutionally definite," "giving a person of ordinary intelligence fair notice of what is prohibited, and providing an explicit standard for those who

apply it"); *State v. Anderson*, 2005 WL 3115469, at *6–7 (Iowa Ct. App. 2005) (finding section 702.17 was "not unconstitutionally vague or overbroad," so "trial counsel did not fail in an essential duty by not raising the challenge.")

The district court here stands alone in his assessment of the "sex acts" statute and thus its identical language in SF496. The Library Program does not fail to "provide adequate notice of the proscribed conduct" or lend "itself to arbitrary enforcement." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023). The preliminary injunction should be vacated for further proceeding at the district court— under the proper government-speech doctrine framework.

## II.   The Instruction Section of SF496 violates neither the Due Process clause nor the First Amendment.

*Standard of review.* Courts review injunction orders for an abuse of discretion. *Rounds*, 530 F.3d at 733. They review constitutional issues de novo. *Escudero-Corona*, 244 F.3d at 614.

* * *

The district court found the Instruction Section was also "staggeringly broad," and so invited arbitrary enforcement. But the court adopted the most extreme construction of the statute possible, where even a passing reference to a pronoun necessarily triggered a violation. But that is not the law. And SF496 is definite enough to pass constitutional muster.

The Instruction Section was titled "Sexual orientation and gender identity – prohibited instruction." SF496 § 16 (Iowa Code § 279.80). It forbids teaching elementary schoolers about sexual orientation and gender. *Id.* It prohibits school districts from providing "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students" in those grades. *Id.* And it adopts the definitions of "gender identity" and "sexual orientation" from the Iowa Civil Rights Act. Iowa Code § 216.2. ICRA defines "Gender identity" as "a gender-related identity of a person, regardless of the person's assigned sex at birth." Iowa Code § 216.2(10). It defines "sexual orientation" as "actual or perceived heterosexuality, homosexuality, or bisexuality." *Id.* § 216.2(14).

A law is unconstitutionally vague if it fails to "provide adequate notice of the proscribed conduct" and lends "itself to arbitrary enforcement." *Parents Defending*, 83 F.4th at 668 (*United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009)). Statutory terms may not be "so vague that persons of common intelligence must necessarily guess at the meaning of the regulation and differ as to its application. *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308–09 (8th Cir. 1997). And the statute may not impermissibly delegate "basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

Although First Amendment vagueness "demands a greater degree of specificity than in other contexts," "school disciplinary rules need not be as detailed as a criminal code that imposes criminal sanctions." *Parents Defending*, 83 F.4th at 668 (quoting *Stephenson*, 110 F.3d at 1308–09). So "a lesser standard of scrutiny is appropriate because of the public school setting," while "a proportionally greater level of scrutiny is required" when "the regulation reaches the exercise of free speech." *Id.* (quoting *Stephenson*, 110 F.3d at 1308–09).

But "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Even where regulations are "flexible," officials may implement them with "considerable discretion." *Ward*, 491 U.S. at 794. For school conduct regulations, there is nothing "basically or constitutionally wrong with flexibility and reasonable breadth, rather than meticulous specificity." *Esteban v. Central Missouri State Coll.*, 415 F.2d 1077, 1088 (1969). And teacher speech regulations must "clearly inform teachers of what is being proscribed." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967).

Two premises carried the district court's interpretation of the Instruction Section: (1) the neutral definitions of "sexual orientation" and "gender identity" adopted from the Iowa Civil Rights Act, and (2) an

50

expansive reading of the phrase "relating to." Together, the district court believed the Instruction Section forbade even the most passing reference to a gender pronoun. The court found that a math teacher would violate the law by giving "an exam stating that Sally bought eight apples and ate three and asking how many 'she' has left." App. 1106–1107, R. Doc. 56, at 41–42.

But words are known by the company they keep. *Dubin v. United States*, 599 U.S. 110, 124 (2023). Normal statutory construction "wisely applies where a word is capable of many meanings in order to avoid" giving "unintended breadth" to legislation. *Id.* (quoting *McDonnell v. United States*, 579 U.S. 550, 568–569 (2016)). Neither "relating to" nor the incorporated definitions should be read apart from the rest of the law. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (discussing the need to interpret statutes as a whole and not construe words out of context or in isolation).

Read as a whole, the statute applies to the compulsory instructional environment of the classroom, and it concerns only that compulsory instruction that the district provides. SF496 § 16 (Iowa Code § 279.80) (listing what "a *school district* shall not provide" as "prohibited instruction").

Courts should not interpret statutes in an acontextual vacuum. Although "a word in a statute may or may not extend to the outer limits of its definitional possibilities," the "interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose

51

and context of the statute." *Dolan*, 546 U.S. at 481. On a plain, holistic reading, SF496 forbids a body of compulsory instruction to be adopted by a school district that relates to sexual orientation and gender identity. And although terms are defined neutrally, they concern matters of identity and perceived sexuality; they do not encompass mere passing references to someone's pronouns. The Instruction Section reserves compulsory curricula on these controversial topics to older grades. That promotes the statute's purpose—to protect parental responsibility over "decisions affecting the parent's . . . minor child," including decisions about their child's education. SF 496, § 24 (Iowa Code § 601.1(2)).

The district court was wrong to construe SF496 to lead to absurd results. Its presumption should have led to the opposite conclusion—the district court should have assumed the Legislature intended to act justly and reasonably. *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 965 (8th Cir. 2015). Courts must also presume statutes are constitutional. Iowa Code § 4.4(1) ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended."). And even if the district court identified a legitimate question of statutory interpretation, "that in itself does not give rise to a finding of unconstitutional vagueness." *Farkas v. Miller*, 151 F.3d 900, 906 (8th Cir. 1998). "It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of disputed terms will be in nice question,'" but that's not enough. *Id.* (quoting *Grayned*, 408 U.S. at 108).

Even in the least generous approach, a limiting construction would have precluded the need for a preliminary injunction. Courts should first determine whether a statute is "readily subject to a narrowing construction." *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 60 (1976) (quoting *Erznoznik*, 422 U.S. at 216). The above contextual reading shows the Instruction Section governs the compulsory instructional functions that school districts adopt. Yet the statute's title reinforces this contextual reading while also showing that a narrowing construction is appropriate. *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 220 (Iowa 2016) (discussing the "title-and-headings canon" which holds that "titles and headings can be useful to shed light on an ambiguous word or phrase as tools for the resolution of doubt) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: the Interpretation of Legal Texts* 221 (2012))). When construing a statute, "context is king," and the district court should not have interpreted the Instruction Section to mandate absurdities or apply outside the domain of compulsory instruction that school districts adopt—it does not forbid references to pronouns or regulate voluntary extracurricular activities or student clubs. *Id.* at 221.

SF496 is not void for vagueness under either the First Amendment or the Due Process Clause of the Fourteenth Amendment.

## III. The injunction here was an abuse of discretion.

*Standard of review.* Courts review injunction orders for an abuse of discretion. *Rounds*, 530 F.3d at 733. "An abuse of discretion occurs where

the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* (quoting *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006)).

\* \* \*

Plaintiffs have no likelihood of success on the merits, yet the other preliminary injunction factors weigh against the injunction as well. *See Sanborn Mfg. Co., v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993) (four preliminary injunction factors: (1) probability of success on the merits, (2) threat of irreparable harm, (3) balance between that harm and the injury the injunction will inflict on others, and (4) whether the injunction is in the public interest).

A preliminary injunction is already "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). But the "standard for demonstrating a likelihood of success on the merits" is even "more rigorous" when plaintiffs seek to "thwart a state's presumptively reasonable democratic processes." *Rounds*, 530 F.3d at 732–33. So this Court holds "a *substantial* likelihood of success on the merits" must govern a district court's decision "to grant a preliminary injunction" that prevents the State from implementing "a statute that was the product of a lengthy public debate involving both" the Legislature and Governor. *Id.* at 731–32 (quoting *Richenberg v. Perry*, 73 F.3d 172 (8th Cir. 1995).

SF496 is constitutional under any reasonably applied standard, and jurisprudential developments post-dating *Pico* and *Pratt* clarify that result. That alone is fatal to Plaintiffs' injunction, and this Court need not "proceed to weigh the other" factors. *See id.* at 732.

Although the district court disagreed, even it held the "standard of scrutiny the Court should apply" was "unclear because the Supreme Court has never settled on a single, governing standard for First Amendment challenges in school settings." App. 1091, R. Doc. 56, at 26. So at best, Plaintiffs could show only that their likelihood of success was "unclear." *Id.* But that is not enough to receive a preliminary injunction.

Plaintiffs cannot meet their burden of showing a "substantial likelihood" that SF496 was unconstitutional under an unclear standard. *Pico* generated seven opinions, no controlling majority, and multiple diverging approaches that supported opposite outcomes. This Court should clarify that when debatable legal principles control the outcome of a case but are unsettled, district courts may not thwart the presumptively constitutional democratic process. *See Rounds*, 530 F.3d at 731–33.

Given that Plaintiffs fail the first factor that is enough for this Court to vacate the injunction. Even so, Plaintiffs fail to meet the other factors as well. Plaintiffs cannot show irreparable harm. The district court relied on the principle that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Powell v. Nobel*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976)). But that begged the question about what the legal right at issue was and disregarded First Amendment standards that apply in schools.

Federal courts cannot intervene into the "operation of school systems" unless the State "directly and sharply implicates basic constitutional values." *Epperson*, 393 U.S. at 104. But "the ready availability of the books elsewhere" is "the most obvious reason" that library book removal does not violate a right to receive information. *Id.* at 915 (Rehnquist, J., dissenting). And where a book's "contents are fully accessible to any inquisitive student" elsewhere, its removal from a public-school library does not sharply implicate the right. *See id.* Indeed, "it is perfectly clear that, unwise as it would be, a school board could wholly dispense with the school library, so far as the First Amendment is concerned." *Pico*, 457 U.S. at 887 n.3 (Berger, C.J., dissenting).

In a similar book-removal case, one court in this circuit held that even with a chance of success on the merits, Plaintiffs "harm would not be especially great, at least compared to a prototypical First Amendment violation." *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022), *appeal dismissed*, No. 22-2885, 2023 WL 2180065 (8th Cir. Jan. 17, 2023).

Removing a book from a school library shelf stops no one from reading or discussing the book, which would be "a more serious issue." *Id.* So removal does not directly or sharply infringe a right to access ideas,

because it "does not deny them access to the book or its ideas." *Id.* Indeed, in "the forty years since the court decided *Pico*," students have gained "easier and greater access to ideas . . . than perhaps any other forty-year period since the invention of the printing press." *Id.* So "the harm to Plaintiffs would be slight" compared to other First Amendment violations. *Id.*

Another federal district court in Missouri has followed *Wentzville's* approach, though it found the failure to establish a fair chance of prevailing on the merits was dispositive on the irreparable harm factor. *L.H. v. Indep. Sch. Dist.*, 2023 WL 2192234, at *6 (W.D. Mo. Feb. 23, 2023).

Plaintiffs' substantial delay in suing and seeking a preliminary injunction undermines their alleged irreparable harm. Although Governor Reynolds signed SF496 on May 26, 2023—after a lengthy and highly publicized committee, amendment, and debate process—Plaintiffs did not sue for six months.

Although one section's enforcement mechanism took effect January 1, 2024, the Library Program was otherwise in effect this whole time. "A delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023) ("An unreasonable delay in moving for the injunction

can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." (internal quotation omitted)).

Finally, the balance of equities and public interest weigh against the injunction. The law stops the circulation of material with descriptions and visual depictions of explicit "sex acts" in public school libraries. The injunction perpetuates the exact harm Iowa citizens sought to remedy through their elected representatives. There is little harm in allowing parents to decide when and how to expose their children to these materials. And the right-to-receive (or -transmit) "sex acts" in a public-school library is "unclear" at best—especially where students have diminished First Amendment Rights. *Fraser*, 478 U.S. at 684; *FCC*, 438 U.S. at 729–730, 748–49. Students, publishers, and authors have ubiquitous alternative channels for these books. *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting).

Perhaps most importantly, the preliminary injunction upset the status quo. Schools were complying with SF496 and removing books that did not comply with the Age-Appropriate Standard. This injunction upset that status quo and now is causing confusion in the schools as to whether they should follow the preliminarily enjoined law or wait until this Court's more final adjudication. In the meantime, students and school libraries face potential whiplash.

Any time a court enjoins a State "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). Courts must presume statutes are constitutional, "and all doubts must be resolved in favor of constitutionality." *Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees*, 37 F.4th 1386, 1393 (8th Cir. 2002), *cert. denied*, 143 S. Ct. 774 (2023). But the district court did not follow these principles. The injunction here was an abuse of discretion.

## CONCLUSION

This court should vacate the district court's injunction order and hold that SF496 does not violate the First or Fourteenth Amendments of the United States Constitution.

March 11, 2024

Respectfully submitted,

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

BRENNA BIRD
Attorney General of Iowa

*/s/ Daniel Johnston*
DANIEL JOHNSTON
*Assistant Attorney General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
daniel.johnston@ag.iowa.gov

*Counsel for State Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,499 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

March 11, 2024

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on March 11, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

March 11, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State Defendants-Appellants*