# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

Penguin Random House, LLC, et al.,
Plaintiffs-Appellees
v.
John Robbins, in his official capacity as President
of the Iowa State Board of Education, et al.,
Defendants-Appellants

Appeal from the United States District Court for the
Southern District of Iowa
Case No. 4:23-cv-00478
The Honorable Stephen H. Locher

## PLAINTIFFS-APPELLEES' BRIEF

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
Meera Gorjala
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7100
Chicago, Illinois 60606
(312) 258-5500

Mark E. Weinhardt
Todd M. Lantz
Jason R. Smith
THE WEINHARDT LAW FIRM
2600 Grand Avenue, Suite 450
Des Moines, Iowa 50312
(515) 244-3100

Christy A.A. Hickman
Becky S. Knutson
Katherine E. Schoolen
Iowa State Education Association
777 Third Street
Des Moines, Iowa 50309
(515) 471-8004

*Counsel for Plaintiffs-Appellees*

**ORAL ARGUMENT REQUESTED**

# SUMMARY OF THE CASE

Iowa Senate File 496 ("SF496") is an unprecedented law that requires school librarians to remove hundreds of books from school libraries without any consideration of a book's merit. The two overbroad and vague content-based book-removal provisions in SF496 violate the rights of students, authors, publishers, and educators under the Free Speech and Due Process Clauses.

This is not a case about government speech. The State of Iowa does not speak through the decisions of local school librarians who make a broad array of books available to students who may choose to read them. Nor is this a case about a school librarian's professional judgment to remove a few books from a school library. Instead, SF496 is a statewide mandate that thwarts librarian discretion and local decision-making, purporting to protect students from obscene books while completely ignoring the governing test for obscenity.

Libraries have historically been places of voluntary inquiry, discovery, and intellectual exploration. A law that requires librarians to remove hundreds of award-winning, classic, and other educationally valuable fiction and nonfiction books has no constitutional justification. The district court did not abuse its discretion in enjoining enforcement of SF496's book-removal provisions.

This case raises important First and Fourteenth Amendment issues and warrants oral argument. Plaintiffs request thirty minutes to present their argument.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Plaintiff-Appellee Penguin Random House LLC makes the following disclosures:

Penguin Random House LLC is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately held company. No publicly held corporation owns 10% or more of the stock of Penguin Random House LLC.

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE .................................................................................. i

CORPORATE DISCLOSURE STATEMENT ........................................... ii

TABLE OF AUTHORITIES ............................................................ v

STATEMENT OF THE ISSUES .................................................... x

STATEMENT OF THE CASE ......................................................... 1

I.      The Book-Removal Provisions Violate First Amendment
        Rights ..................................................................................... 1

II.     SF496 Is A Solution In Search Of A Problem. .................... 6

III.    Parties And Procedural History ........................................... 7

SUMMARY OF THE ARGUMENT ............................................. 9

LEGAL STANDARD ................................................................... 13

ARGUMENT ............................................................................... 14

I.      Plaintiffs Are Likely To Succeed On The Merits Of Their
        Claims ................................................................................... 14

        A.      Senate File 496's Book-Removal Provisions
                Violate The First Amendment. ................................. 14

                1.      First Amendment Rights Exist In Public
                        And School Libraries. ..................................... 14

                2.      No Court Has Applied Defendants' Radical
                        Government-Speech Argument To Libraries. ............... 18

                        a.      School Libraries Are Not Compulsory
                                And Students In School Libraries Are
                                Not Captive Audiences ......................... 20

b.     Defendants Ignore The Test For Government Speech, Which Defeats Their Primary Argument. ......................23

B.     The Age-Appropriate Standard Is Unconstitutional. .........................................................27

1.     The Age-Appropriate Standard Is A Content-Based Restriction That Serves No Permissible Purpose. ........................................27

a.     The Age-Appropriate Standard Violates Publishers' And Authors' First Amendment Rights. .....................................31

b.     The Age-Appropriate Standard Violates Students' First Amendment Rights. ..............................................36

2.     The Standard Is Also Overbroad. ...................39

3.     The Age-Appropriate Standard Is Void For Vagueness. .....................................................43

C.     The Identity And Orientation Prohibition Is Unconstitutionally Overbroad And Vague. ............................46

II.    The District Court Did Not Abuse Its Discretion In Finding That Plaintiffs Succeed On The Remaining Preliminary Injunction Factors. ................................................................51

CONCLUSION .............................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Booksellers Ass'n, Inc. v. Virginia*,
  882 F.2d 125 (4th Cir. 1989)............................................................37

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)...................................................................39

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .............................................................. 17, 31

*Bethel School Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986)...................................................................23

*Board of Education, Island Trees Union Free School District Number 26 v. Pico*,
  457 U.S. 853 (1982) ........................................................... passim

*Book People, Inc. v. Wong*,
  --- F. Supp. 3d ----, 2023 WL 6060045 (W.D. Tex. Sept. 18, 2023)...................33

*Burnham v. Ianni*,
  119 F.3d 668 (8th Cir. 1997)...........................................................30

*C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022)...................................................30

*Campbell v. St. Tammany Parish Sch. Bd.*,
  64 F.3d 184 (5th Cir. 1995)..................................................... passim

*Carson v. Simon*,
  978 F.3d 1051 (8th Cir. 2020) .........................................................14

*Case v. Unified Sch. Dist. No. 233*,
  908 F. Supp. 864 (D. Kan. 1995)......................................................14

*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005).................................................... 22, 24

*Cohen v. California*,
  403 U.S. 15 (1971)....................................................................22

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985)..................................................................29

*Counts v. Cedarville Sch. Dist.*,
　295 F. Supp. 2d 996 (W.D. Ark. 2003) ............................................. 14, 28, 30, 38

*Cuviello v. City of Vallejo*,
　944 F.3d 816 (9th Cir. 2019) ................................................................52

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
　917 F.3d 994 (8th Cir. 2019) ................................................................52

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
　640 F.2d 109 (8th Cir. 1981) ........................................................ xi, 14

*Dream Defenders v. DeSantis*,
　559 F. Supp. 3d 1238 (N.D. Fla. 2021) ................................................52

*Elrod v. Burns*,
　427 U.S. 347 (1976) ...............................................................................51

*Erznoznik v. City of Jacksonville*,
　422 U.S. 205 (1975) .................................................................... passim

*Fayetteville Public Library v. Crawford County, Arkansas*,
　--- F. Supp. 3d ----, 2023 WL 4845636 (W.D. Ark., July 29, 2023) .......... passim

*FCC v. Fox Television Stations, Inc.*,
　567 U.S. 239 (2012) ......................................................... x, xi, 43, 49

*FCC v. Pacifica Foundation*,
　438 U.S. 726 (1978) ................................................................. 23, 34

*Gerlich v. Leath*,
　861 F.3d 697 (8th Cir. 2017) ................................................................25

*Griswold v. Driscoll*,
　625 F. Supp. 2d 49 (D. Mass. 2009) .....................................................22

*Hazelwood Sch. Dist. v. Kuhlmeier*,
　484 U.S. 260 (1988) ...............................................................................22

*Heartland Acad. Cmty. Church v. Waddle*,
　335 F.3d 684 (8th Cir. 2003) ................................................................13

*Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.*,
　329 F.3d 954 (8th Cir. 2003) ................................................................40

*Johnson v. United States*,
　576 U.S. 591 (2015) ...................................................................... 43, 50

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
　385 U.S. 589 (1967) ......................................................... xi, 31, 46

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ...........................................................................16

*Knights of Ku Klux Klan v. Curators of University of Missouri*,
203 F.3d 1085 (8th Cir. 2000) ...........................................................27

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992)...............................................................29

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ......................................................................... xi, 48

*Little v. Llano Cnty.*,
No. 1:22-CV-424-RP, 2023 WL 2731089 (W.D. Tex. Mar. 30, 2023) .............14

*Mailloux v. Kiley*,
436 F.2d 565 (1st Cir. 1971) ...............................................................33

*Martin v. City of Struthers, Ohio*,
319 U.S. 141 (1943)...........................................................................16

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................... x, 24, 25, 26

*McNary v. Haitian Refugee Center, Inc.*,
498 U.S. 479 (1991) ...........................................................................13

*Miller v. California*,
413 U.S. 15 (1973) .................................................................... passim

*Minarcini v. Strongsville City Sch. Dist.*,
541 F.2d 577 (6th Cir. 1976)...................................................... passim

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir. 2012)......................................................... xi, 51

*Minnesota Voters All. v. Mansky*,
585 U.S. 1 (2018).............................................................................30

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)...........................................................................34

*PEN American Center, Inc. v. Escambia County School Board*,
--- F. Supp. 3d ----, 2024 WL 133213 (N.D. Fla. Jan. 12, 2024) .......................14

*People for the Ethical Treatments of Animals, Inc. v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005) ..............................................................27

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009) .................................................................. 24, 26

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015) .......................................................... xi, 51

*Pratt v. Independent School District No. 831, Forest Lake, Minnesota*,
670 F.2d 771 (8th Cir. 1982) ....................................................... 17, 28

*Prison Legal News v. Livingston*,
683 F.3d 201 (5th Cir. 2012) .............................................................31

*Pugin v. Garland*,
599 U.S. 600 (2023) ...........................................................................48

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ...........................................................................27

*Reno v. Am. C. L. Union*,
521 U.S. 844 (1997) ...................................................................... 16, 38

*Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*,
454 F. Supp. 703 (D. Mass. 1978) .....................................................15

*Roach v. Stouffer*,
560 F.3d 860 (8th Cir. 2009) ........................................................ 25, 26

*Salvail v. Nashua Bd. of Ed.*,
469 F. Supp. 1269 (D.N.H. 1979) .....................................................15

*Sheck v. Baileyville Sch. Comm.*,
530 F. Supp. 679 (D. Me. 1982) .................................................. 15, 32

*Shipley Inc. v. Long*,
454 F. Supp. 2d 819 (E.D. Ark. 2004) ..............................................41

*Shurtleff v. City of Boston, Massachusetts*,
596 U.S. 243 (2022) ..........................................................................x, 26

*Stanley v. Georgia*,
394 U.S. 557 (1969) ...................................................................... 16, 36

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
580 U.S. 405 (2017) ...........................................................................47

*Sullivan v. Stroop*,
496 U.S. 478 (1990) ...................................................................... xi, 47

*Sund v. City of Wichita Falls, Tex.*,
121 F. Supp. 2d 530 (N.D. Tex. 2000) ..............................................14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ...................................................................... 17, 27

*United States v. Am. Library Ass'n, Inc.*,
539 U.S. 194 (2003) ................................................................ 21, 29, 31

*United States v. Stevens*,
559 U.S. 460 (2010) ...............................................................................39

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .......................................................................... 43, 49

*Virginia v. Am. Booksellers Ass'n, Inc.*,
488 U.S. 905 (1988) .......................................................................... 37, 39

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ...................................................................... 24, 25, 26

*Ward v. Hickey*,
996 F.2d 448 (1st Cir. 1993) ..................................................................22

## Statutes

Iowa Code § 216.2 ................................................................................ xi, 3

Iowa Code § 256.11 ............................................................................ passim

Iowa Code § 272.2 ................................................................................ xi, 4

Iowa Code § 279.27 ............................................................................... xi, 4

Iowa Code § 279.80 ................................................................. xi, 3, 47, 49

Iowa Code § 280.6 ............................................................................ x, 4, 35

Iowa Code § 702.17 ...................................................................... x, xi, 2, 45

Iowa Code § 728.2 .....................................................................................6

## Other Authorities

Iowa Admin. Code r. 282—25.3(272) ......................................................4

## Constitutional Provisions

U.S. Const. amend. I ................................................................... x, xi, 27

U.S. Const. amend. XIV ............................................................................ xi

# STATEMENT OF THE ISSUES

I. **Does the government-speech doctrine apply to school library books, rendering the Free Speech Clause inapplicable?**

Most Apposite Authorities:

*Matal v. Tam*, 582 U.S. 218 (2017)

*Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243 (2022)

*Board of Education, Island Trees Union Free School District Number 26 v. Pico*, 457 U.S. 853 (1982)

*Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184 (5th Cir. 1995)

U.S. Const. amend. I

II. **Is the Age-Appropriate Standard, which requires the removal of certain library books without consideration of their value or the age of the reader, an impermissible or overbroad content-based restriction in violation of the Free Speech Clause?**

Most Apposite Authorities:

*Miller v. California*, 413 U.S. 15 (1973)

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)

*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976)

*Fayetteville Public Library v. Crawford County, Arkansas*, --- F. Supp. 3d -----, 2023 WL 4845636 (W.D. Ark. July 29, 2023) (unpublished)

Iowa Code §§ 256.11(9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4); 280.6; 702.17

U.S. Const. amend. I

III. **Is the Age-Appropriate Standard void for vagueness under the Due Process Clause?**

Most Apposite Authorities:

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967)

Iowa Code §§ 256.11(9)(a)(2)–(3), 19(a)(1) (SF496 §§ 2, 4); 272.2(4); 279.27; 702.17

U.S. Const. amend. XIV

**IV.** **Is the Identity And Orientation Prohibition overbroad in violation of the Free Speech Clause or vague in violation of the Due Process Clause?**

<u>Most Apposite Authorities</u>:

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018)

*Sullivan v. Stroop*, 496 U.S. 478 (1990)

*FCC v. Fox Television Stations, Inc*., 567 U.S. 239 (2012)

Iowa Code §§ 216.2(10), (14); 256.11(9)(a)(2) (SF496 § 2); 279.80(2) (SF496 § 16); 272.2 (4); 279.27

U.S. Const. amends. I, XIV

**V.** **Did the district court abuse its discretion by enjoining Senate File 496's book-removal provisions?**

<u>Most Apposite Authorities</u>:

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012)

*Powell v. Noble*, 798 F.3d 690 (8th Cir. 2015)

## STATEMENT OF THE CASE

### I.    The Book-Removal Provisions Violate First Amendment Rights.

SF496 is an unprecedented assault on school libraries.[1]   The two book-removal provisions of SF496 that Plaintiffs challenge in this case resulted in the removal of hundreds of books from school libraries across Iowa before the district court enjoined those provisions.[2]

Before SF496, librarians and other educators curated school libraries based on educational objectives, their professional judgment and best practices, and the First Amendment.   Now, under the guise of protecting students from obscene materials, the State has mandated the removal of a wide range of literature that is not remotely obscene through two extremely broad and poorly defined categories of books.

First, SF496 requires that library books for K-12 students be "age-appropriate," which wholly ignores the age of students by excluding *any* book

---

[1] As used herein, the term "school libraries" encompasses both traditional school libraries and classroom collections of books, which are essentially classroom libraries.

[2] As used herein, the term "books" refers to individual titles, not numbers of copies of books.  The district court identified 567 individual titles that had been removed by at least one school library.  *See* App. 1031; R. Doc. 55, at 71:12–20.  The total number of copies of books removed from school libraries under SF496 is almost certainly in the thousands.  Plaintiffs' Addendum consists of a comparison of five Iowa school districts' book-removal lists.  *See* Plaintiffs' Add. 1–8; App. 769–776; R. Doc. 34-15.

containing *any* "description" of a "sex act" for students in *every* grade (the "Age-Appropriate Standard").[3]  Iowa Code §§ 256.11(9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4).  SF496 incorporates the definition of "sex act" from Iowa's criminal code, which defines the term as "any sexual contact between two or more persons" and includes examples.  *Id.*; *id.* § 702.17.  Because SF496 does not define the word "description" in relation to the term "sex act," it is unclear what level of detail is necessary for a book to implicate the Standard.  For example, a book that contains the phrase "spent the night together" may be sufficiently detailed for the Standard to apply.  It appears that some school districts actually removed books on that basis.  *See*, *e.g.*, App. 734; R. Doc. 34-10, ¶13.

The Standard elsewhere recognizes the importance of considering the "developing cognitive, emotional, and behavioral capacity typical for the age or age group," but its mandate applies regardless of the age of the student.  Iowa Code §§ 256.11(9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4).  Rather than being age-appropriate, the Standard is age-indifferent.  As the district court recognized, the "underlying message is that there is no redeeming value to any such book even if it is a work of history, self-help guide, award-winning novel, or other piece of serious literature."  App. 1099; R. Doc. 56, at 34.

---

[3] Defendants refer to this provision as the "Library Program."

Second, SF496 prohibits "any *program*, curriculum, test, survey, questionnaire, *promotion*, or instruction relating to gender identity or sexual orientation" for K-6 students (the "Identity And Orientation Prohibition").[4] Iowa Code § 279.80(2) (SF496 § 16) (emphasis added). Because "program" is undefined and SF496 elsewhere refers to a school district "library program" (including in relation to the Age-Appropriate Standard), the Prohibition appears to apply and—before the district court enjoined it—was being applied to library books. Iowa Code §§ 256.11(9)(a)(2), 279.80(2) (SF496 §§ 2, 16). The terms "gender identity" and "sexual orientation" are defined neutrally to encompass all gender identities and sexual orientations: "[g]ender identity" is defined as a gender-related identity of a person, regardless of the person's assigned sex at birth; "[s]exual orientation" is defined as actual or perceived heterosexuality, homosexuality, or bisexuality. *Id*. § 216.2(10), (14). SF496 does not define or limit what types of content "relat[e]" to gender identity or sexual orientation or what qualifies as "promotion."

Neither removal provision accounts for the literary, artistic, political, or scientific value of books taken as a whole, as the First Amendment requires. But

---

[4] Defendants refer to this provision as the "Instruction Section." Plaintiffs challenge the Prohibition only to the extent that it requires the removal of library books.

the Age-Appropriate Standard exempts certain religious books, such as the Bible, from removal. Iowa Code §§ 256.11(9)(a)(2) (SF496 § 2), 280.6.

SF496 empowers Defendants, school districts, and school superintendents to enforce its provisions against school districts, librarians, and teachers through a harsh system of penalties, including disciplinary action, loss of teaching licenses, and termination of employment.[5] The penalty provisions were to take effect on January 1, 2024. Iowa Code § 256.11(9)(a)(3) (SF496 § 2). Before that date, educators repeatedly requested guidance from the Iowa Department of Education regarding how to implement the book-removal provisions, but the State provided none. *See, e.g.*, App. 692–94; R. Doc. 34-2, at 2-4.

SF496 unleashed fear and chaos upon the Iowa education community, which struggled to determine what the book-removal provisions require. Educators, school districts, and even state administrators expressed confusion. Defendant John Robbins, President of the Iowa State Board of Education, stated that "there's a lot of confusion" about the scope of the prohibitions and that people "in the field" hope the Iowa Department of Education "provides direction because right now, we're kind of either guessing what is right or wrong, and not being in violation of the

---

[5] *See* Iowa Code §§ 256.11(9)(a)(3) (SF496 § 2), 272.2(4), 279.27; Iowa Admin. Code r. 282—25.3(272).

law." App. 778; R. Doc. 34-16, at 1. Robbins was right: before the book-removal provisions were enjoined, everyone appeared to be guessing.

Confusion about the meaning of the vague provisions led to wildly inconsistent interpretations, resulting in First Amendment violations through the removal of protected literature. Some districts erred on the side of removing books to avoid penalties. *See* App. 735; R. Doc. 34-10, ¶15. Many teachers "reduc[ed] book collections in their classrooms or eliminat[ed] them altogether out of fear of retaliation or discipline." *See*, *e.g.*, App. 725; R. Doc. 34-9, ¶12. School districts across the State removed award-winning and classic books that have been in libraries for decades, including books that are commonly included on Advanced Placement exams. Each school district appeared to interpret SF496 differently, resulting in vastly different removal lists. *See* Plaintiffs' Add. 2–8; App. 770–76; R. Doc. 34-15. While many school districts did not compile removal lists, they still required libraries to remove books. App. 733–34; R. Doc. 34-10 ¶¶11, 18 (describing the removal of library books by a school district that did not publish a removal list).

A small selection of the books that school districts removed under SF496 because they decided the books contain a "description" of a "sex act" includes George Orwell's *1984*, Aldous Huxley's *Brave New World*, Toni Morrison's *Beloved*, William Faulkner's *As I Lay Dying*, Kurt Vonnegut's *Slaughterhouse-*

*Five*, Alice Walker's *The Color Purple*, Richard Wright's *Native Son*, Maya Angelou's *I Know Why the Caged Bird Sings*, and James Joyce's *Ulysses*. App. 1072, 1093, 1103; R. Doc. 56, at 7, 28, 38.

## II.    SF496 Is A Solution In Search Of A Problem.

Defendants do not attempt to justify the unprecedented breadth of the book-removal provisions.  Unable to justify the havoc that SF496 has caused—and would continue to cause if not enjoined—Defendants pretend that they are defending a different statute in an entirely different case.

According to Defendants, the State solved a "real problem" throughout Iowa schools by enacting the book-removal provisions.  The supposed problem was "pornography" or "smut" in school libraries.  Appellants' Br. 40; App. 779; R. Doc. 34-16, at 3; App. 785; R. Doc. 34-17, at 6.

Contrary to Defendants' assertion, the State is not and has never been "powerless" to require the removal of obscene materials from school libraries. Iowa has long forbidden the dissemination of obscenity to minors under statutes that predate SF496.  *See*, *e.g.*, Iowa Code § 728.2.  The preliminary injunction in this case does not change that.  Iowa school districts already had procedures for parents and community members to challenge library books.  Under those procedures, qualified educators would review challenged books at the school or district level, considering educational criteria and the merits of each book as a

whole. *See, e.g.*, App. 737–38; R. Doc. 34-10, ¶20. In addition, Iowa school districts have procedures that enable parents to regulate their own children's access to library books. *See, e.g.*, App. 958; R. Doc. 53, at 9 n.9 (citing Urbandale Board Policy Exhibit 0631B-E(1); Urbandale Board Policy 0631C).

Defendants attempt to shock the Court with images from two books in their brief, but (as Defendants' declarations illustrate) those books were actually removed by a school district at the request of parents using Iowa's pre-SF496 procedures. *See* App. 865; R. Doc. 45-1, Ex. C (explaining how a book was successfully challenged and removed from the school library prior to SF496); App. 947, R. Doc. 45-1, Ex. L (same). The fact that a few books arguably "could have been removed without violating the First Amendment" does not sustain the book-removal provisions. App. 1102; R. Doc. 56, at 37. Moreover, as the district court explained, SF496 "did not merely remove" one or a few school library books; "it removed hundreds." *Id.* Instead of a "scalpel," the State "used a bulldozer." App. 1093; R. Doc. 56, at 28.

## III.    Parties And Procedural History.

Plaintiffs are Penguin Random House, the world's largest trade publisher; authors John Green, Laurie Halse Anderson, Malinda Lo, and Jodi Picoult; Scott Bonz as parent of high school senior Hailie Bonz; and the Iowa State Education Association and educators Mari Butler Abry, Alyson Browder, and Daniel

Gutmann. Defendants in this appeal are the state officials tasked with implementing and enforcing the book-removal provisions.

Plaintiffs filed their Complaint against Defendants (and school districts and superintendents, who decided not to defend the constitutionality of SF496 in the district court or on appeal) on November 30, 2023, approximately two weeks after the Iowa State Board of Education issued proposed rules that purported to clarify SF496's book-removal provisions. App. 526–600; R. Doc. 1. The proposed rules would not have clarified the meaning of the book-removal provisions, the proposed rules have not been adopted, and Defendants do not mention the proposed rules in their brief.

On December 8, Plaintiffs moved for a preliminary injunction to enjoin the book-removal provisions before SF496's penalty provisions became effective. App. 627–637; R. Doc. 28. The district court heard argument on Plaintiffs' motion on December 22 and granted the motion on December 29, holding that the book-removal provisions violate the First and Fourteenth Amendments. App. 961-1064; R. Doc. 55; App. 1065–1111; R. Doc. 56.

At argument, the district court asked Defendants whether the State was aware of any authority that supported a law resulting in the removal of hundreds of school library books throughout a state. App. 1032–33; R. Doc. 55, at 72:24–73:9. The

State did not identify any authority in response, and it still has not identified authority that would uphold the book-removal provisions.

## SUMMARY OF THE ARGUMENT

Defendants pretend that this case is about curriculum, instruction, and parental rights. References to those concepts appear throughout their brief. But that is not this case. Curriculum and instruction are not at issue here. And the book-removal provisions do not protect "parental rights" because parents can already restrict their own child's access to any library book.

This case concerns two sweeping provisions of SF496 that require the removal of hundreds of works of fiction and nonfiction from school libraries with total disregard for their literary merit. This includes classics that have been ubiquitous in libraries for decades. Under SF496, *any* book that contains *any* description of a "sex act" or relates to *any* sexual orientation or gender identity must be removed. Defendants claim these book-removal mandates were necessary to "protect children" (Appellants' Br. 44), but they do not explain how requiring the removal of non-obscene books with literary value is justified in relation to that goal.

Broad state-mandated content-based restrictions, like the book-removal provisions, subvert the purpose and function of school libraries. Critical to libraries' missions are trained librarians and their discretion to select a broad range of books. Authors, publishers, students, and parents rely on trained educators to

facilitate voluntary book discovery through individualized consideration of a student's age, maturity, reading level, interests, and life experiences. Yet SF496 bars consideration of context and eliminates librarian discretion. Neither the value of a work nor a student's readiness or desire to read it counts for anything under SF496.

Defendants state that the law surrounding the content-based removal of library books is "a mess" (Appellants' Br. 13), but courts that have considered these issues have used a consistent framework. In numerous decisions, courts have found that the Free Speech Clause applies in libraries, which means that the government-speech doctrine does not. *See supra* at 14–16. Those decisions make sense. The government does not communicate through or control the content of library books—authors and publishers do. Iowa does not "speak" through the varying and contradictory messages in library books. No court has ever applied the government-speech doctrine to library books.

The Supreme Court considered the issue of library book removal in *Board of Education, Island Trees Union Free School District Number 26 v. Pico*, 457 U.S. 853 (1982) ("*Pico*"). Although that was a plurality decision, even the dissenting justices agreed that the First Amendment precludes unfettered government authority to remove school library books. *Pico*, 457 U.S. at 866, 879–880, 883, 907. Every court that has considered similar issues both before and after *Pico* agrees: the

government cannot require the content-based removal of library books to impose a puritanical pall of orthodoxy or to rid libraries of disfavored messages. *See supra* at 14–16.

This case concerns a much more extreme situation than *Pico* and its progeny, all of which involved localized decisions to remove particular books or materials. Through SF496, Iowa legislators mandated the statewide removal of hundreds of books regardless of their value. Plaintiffs and Defendants agree that librarians must have "broad discretion." Appellants' Br. at 22. But SF496 replaces professional librarians' discretion with the State's mandate.

The Age-Appropriate Standard completely disregards existing First Amendment jurisprudence, which permits regulating books as "obscene" only where specific factors are satisfied, including consideration of the value of the work taken as a whole, in the context of the age of the minor. *See Miller v. California*, 413 U.S. 15, 24 (1973); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). The *Miller* test as applied to minors—or, as the district court called it, the "'obscenity-light' standard" (App. 1095; R. Doc. 56, at 30)—permits greater regulation of speech than the *Miller* test as applied to adults. Under the *Miller* test as applied to minors, material that is not obscene for adults or older minors may be obscene (and appropriately regulated) for younger minors. In contrast, the Standard does not distinguish among the different ages of readers, treating high school

seniors who seek to read a school library book in preparation for an AP exam the same as third graders. For that same reason, the Standard is overbroad.

The Standard is also vague because it does not define what is meant by "description" in relation to a "sex act," providing no guidance to educators regarding the reach of the provision or how to apply it. As the district court found, "[o]ne of the major areas of uncertainty is the level of detail a book passage must have before it constitutes a description or visual depiction of a sex act" under the Standard. App. 1104; R. Doc. 56, at 39. This vagueness will result in arbitrary application of the Standard, as it did before the district court enjoined it.

The Identity And Orientation Prohibition fares no better. By its plain language, the Prohibition applies to library books. Defendants advance no construction of the text that suggests otherwise. Because the Prohibition requires removal of all library books "relating to" *any* sexual orientation or *any* gender identity, it is difficult to imagine a book that would not fall within the broad sweep of the Prohibition. That breadth also renders the Prohibition void for vagueness. Given its all-encompassing reach, educators lack a clear understanding of how the Prohibition will be enforced and fear arbitrary enforcement.

SF496 threatens imminent injury to publishers, authors, students, and educators. The book-removal provisions harm students by impeding their right to receive information in school libraries; they harm authors and publishers by

requiring the removal of their books from school libraries based on impermissible, overbroad content-based restrictions; and they harm educators by requiring them to choose between censoring protected speech and facing penalties, including loss of their livelihood.

After applying existing jurisprudence to hold that the book-removal provisions violate the Free Speech and Due Process Clauses, the district court found for Plaintiffs on the remaining preliminary injunction factors. The district court did not abuse its discretion; rather, it held as the Constitution requires, protecting the rights of publishers, authors, students, and educators.

## LEGAL STANDARD

In reviewing the district court's grant of a motion for preliminary injunction, this Court reviews the district court's "material factual findings for clear error, its legal conclusions de novo," and "the ultimate decision to grant the injunction" for an abuse of discretion. *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 689–90 (8th Cir. 2003). Constitutional issues are also reviewed de novo. *See McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 493 (1991).

In determining whether to issue a preliminary injunction, the court considers the movant's probability of success on the merits, which is the "most significant" factor, as well as the threat of irreparable harm to the movant, the balance between that harm and any injury to the other parties of granting the injunction, and the

public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020).

<u>**ARGUMENT**</u>

I. **Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.**

    A. **Senate File 496's Book-Removal Provisions Violate The First Amendment.**

        1. **First Amendment Rights Exist In Public And School Libraries.**

No court has ever held that the First Amendment does not apply in school libraries. Consistent with the district court's order, numerous courts have specifically held that First Amendment rights exist in libraries, including school libraries. *See*, *e.g.*, *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188–190 (5th Cir. 1995); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582–83 (6th Cir. 1976); *PEN American Center, Inc. v. Escambia County School Board*, --- F. Supp. 3d ----, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) (unpublished); *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *7 (W.D. Tex. Mar. 30, 2023) (unpublished); *Fayetteville Public Library v. Crawford County, Arkansas*, --- F. Supp. 3d ----, 2023 WL 4845636, at *20–21 (W.D. Ark. July 29, 2023) (unpublished); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547–48 (N.D. Tex. 2000); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 874–76 (D. Kan. 1995); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686–89 (D. Me.

1982); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272–73 (D.N.H. 1979); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 710–11 (D. Mass. 1978). Defendants entirely ignore this substantial body of caselaw that contradicts their primary argument.

The only case that Defendants cite concerning library books is the Supreme Court's decision in *Pico*. While *Pico* was a plurality decision, it provides useful guidance regarding the First Amendment implications of removing school library books, which other courts have relied upon. Even the dissenting justices in *Pico* agreed that the government does not have unlimited authority to remove school library books without running afoul of the First Amendment.[6] *Pico* also involved a much less extreme situation than that presented by SF496—there, the Court considered whether a local school board's decision to remove nine books from a school library violated the First Amendment rights of students. *Id*. at 858. In

---

[6] The plurality opinion expressly states that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866 (plurality opinion). *Pico*'s concurrences and dissents articulate that limit in different ways and to different extents. *Id*. at 879–880 (Blackmon, J. concurring) ("[S]chool officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved" (emphasis in original).); 907 (Rehnquist, J., Burger, C.J., Powell, J. dissenting) (recognizing that "significant discretion to determine the content" of "school libraries" may not be "exercised in a narrowly partisan or political manner" or "motivated by racial animus"; the Constitution "does not permit the official suppression of *ideas*" (emphasis in original)).

contrast, SF496 is a statewide mandate from Iowa legislators to librarians and educators that resulted in the removal of hundreds of books. SF496 eliminates the discretion that librarians have because it requires them to remove books that they had selected for library shelves.

Defendants question the existence of a First Amendment right to receive information, contending that *Pico* "never fully adopted" that right. Appellants' Br. 27. But the right to receive information is well-established in constitutional law. *See*, *e.g.*, *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (The authors of the First Amendment "chose to encourage a freedom which they believed essential if vigorous enlightenment would triumph over slothful ignorance," which "embraces the right to distribute literature and necessarily protects the right to receive it." (citation omitted)); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.") (collecting cases); *Reno v. Am. C. L. Union*, 521 U.S. 844, 874 (1997) (recognizing the "constitutional right to receive" information).

The First Amendment right to receive information exists in school libraries. *See*, *e.g.*, *Campbell*, 64 F.3d at 189–190 (following *Pico*); *Minarcini*, 541 F.2d at 583 (recognizing the "right of students to receive information which they and their teachers desire them to know"). *See also Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (holding that the right to receive information is "nowhere more vital" than in

"schools and universities"). Defendants "do not possess absolute authority over [Iowa] students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 514 (1969) (holding that the First Amendment permits only "reasonable regulation of speech-connected activities in carefully restricted circumstances"). Students have "fundamental rights which the State must respect" because they "are 'persons' under our Constitution." *Id.* at 511. They do not "shed their constitutional rights" at "the schoolhouse gate" and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Id.* at 506, 511. *See also Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670 F.2d 771, 776 (8th Cir. 1982) (Federal courts that have "considered First Amendment challenges to the removal of books from school libraries" have "generally concluded that a cognizable First Amendment claim exists if the book was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed.") (collecting cases).

Publishers like PRH and authors like the Author Plaintiffs also have First Amendment rights in school libraries. The First Amendment "embraces the circulation of books as well as their publication." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963). Publishers and authors have the right to speak through their books without the State censoring those books through impermissible content-based restrictions. *See id.* at 71 (rejecting as unconstitutional a content-based

restriction on publishers' right to distribute books). That right also exists in school libraries. *See Minarcini*, 541 F.2d at 583 (holding that the removal of school library books was unconstitutional because "[f]reedom of speech presupposes a willing speaker [but] where a speaker exists" the "protection afforded is to the communication, to its source and to its recipients both").

### 2. No Court Has Applied Defendants' Radical Government-Speech Argument To Libraries.

Defendants contend that the Free Speech Clause does not apply in school libraries because the content-based removal of books from school libraries is government speech. Appellants' Br. 14. But that is not the law. The government-speech doctrine is a narrow doctrine that holds that when the government speaks for itself, the Free Speech Clause has no application. Defendants ask this Court to accept their government-speech argument, but they do not even attempt to apply the Supreme Court's test for government speech because they cannot satisfy that test. Library books are fundamentally different than the limited contexts in which the government-speech doctrine applies. By asking this Court to rule that the removal of school library books is government speech, Defendants request an unprecedented expansion of the government-speech doctrine that would eviscerate First Amendment rights in libraries.

No court has held that the government-speech doctrine applies to the removal of books from libraries, including Defendants' cases. Ignoring this lack of

authority, Defendants insist that "[g]overnment-speech principles apply more forcefully to school libraries where young children have diminished First Amendment rights." Appellants' Br. 17. This unsupported assertion mischaracterizes the doctrine. The government-speech doctrine is a blanket exception to the Free Speech Clause: it either applies (in limited circumstances) or it does not apply at all. In contrast, different levels of scrutiny apply to First Amendment restrictions imposed upon minors compared to adults, but the lesser scrutiny applied to restrictions imposed upon minors has no bearing on the government-speech doctrine. As the district court held, content-based removal of school library books implicates the First Amendment rights of students, publishers, and authors. App. 1087–88; R. Doc. 56, at 22–23.

Lacking relevant authority that supports their argument, Defendants selectively quote cases that do not apply the government-speech doctrine and cases that apply it, but not to government-mandated removal of library books. They disregard the holdings of those cases, the contexts in which those cases arise, and the fundamental distinctions between their cases and SF496. And aside from *Pico*, they wholly ignore cases involving the removal of library books. Instead, they confuse curricular decisions with the non-compulsory library environment in which First Amendment protections apply.

This Court should reject Defendants' radical government-speech argument.

### a. School Libraries Are Not Compulsory And Students In School Libraries Are Not Captive Audiences.

While the State has substantial discretion in certain compulsory functions of public schools, school libraries are different. School libraries are places of voluntary learning in which student participation is self-driven and optional. In contrast, other aspects of the educational experience such as curriculum and instruction are compulsory and require students to participate as a captive audience. In the district court, Defendants acknowledged that school libraries are "non-instructional" and library books are "noncurricular." App. 833, 838; R. Doc. 45, at 19, 24. On appeal, Defendants entirely ignore this distinction, pretending that the curriculum includes library books and stating that elected officials must be allowed "to control the curriculum." Appellants' Br. 22. Although curriculum is not at issue here, Defendants disregard cases involving library books in favor of inapplicable cases concerning curriculum and captive audiences.

School libraries serve an important purpose. As the Supreme Court has recognized, a school library is a place where students "can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Pico*, 457 U.S. at 868−69 (explaining that "students must always remain free to inquire" and the "school library is the principal locus of such freedom"). A school library is meant to be a "regime of voluntary inquiry," affording students "an opportunity at self-education and individual enrichment that

is wholly optional." *Id.* at 869. Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-functioning democracy." *Fayetteville*, 2023 WL 4845636, at *3, 5 (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003) ("*ALA*")).

The discretion afforded to librarians in overseeing their library collections is crucial to well-functioning libraries. Librarians are tasked with "curat[ing] the collections of public libraries to serve diverse viewpoints" and must be "commit[ted] to freedom of speech." *Id*. Because that task requires librarians to have "broad discretion to decide what material to provide to their patrons," librarians are "afforded significant professional responsibility and deference with respect to their area of expertise." *Id*. at *4–5. Defendants recognize that public librarians must have "broad discretion" (Appellants' Br. 22), but they ignore the fact that SF496 replaces librarians' discretion with the blunt dictates of Iowa legislators.

School libraries are not compulsory educational environments, and the removal of a book from a school library is not a curricular decision. The State's mandate to remove books from school libraries "must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter." *See Campbell*, 64 F.3d at 189 (citing *Pico*, 457 U.S. at 868–870

(comparing the "compulsory environment of the classroom" to "the school library and the regime of voluntary inquiry that there holds sway")).

This is not a case about government discretion regarding curriculum. Therefore, Defendants' cases concerning textbooks and other curricular decisions (Appellants' Br. 2, 5, 13–14, 18–19, 21, 24–26, 33–35, 37–39, 47), offer no guidance regarding the constitutionality of SF496's book-removal provisions. *See*, *e.g.*, *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) (concerning the "selection and use of textbooks" and the selection of "curricular materials"); *Griswold v. Driscoll*, 625 F. Supp. 2d 49, 54 (D. Mass. 2009) (concerning "the curriculum that will be taught in public school classrooms"); *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993) (concerning the regulation of "a teacher's classroom speech"); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 268 (1988) (concerning a school newspaper that was part of the "educational curriculum and a regular classroom activit[y]").

Because students are voluntary participants in school libraries, the captive audience doctrine also provides no guidance here. *See Cohen v. California*, 403 U.S. 15, 21 (1971) (holding that to "shut off discourse solely to protect" captive audiences, the State must show "that substantial privacy interests are being invaded in an essentially intolerable manner"). Contrary to Defendants' assertion (Appellants' Br. 25, 36, 39–43, 58), students are not compelled to read the books

that SF496 mandates be removed, and therefore Defendants' cases concerning captive audiences have no application here. *See Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684–85 (1986) (applying the "captive audience" doctrine to a "sexually explicit monologue directed towards an unsuspecting audience of teenage students"); *FCC v. Pacifica Foundation*, 438 U.S. 726, 747–48 (1978) (applying the captive audience doctrine to broadcasting, which "has received the most limited First Amendment protection").

Defendants' reliance solely upon cases that do not apply to library books only illustrates the lack of authority for their arguments.

### b. Defendants Ignore The Test For Government Speech, Which Defeats Their Primary Argument.

Defendants' government-speech argument fails for another reason: they entirely ignore and cannot satisfy the governing test established by the Supreme Court to determine whether the government-speech doctrine applies. Library books are not government speech because (1) school libraries have historically not communicated messages from the State, (2) the public does not identify library books as government-endorsed messages, and (3) the State does not control the contents of library books.

Because the government-speech doctrine is a "doctrine that is susceptible to dangerous misuse," courts "must exercise great caution" when considering whether to "extend[] government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235

(2017) (Alito, J.). The Supreme Court has instructed that, to determine whether the government-speech doctrine applies, courts must consider whether (1) the State has historically "communicated messages" through the medium; (2) the medium is "closely identified in the public mind" with the State such that the government "has endorsed that message," and (3) the State directly controls "the messages conveyed" through that medium. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–213 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472–73 (2009); *Matal*, 582 U.S. at 238 (assessing whether trademarks are government speech by applying "three factors [*Walker*] distilled from *Summum*").

Defendants do not even attempt to satisfy the test for government speech in the context of school libraries. Instead, they claim only that "no elaborate multifactor test applies" when an act is "clearly government speech." Appellants' Br. 33 (citing *Chiras*, 432 F.3d at 618). But *Chiras* is a case about curricular materials (textbooks) that predates *Walker* and *Summum*, both of which narrowed the government-speech doctrine to apply only when the government satisfies the three-part test from those cases. While Defendants erroneously assert that the district court "did not account for developments in First-Amendment law beyond old authorities" (Appellants' Br. 5), it is Defendants who disregard controlling precedent in favor of inapplicable cases.

School library books do not satisfy any of the three factors. First, school libraries have not historically communicated messages from the State. Instead, school libraries have long served as vehicles to expose students to a broad array of ideas from authors who express unique, personal points of view. *See, e.g.*, App. 688–89; R. Doc. 34-1, ¶10; App. 954; R. Doc. 53, at 5 (citing Urbandale Board Policy Regulation 0631A-R(1)-R(1)). *See also Gerlich v. Leath*, 861 F.3d 697, 708–709 (8th Cir. 2017) (holding that a university program was not government speech because it "was capable of accommodating a large number of public speakers without defeating [its] essential function" and that permitting speech by hundreds of organizations did not "communicate any message to the public" from the university); *Roach v. Stouffer*, 560 F.3d 860, 868 (8th Cir. 2009) ("[T]he wide variety of available specialty [vanity license] plates further suggests that the messages on specialty plates communicate private speech.").

Second, messages conveyed in school library books are diverse and contradictory—not endorsed by the State, as government speech must be. It would be absurd for Defendants to claim that by including the *Bible*, the *Koran*, *Mein Kampf*, the *Communist Manifesto*, or the *Sayings of Chairman Mao* in a school library, the State has endorsed those messages. As Justice Alito has explained, the government-speech doctrine does not extend to speech that expresses "contradictory views." *See Matal*, 582 U.S. at 236, 238 (explaining that *Walker*, concerning

"Texas specialty license plates," "likely marks the outer bounds of the government-speech doctrine"); *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 272–73 (2022) (Alito, J., concurring) (explaining that "flags flown [from a city flagpole] reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message" of the government).

Third, the State does not "maintain[] direct control over the messages conveyed" in school library books. *See Walker*, 576 U.S. at 213. Rather, authors and publishers control the contents of their books. The State does not "dream up" the books or "edit [books] submitted for" inclusion in school libraries. *See Matal*, 582 U.S. at 235. *See also Shurtleff*, 596 U.S. at 256 (explaining that the "most salient feature" of the case was the defendant's failure to "control[] the flags' content and meaning"); *Roach*, 560 F.3d at 864 ("[T]he more control the government has over the content" the "more likely it is to be government speech."). No court has found that school library collections constitute government speech because there is no plausible argument that library collections deliver "a government-controlled message." *See Summum*, 555 U.S. at 468. Defendants' argument to the contrary is antithetical to the purpose of libraries.

Defendants cannot demonstrate that the government-speech doctrine applies to school library books because library books are fundamentally different than the limited media that constitute government speech. For that reason, the non-library

cases that Defendants cite for their government-speech argument do not help them. *See*, *e.g.*, *Knights of Ku Klux Klan v. Curators of University of Missouri*, 203 F.3d 1085, 1087, 1091 (8th Cir. 2000) (concerning "public broadcast radio" messages in which the government exerted "control over the content and form"); *People for the Ethical Treatments of Animals, Inc. v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005) (concerning a government-sponsored outdoor public art exhibit).[7]  To find that school library books are government speech, the Court would have to expand drastically the reach of this doctrine.  The Court should reject Defendants' baseless government-speech argument.

**B.      The Age-Appropriate Standard Is Unconstitutional.**

**1.      The Age-Appropriate Standard Is A Content-Based Restriction That Serves No Permissible Purpose.**

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I.  Laws that restrict speech based on its content are disfavored and subject to heightened scrutiny.  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).   In addition, the First Amendment limits government restrictions on speech in public schools to "reasonable regulation of speech-connected activities in carefully restricted circumstances."  *Tinker*, 393 U.S. at 513

---

[7] *Gittens* is not a case about library books, it predates the Supreme Court government-speech test, and the language on which Defendants rely from *Gittens* is dicta.  Appellants' Br. 19–20, 33.

(explaining that speech restrictions must be "necessary to avoid material and substantial interference with schoolwork or discipline"). Even under the least-stringent forum standard, the Age-Appropriate Standard is unconstitutional.

The Standard violates the First Amendment because it mandates the content-based removal of library books and is inconsistent with the purpose of libraries, undermining the discretion of librarians and other trained professionals in Iowa schools. No exigency of the educational environment justifies the Standard; nor do Defendants attempt to identify one in their brief.

As the district court explained, courts agree that the government cannot require the content-based removal of library books to impose a "puritanical 'pall of orthodoxy'" or to rid libraries of messages with which they disagree. App. 1099; R. Doc. 56, at 34. *See Pico*, 457 U.S. at 877; *Minarcini*, 541 F.2d at 580; *Campbell*, 64 F.3d at 188–89 (quoting *Pico*); *Counts*, 295 F. Supp. 2d at 1004–1005 (quoting *Pico*). *See also Pratt*, 670 F.2d at 777 (holding that the government "must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information"). The district court correctly applied this standard in ruling that SF496 is an impermissible content-based restriction. App. 1090; R. Doc. 56, at 25 (holding that books cannot be "removed from the school library based on ideological, religious, or other grounds designed to suppress ideas or impose a 'pall of orthodoxy,'" and "the State must establish a 'substantial and

reasonable governmental interest' that justifies the school library restrictions"
(citations omitted)).

The standards that courts apply to assess the removal of library books are consistent with the standard used to assess speech restrictions in nonpublic forums. When the government restricts speech on government property, courts assess those restrictions based on the nature of the forum and the type of speech that is restricted. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).[8] The district court found that "libraries are a 'limited public forum' for which the government may not impose unreasonable or viewpoint-specific restrictions." App. 1097; R. Doc. 56, at 32 (quoting *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1259, 1261 (3d Cir. 1992) (explaining that a library is a "limited public forum" for "communication of the written word")).

At a minimum, a school library is a nonpublic forum. Within nonpublic forums, content-based restrictions must be (1) reasonable in light of the purpose of the forum and (2) viewpoint-neutral. *Cornelius*, 473 U.S. at 806. *Accord*

_____

[8] Despite Defendants' contention, no court has held that a "First Amendment forum analysis is inapt for libraries." Appellants' Br. 14 (citing *ALA*, 539 U.S. at 205–207 (plurality). Defendants mischaracterize *ALA*. That case concerned government subsidies conditioned upon the use of internet-filtering software to block obscene images or child pornography in public libraries—not library books. *Id.* at 198–99. *ALA* stated only that "*[i]nternet access* in public libraries is neither a 'traditional' nor a 'designated' public forum," *id.* at 205 (emphasis added), which is not at issue in this case.

*Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018) (holding that the state must "articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]" inside a polling place); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (holding that "the suppression of exactly [the] type of information" the forum was created for "was simply not reasonable"). That standard is the same as the standard that the district court applied. App. 1097; R. Doc. 56, at 32. For the Standard to pass constitutional muster, Defendants must demonstrate that it is reasonable in light of the purpose of a school library, which they cannot do. *See also Counts*, 295 F. Supp. 2d at 1002 (requiring the State to show that book-removal decisions were "justified by some exigency").

As the district court explained, a "recurring tension[]" in *Pico* and other cases considering the removal of school library books is "whether and to what extent federal judges should get into the business of reviewing *ad hoc* decisions" of local school districts.[9] App. 1092–93; R. Doc. 56, at 27–28. That tension is absent here because, as the district court recognized, SF496 adopts a statewide, "across-the-board" approach mandating the removal of hundreds of books that librarians had

---

[9] *See, e.g.*, *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022). *C.K.-W* is not "similar" (Appellants' Br. 56) to this case. There, the court deferred to school librarians to determine whether a few challenged books should be removed from school district libraries.

selected.  *Id.*  The result was to take away the "broad discretion" that Defendants conceded it is important for librarians to have.  Appellants' Br. 22.

### a. The Age-Appropriate Standard Violates Publishers' And Authors' First Amendment Rights.

The Age-Appropriate Standard violates the First Amendment right of publishers and authors to communicate their messages through their books in school libraries because it is unreasonable in light of the purpose of a school library and unjustified by any exigency of the educational environment.  The First Amendment "embraces the circulation of books as well as their publication."  *Bantam Books*, 372 U.S. at 64 n.6.  *See also Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) (holding that an "interest in distributing books" is "precisely the type of interest at the core of First Amendment protections").  The Standard purports to remove obscene books from school libraries but entirely disregards the Supreme Court's obscenity standard.

The purpose of school libraries is inconsistent with broad content-based restrictions.  Libraries are places of voluntary inquiry that provide students with the opportunity for exploration, discovery, and growth.  *See Pico*, 457 U.S. at 868–889.  Libraries provide students with access to "areas of interest and thought not covered by the prescribed curriculum."  *Id.*  Critical to the success of libraries is the lack of "any kind of authoritative selection" of ideas by the State.  *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–04 (1967); *ALA*, 539 U.S. at

204 ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons.").

In light of these purposes, the Standard is unreasonable, unjustified by any exigency, and therefore unconstitutional. Under the guise of keeping "sexually explicit content" out of school libraries (Appellants' Br. 33–34), the State enacted a law that resulted in the removal of hundreds of library books, virtually all of which have literary value. While the State has a legitimate interest in not providing students with access to books that are obscene, a book is not obscene merely because it contains a description of a sex act. The Supreme Court has defined obscenity as "limited to works" (a) "which, taken as a whole, appeal to the prurient interest in sex"; (b) "which portray sexual conduct in a patently offensive way"; and (c) "which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. at 24. When applied to minors, the *Miller* obscenity standard accounts for the age of the reader. *See Erznoznik*, 422 U.S. at 213–14.

Application of the *Miller* test to minors—what the district court called the "'obscenity-light' standard"—is not "novel" as Defendants wrongly assert. Appellants' Br. 45. Courts have applied the "obscenity-light" standard to evaluate First Amendment restrictions in schools. *See*, *e.g.*, *Sheck*, 530 F. Supp. at 686–87, 691 (applying *Miller*, with consideration of students' "age or maturity," to the

removal of a school library book); *Book People, Inc. v. Wong*, --- F. Supp. 3d ----, 2023 WL 6060045, at *21–22 (W.D. Tex. Sept. 18, 2023), *aff'd in relevant part and remanded*, 91 F.4th 318 (5th Cir. 2024) (unpublished) (applying *Miller* in the context of school libraries and considering the "wide range of grades and ages of potential readers"). *Accord Mailloux v. Kiley*, 436 F.2d 565, 566 (1st Cir. 1971) (holding that restrictions on student access to "offensive" language in schools must account for "the age and sophistication of students," as well as the "context and manner of presentation").

*Miller*'s contextual approach is consistent with other Supreme Court opinions. *Pico* suggested that school districts may be able to remove library books that are "pervasively vulgar" or not "educational[ly] suitab[le]." *See Pico*, 475 U.S. at 871. Books that are "pervasively vulgar" may also be obscene as to minors under the *Miller* test, which requires consideration of both the book's appeal to prurient interests and its value as a whole.[10] Similarly, the Supreme Court's concern about the "educational suitability" of books is captured in the third prong of the *Miller*

_____

[10] To the extent that a book is "pervasively vulgar" but does not appeal to prurient interests, it would also likely not implicate the Age-Appropriate Standard. Defendants hypothesize about *Playboy* magazines in school libraries, claiming that "the district court's approach" would not allow the State to require the removal of those magazines. In the extremely unlikely event that a school library contained *Playboy* magazines, neither the First Amendment nor the district court's ruling would prohibit their removal.

test. The *Miller* test is also consistent with the Supreme Court's decision in *Pacifica.* 438 U.S. 726. Defendants assert that *Pacifica* "disclaimed a contextual obscenity review" (Appellants' Br. 41), but they are wrong. *Pacifica* held that "regulation of indecency" required review of the "specific factual context," because "indecency is largely a function of context—it cannot be adequately judged in the abstract." *Pacifica*, 438 U.S. at 742, 750 (comparing a 12-minute broadcast replete with expletives to "a telecast of an Elizabethan comedy"). Likewise, to determine whether a book is obscene, it must be judged in the context of its value as a whole and the age of its readers.[11]

The Standard fails to account for the *Miller* test and instead requires the removal of all school library books that contain a description of a "sex act." In an implicit admission that books that contain a description of a sex act may have value for Iowa students, SF496 expressly exempts "[r]eligious books such as the Bible, the Torah, and the Koran," which "shall not be excluded from any public school or

---

[11] *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) is also consistent with *Miller*. *Finley* concerned a statute that required an agency to consider decency in determining which arts projects to fund but did not proscribe the funding of indecent speech. *Finley*, 524 U.S. at 580–81 (explaining that the statute "adds 'considerations'" to the process but "does not preclude awards to projects that might be deemed 'indecent' or 'disrespectful'" or "specify that those factors must be given any particular weight"). Defendants assert that *Finley* supports government-use of "content-based criteria" (Appellants' Br. 22–23), but *Finley*, like *Miller*, endorses a factor-based analysis rather than a broad content-based prohibition.

institution in the state."  Iowa Code §§ 256.11(9)(a)(2) (SF496 § 2), 280.6.  This exemption is blatant content-based discrimination.

The Standard resulted in the removal of hundreds of school library books, including books that are highly acclaimed or award-winning, books that are commonly included on AP exams or advance important educational objectives, books that have been in school libraries in Iowa and throughout the nation for decades, and books that cover important educational topics such as history, health, the effects of bullying, coming of age, trauma and grief, duty and mortality, repression, injustice, sexual assault, and the human body.  App. 666–67; R. Doc 34, at 28–29; App. 1093; R. Doc 56, at 28.

SF496 is indifferent to these educational and literary qualities in the hundreds of books that were removed from Iowa schools.  It requires schools to remove a book regardless of its value if it contains only a single, brief description of a sexual encounter—unless the book is a religious text.  As the district court found, the "fact that the Bible and other religious texts are exempted from the law makes the problem even worse, as it communicates that religious books with descriptions of sex acts have value after all, while all others do not."  App. 1100; R. Doc 56, at 35.

It is unreasonable for the State to mandate the removal of library books as "pornography" or "smut" merely because they contain a description of a sex act, without any regard to the value of those books when considered as a whole.  The

State does not contend that the presence of any of these books in school libraries interferes with schoolwork or causes disorder. Instead, the State's proffered justification shows that the Standard is an attempt by Iowa's elected officials "to prescribe what shall be orthodox" and to force their "displeasure or disapproval" upon all students who use school libraries. *See Pico*, 457 U.S. at 870; *Minarcini,* 541 F.2d at 581. Because Defendants cannot demonstrate any reasonable basis for the Standard in light of the purpose of school libraries, the Standard is unconstitutional.

### b. The Age-Appropriate Standard Violates Students' First Amendment Rights.

The Standard also violates students' First Amendment right to receive information. Iowa students' right to receive information is commensurate with publishers' and authors' rights to communicate their messages through their books. The "right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley*, 394 U.S. at 564 (citation omitted). *See also Erznoznik*, 422 U.S. at 213–14 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.").

Under the Standard, the State treats high school seniors the same as third graders and prohibits all students regardless of age, maturity, or reading level from

accessing certain books in their school libraries. A book is not obscene as to all minors if it has serious value for a legitimate minority of minors, such as older minors. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127–28 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990). Nevertheless, the Standard applies to all school libraries and all students without differentiating based on the age of the prospective reader—even if the reader is an adult under Iowa law—and therefore violates the First Amendment.[12]

The Standard has already caused students to lose access to countless library books, and it will continue to do so. For example, Plaintiff Hailie Bonz sought to check out three award-winning school library books this school year, but she was unable to do so because those books had been removed due to SF496. App. 700; R. Doc. 34-4, ¶6. As a result of the Standard, students are deprived of "relevant and important conversations that are sparked by the works of great authors." App. 701; R. Doc. 34-4, ¶11. It takes away tools that students need "to access information" and "navigat[e] life" and "[cheats them] of books that contain facts and histories that are critical to [their] participation in society and our democracy and advancing [their] critical thinking skills." App. 700–701; R. Doc. 34-4, ¶¶7, 11.

---

[12] Students who are at least sixteen years old can legally consent to a "sex act" under Iowa law but cannot, under the Standard, access a library book that contains a single sentence describing a sex act.

Students risk incurring reputational and other harm because of the Standard. Students may seek to read many of the books that SF496 mandates be removed from libraries. But the State has labeled those books "pornography," inappropriate, and "smut," creating a fear that students' reputations may suffer if they seek to read those books. App. 700; R. Doc. 34-4, ¶8; Appellants' Br. 40. Defendants are wrong that the availability of the removed books elsewhere mitigates the First Amendment injury. Appellants' Br. 36. *See Reno*, 521 U.S. at 880 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). And while some students may be able to obtain those books from places other than their school libraries, they may be less likely to do so because of the stigma that arises from the books being labeled "pornography." App. 700–701; R. Doc. 34-4, ¶¶8–10. *See also Counts*, 295 F. Supp. 2d at 999 (holding that stigma associated with reading certain books, access to which had been limited, violated a student's First Amendment right to receive information).

The Standard violates the First Amendment rights of hundreds of thousands of students in Iowa. In the First Amendment context, litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or

expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988). The stigma associated with interest in books that have been designated for removal and the burden associated with advocating for students' rights will likely deter many Iowa students from challenging the Standard. *See* App. 701; R. Doc. 34-4, ¶10. To protect these students' rights, the Court should affirm the preliminary injunction.

### 2. The Standard Is Also Overbroad.

The Age-Appropriate Standard is unconstitutionally overbroad. The Standard bars minors from accessing books that contain a description of a "sex act" even where those books are not obscene under the *Miller* test. The Standard also makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for younger minors.

A statute that burdens otherwise-protected speech is invalid as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The overbreadth doctrine bars the State from restricting even unprotected speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

The Standard is overbroad because it requires the removal of library books

without considering the purpose or offensiveness of the description of sexual activity or the "literary, political, or scientific value" of the books "taken as a whole" as *Miller* requires. *See* 413 U.S. at 24. As the district court found, SF496 prohibits books even if the "sex act" that they describe was "an impetus for legislation" (concerning sexual assault), was "important for historical reasons" (such as an impeachment), or "played an important role in an award-winning work of fiction" (such as for a character's emotional development). App. 1071; R. Doc. 56, at 6.

Although the State has an interest in protecting minors from obscene materials, that interest is not "an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959–960 (8th Cir. 2003). Moreover, the State cannot suppress "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription" solely "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14 (striking ordinance as overbroad).

The text of the Standard bears no relationship to the *Miller* test and therefore is an overbroad regulation of protected speech. Under the plain language of the Standard, the Iowa Code—which contains the statutory definition of "sex act" but is obviously not obscene—cannot exist in school libraries. Because the Standard

requires removal from school libraries of countless materials that are not obscene, it is unconstitutionally overbroad.

The Standard is also impermissibly overbroad because it requires removal of all school library books that describe a sex act without accounting for the age of readers. The First Amendment requires that books be considered in relation to the age and maturity of the students who may access them. *See Erznoznik*, 422 U.S. at 214 n.11 ("[T]he age of a minor is a significant factor."). The Standard prevents older minors from accessing school library books that contain a description of a sex act, even where those books are not obscene as to those older minors. The State cannot "effectively stifle[] the access" of "older minors to communications and materials they are entitled to receive and view" just because such material may be "harmful to the youngest of the minors." *Shipley Inc. v. Long*, 454 F. Supp. 2d 819, 829–830 (E.D. Ark. 2004). *See also Fayetteville*, 2023 WL 4845636, at *15–16 (finding obscenity restriction on library books to be overbroad, even where the statutory language was consistent with *Miller*, because the restriction burdened older minor and adult access to books).

Defendants make three arguments to defend the breadth of the Standard. Appellants' Br. 46–47. Each argument lacks merit. First, Defendants contend that the government-speech doctrine precludes an overbreadth challenge to the

Standard. As explained above, that doctrine does not apply to school libraries.[13]

Second, Defendants contend that the Standard could not be overbroad because it has so far resulted in the removal of only "hundreds of books." The fact that "there are millions of books" in the world and "hundreds of books [were] removed from [library] shelves" does not render the Standard constitutional. Appellants' Br. at 46. Hundreds of books is exponentially greater than the "small number of books or materials" at issue in *Pico* and "[o]ther reported cases emanating from *Pico*." App. 1092; R. Doc. 56, at 27.

Third, Defendants assert that the Standard is not overbroad because no other court has found the definition of "sex act" from the Standard to be unconstitutionally overbroad. But Defendants' cases do not address First Amendment overbreadth; they address crimes that are based on "sex acts." Appellants' Br. 47–48. The definition of "sex act" appears in Iowa's criminal code, and it implicates the First Amendment only because SF496 prohibits library books that contain a description of a sex act. Moreover, the district court did not rule that the definition of sex act is overbroad. Rather, the Standard is overbroad because it requires removal of *any* book with a *description* of a sex act, including "books that

_____

[13] Defendants fail to mention that their government-speech argument, if adopted, would permit the State to mandate the removal of any library book without limitation by the Free Speech Clause.

have as little as a single sentence describing a sex act."  App. 1102–103; R. Doc. 56, at 37-38.  The district court correctly enjoined the Standard as overbroad.

### 3.     The Age-Appropriate Standard Is Void For Vagueness.

The Age-Appropriate Standard does not clearly articulate how school districts should determine which library books must be removed.  The Standard, therefore, violates the due process rights of Iowa educators and is void for vagueness.

Vague laws violate due process and are unconstitutional.  *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").  Laws are void for vagueness where they use imprecise terms that leave "grave uncertainty" about how to understand their scope, even if some parts of what the terms encompass might be "straightforward" exercises of government power.  *Johnson v. United States*, 576 U.S. 591, 597, 602 (2015).  Due process prohibits punishing someone for violating a law where the law "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement."  *Id.* at 595.  When a law "threatens to inhibit the exercise of constitutionally protected rights," including First Amendment rights, a "more stringent vagueness test" applies.  *Vill. Of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

43

The Standard requires Iowa educators to remove library books but does not explain what constitutes a description of a sex act or what level of detail is necessary for the Standard to apply. It is unclear, for example, whether a book that contains the phrase "spent the night together" (or other phrases that might imply a sexual interaction) is descriptive enough to offend the Standard. *See*, *e.g.*, App. 734–35; R. Doc. 34-10, ¶¶13–14. Nor is it clear whether a book that states that two characters "made passionate love" or "had sexual intercourse" must be removed. If Iowa educators fail to divine what the Standard requires, they risk either "interfering with the First Amendment rights of students" or "facing potential discipline, up to and including termination." App. 1105; R. Doc. 56, at 40.

Because the Standard is vague, it is unsurprising that the book-removal lists developed by some Iowa schools in an attempt to comply with SF496 vary widely. The Standard is susceptible to vastly different interpretations, and school districts have reached different determinations regarding whether and which library books must be removed. *See* App. 1072; R. Doc. 56, at 7. If the Standard were sufficiently clear to comport with the Due Process Clause, it would not have resulted in such varying applications.

The examples in Defendants' brief illustrate the difficulty of determining what constitutes a description of a sex act. Defendants assert that SF496 was enacted to address images in books "that explicitly described or depicted sexual

activity." Appellants' Br. 6–8. But many of these images do not depict sexual activity "between two or more persons" and, therefore, are not "sex acts" under the Standard.[14] *See* Iowa Code § 702.17.

Defendants admit that the Standard is difficult to apply. App. 1028–29; R. Doc. 55, at 68:13–69:9 (stating that the Standard would "[p]otentially" prohibit a book concerning the impeachment of President Clinton); App. 1030; R. Doc. 55, at 70:9–20 ("hedging" as to whether schools should remove books about the 2016 election under the Standard).) Defendant Robbins stated that people "in the field" have asked for guidance regarding SF496 "because right now, we're kind of either guessing what is right or wrong, and not being in violation of the law." App. 778; R. Doc 34-16, at 2.

Defendants are correct: the Standard is vague, and it leaves educators with fear that they will inadvertently violate that law and therefore incur penalties for themselves and their school districts. App. 738; R. Doc. 34-10, ¶22; App. 746; R. Doc. 34-11, ¶17. Vague laws give rise to concerns about arbitrary enforcement. The lack of clear guidance gives the State and its school districts discretion to enforce the Standard on an ad hoc and subjective basis, removing any notice to

---

[14] One of Defendants' declarations also shows that the book excerpted on pages 7–8 of their brief was removed from a school library upon parent request *prior to* enactment of SF496. App. 930–947; R. Doc 45-1, Ex. L.

educators as to exactly what conduct is proscribed. *See Keyishian*, 385 U.S. at 603–604 (holding that a speech restriction was unconstitutionally vague where it did not "clearly inform teachers what is being proscribed").

In contending that the Standard is not vague, Defendants do not substantively engage with its text. Instead, they ignore the term "description" and focus exclusively on the term "sex act." But it is the term "description"—in relation to "sex act"—that fails to provide educators with guidance as to how to implement the Standard. The district court agreed. *See* App. 1104; R. Doc. 56, at 39 (finding that the word "description" in SF496 is "elastic enough to leave considerable uncertainty about what crosses the line").

As is typical with vague restrictions on speech, the Standard has chilled First Amendment activity. One school district adopted "a fairly broad interpretation" of the Standard "because if [its] interpretation was too finite, [its] teachers and administrators could be faced with disciplinary actions." App. 798; R. Doc. 34-19, at 4. The resulting harm disproportionately affects educators, who must err on the side of censorship or risk losing their employment and licensure. The Standard was properly enjoined for this additional and independent reason.

### C. The Identity And Orientation Prohibition Is Unconstitutionally Overbroad And Vague.

The Identity And Orientation Prohibition is also unconstitutionally overbroad, because by its plain language it requires the removal of all library books

that mention a character's gender identity or sexual orientation. This overbreadth renders the Prohibition void for vagueness because it threatens to lead to arbitrary enforcement.

As the district court concluded, the Prohibition applies to school library books. App. 1073; R. Doc. 56, at 8. When interpreting statutes, courts give effect to the "clear meaning of the statutes as written" and "begin and end [the] inquiry with the text." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (citation omitted). Courts do not, however, "limit this inquiry to the text" of the statutory provision "in isolation," but instead "look to the provisions of the whole law" to determine a term's meaning. *Id.* (quotations omitted). The plain language of the Prohibition states that it applies to "programs," and SF496 elsewhere refers to a school's "library program." Iowa Code §§ 256.11(9)(a)(2), 279.80(2) (SF496 §§ 2, 16). Consequently, the Prohibition applies to school libraries because courts interpret statutory terms to promote internal consistency. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (holding that the "relation between the two programs" enumerated in a statute "presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (quotations and citations omitted)).

The Prohibition has a "staggeringly broad" scope (App. 1106; R. Doc. 56, at

41) that prohibits and chills a substantial amount of protected speech. The Prohibition defines the terms "gender identity" and "sexual orientation" so broadly that they encompass all gender identities (such as male, female, or nonbinary) and all sexual orientations (such as heterosexual, homosexual, or bisexual). Because the plain language of the Prohibition forbids "programs" (such as library programs) "relating to" gender identity or sexual orientation, the Prohibition requires the removal of all library books that mention a character's gender identity or sexual orientation. *See*, *e.g.*, *Pugin v. Garland*, 599 U.S. 600, 607 (2023) ("[R]elating to" is a "broad phrase."); *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (holding that the phrase "relate to" is "expansive" and reaches "any subject that has a connection with, or reference to, the topics the statute enumerates" (quotation and citation omitted)). Even under a construction that does not forbid mere mention of a character's gender identity, the Prohibition would still bar any school library book that portrays or refers to a marriage or romantic relationship between two persons whose gender identity is referenced, because that would reveal (and "relat[e] to") the sexual orientation of those two persons.

The broad language of the Prohibition would also require the removal of books that address the gender identity or sexual orientation of their characters. For example, the inclusion of the biographical civil rights book *Who Was Harvey Milk* on multiple book-removal lists suggests that the Prohibition requires the removal of

all school library books that refer to a person's sexual orientation—"heterosexual, homosexual, or bisexual"—for K-6 students. There is no possible constitutional justification for the State to mandate the removal of such a wide array of books.

Defendants contend that the district court "adopted the most extreme construction of the [Prohibition] possible" (Appellants' Br. 48), but they fail to advance a valid reason for ignoring the Prohibition's plain language. Instead, Defendants assert that the Prohibition "concerns only [the] compulsory instruction that the [school] district provides." *Id.* at 51. But the word "compulsory" is nowhere to be found in the Prohibition, and "instruction" is only one of the contexts that is explicitly enumerated in the statute. *See* Iowa Code § 279.80(2) (SF496 § 16). Defendants ask this Court to ignore the plain language of the Prohibition without suggesting a plausible "narrowing construction." Appellants' Br. 53. The Prohibition is too broad to satisfy the First Amendment.

The Prohibition is also unconstitutionally vague due to its overbreadth. It does not satisfy the "stringent vagueness test" imposed by the Due Process Clause, *see Vill. of Hoffman Ests.*, 455 U.S. at 499, and it does not provide "a person of ordinary intelligence fair notice of what is prohibited," *see Fox Television Stations*, 567 U.S. at 253. Ultimately, the Prohibition is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

The lack of clear standards creates the potential for arbitrary enforcement of

the Prohibition, which has actually occurred. Defendants refused to inform school districts whether they believed the Prohibition applies to library books—despite receiving questions from educators and despite taking the position in this lawsuit that it does not. Some districts decided that the Prohibition does not apply to school libraries; other districts applied the Prohibition to school libraries to avoid the risk of penalties from being underinclusive. *See*, *e.g.*, App. 736; R. Doc. 34-10, ¶17; App. 699; R. Doc 34-4, ¶3. Virtually all of the books that appear on school districts' removal lists based on the Prohibition have been removed because they portray non-heteronormative characters or relate to non-heteronormative themes. *See* App. 736, R. Doc. 34-10, at 7; App. 759–768; R. Doc. 34-14, at 2–11. In contrast, books that discuss heterosexual parents, moms and dads, and gender roles (of boys and girls) were not marked for removal. *Id*. Regulations that impede First Amendment rights at the whim of regulators are unconstitutionally vague. *See Johnson*, 576 U.S. at 595.

The overbreadth and vagueness of the Prohibition leave educators with an unconstitutional choice: (a) risk penalties, including termination of employment and loss of licensure or (b) err on the side of caution and remove constitutionally protected books that may offend the Prohibition. Many educators proceeded with caution, censoring books that "relate to" gender identity or sexual orientation to the detriment of authors, publishers, and students because to do otherwise would create

undue risk. App. 743, 745; R. Doc 34-11, ¶¶11, 15; App. 751–52; R. Doc. 34-12, ¶¶ 7,13; App. 724–25; R. Doc. 34-9, ¶12. Speech is chilled; books are stigmatized and removed. For all of these reasons, the Prohibition is unconditionally overbroad and vague.

## II. The District Court Did Not Abuse Its Discretion In Finding That Plaintiffs Succeed On The Remaining Preliminary Injunction Factors.

The district court did not abuse its discretion in finding that the remaining preliminary injunction factors also favor injunctive relief. Where, as here, a plaintiff shows the "likely violation" of "First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). Even so, the remaining factors favor Plaintiffs.

As the district court held, "the irreparable harm factor weighs squarely in favor of imposing a preliminary injunction." App. 1110; R. Doc. 56, at 45. Plaintiffs will suffer irreparable harm without a preliminary injunction because the book-removal provisions violate their First Amendment rights. *See Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) ("It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Contrary to Defendants' assertions of "substantial delay" (Appellants' Br. 57) Plaintiffs timely moved for a preliminary injunction (1) promptly after release of

the State's Proposed Rules, which might have but ultimately did not clarify the scope or meaning of the book-removal provisions, (2) only eight days after filing their complaint, and (3) nearly a month before the penalty and enforcement provisions of SF496 were to take effect. *See* App. 628; R. Doc. 28; Iowa Code § 256.11(9)(a)(3) (SF496 § 2). Further, courts have counseled that delay is less probative in the context of continuing constitutional injuries. *See, e.g.*, *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1285 (N.D. Fla. 2021) (citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019)).

The balance of the equities and the public interest also decidedly favor injunctive relief. *See Fayetteville*, 2023 WL 4845636, at *21 (explaining that those factors "merge" "when the government opposes the issuance of a preliminary injunction"). It is "always in the public interest to prevent the violation of a party's constitutional rights." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted). In contrast, injunctive relief does not harm Defendants. Existing Iowa laws and school district procedures protect minors from accessing obscene materials in school libraries, while permitting evaluation of the book's value as a whole and avoiding the sweeping removal of non-obscene books. Defendants have no legitimate interest in enforcing the book-removal provisions because they violate the First and Fourteenth Amendments.

## CONCLUSION

SF496's Age-Appropriate Standard and Identity And Orientation Prohibition violate Plaintiffs' First and Fourteenth Amendment rights. For the reasons set forth above, the Court should affirm the district court's decision to preliminarily enjoin those provisions.

Dated: April 12, 2024

/s/ Frederick J. Sperling
Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
Meera Gorjala
ArentFox Schiff LLP
233 South Wacker Drive
Suite 7100
Chicago, Illinois 60606
Tel: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com
meera.gorjala@afslaw.com

Mark E. Weinhardt
Todd M. Lantz
Jason R. Smith
The Weinhardt Law Firm
2600 Grand Avenue, Suite 450
Des Moines, Iowa 50312
Tel: (515) 244-3100
mweinhardt@weinhardtlaw.com
tlantz@weinhardtlaw.com
jsmith@weinhardtlaw.com

*Attorneys for Plaintiffs-Appellees*

Christy A.A. Hickman
Becky S. Knutson
Katherine E. Schoolen
Iowa State Education
Association
777 Third Street
Des Moines, Iowa 50309
Tel: (515) 471-8004
christy.hickman@isea.org
becky.knutson@isea.org
katie.schoolen@isea.org

*Attorneys for the Educator
Plaintiffs-Appellees*

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

I hereby certify that this brief complies with (1) the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font in the text and footnotes.

Dated: April 12, 2024                    /s/ Kirstie Brenson
                                          Kirstie Brenson

                                          *Counsel for Plaintiffs-Appellees*


## CERTIFICATION OF ELECTRONIC SUBMISSION

I hereby certify that this brief complies with Eighth Cir. R. 28A(h) because it is in PDF format and the brief has been scanned for and is free of viruses.

Dated: April 12, 2024                    /s/ Kirstie Brenson
                                          Kirstie Brenson

                                          *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I caused a true and correct copy of the foregoing brief to be electronically filed with the Clerk of the Court by using the Court's CM/ECF system, which will send notification of the filing to all registered users of the CM/ECF system.

Dated: April 12, 2024

/s/ Kirstie Brenson
Kirstie Brenson

*Counsel for Plaintiffs-Appellees*