# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 24-1075

GLBT YOUTH IN IOWA SCHOOLS TASK FORCE, D/B/A IOWA SAFE SCHOOLS
ET AL., *Plaintiffs-Appellees,*

v.

KIM REYNOLDS, IN HER OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF
IOWA, *et al., Defendants-Appellants,*
JULIE MITCHELL, IN THEIR OFFICIAL CAPACITIES AS BOARD MEMBERS OF
THE URBANDALE COMMUNITY SCHOOL DISTRICT, *et al., Defendants.*

No. 24-1082

PENGUIN RANDOM HOUSE, LLC, ET AL., *Plaintiffs-Appellees,*

v.

JOHN ROBBINS, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE IOWA
STATE BOARD OF EDUCATION, ET AL., *Defendants-Appellants*

Appeals from the United States District Court for the
Southern District of Iowa, No. 4:23-cv-00474 & No. 4:23-cv-00478,
Hon. Stephen H. Locher, presiding

# BRIEF OF PEN AMERICAN CENTER AS *AMICUS CURIAE*
# IN SUPPORT OF PLAINTIFFS-APPELLEES & AFFIRMANCE

Katherine H. Blankenship
PEN AMERICAN CENTER
250 Catalonia Ave., Ste. 405
Coral Gables, Florida 33134
Telephone: 786-330-9672
kblankenship@pen.org
*Attorney for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amicus Curiae PEN American Center ("PEN America") states that it does not have a parent corporation and that no publicly held company owns 10% or more of its stock.

Dated: April 18, 2024
*/s/ Katherine H. Blankenship*
Katherine H. Blankenship

## RULE 29(a)(4)(E) STATEMENT

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *Amicus Curiae* states that counsel for neither party contributed to the writing of this brief and that counsel for neither party nor any other person contributed money that was intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF INTEREST .................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT ............................................................................................ 4

I.   SF496 is part of a troubling national trend of national
educational censorship and has already caused substantial
harm.. ............................................................................................ 4

II.  SF496  intrudes upon First Amendment freedoms and
violates Supreme Court precedent ................................................. 9

   A.   Students have the right to receive information in
public schools .......................................................................... 9

      1.   The standards established in *Pico* and *Pratt*
should control. ................................................................ 11

      2.   The Library Program fails to withstand the
standard of scrutiny that *Pratt* requires. .................... 14

   B.   The restrictions on sexual content go beyond school
districts' discretion and fail to appropriately apply an
obscenity standard for minors. ............................................ 15

      1.   The obscenity doctrine does not give the
government carte blanche to trample students'
First Amendment rights. ............................................... 15

      2.   Appellants advocate for a distorted reading of the
obscenity doctrine that would infringe on

students' rights to information with serious
literary, artistic, political, or scientific value. ............. 19

C.    The government speech doctrine does not save SF496's
      Library Program; finding otherwise would create a
      dangerous precedent. ........................................................... 23

      1.    The viewpoint-based removal of library books
            fails to meet the definition of government speech....... 24

      2.    Finding that the government speech doctrine
            applies to SF496's Library Program would set a
            novel and dangerous precedent. ................................... 30

CONCLUSION ......................................................................................... 33

CERTIFICATION OF COMPLIANCE PURSUANT TO FED. R.
    APP. 32(g) ........................................................................................ 34

CERTIFICATION OF COMPLIANCE WITH EIGHTH CIRCUIT
    RULE 28A(h) ................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.,*
557 F.3d 1177 (11th Cir. 2009) ...................................................... 11

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ............................ 11, 13, 32

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S.
853 (1982) ..................................................10, 11, 12, 13, 25, 26, 33

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ...................... 17, 22

*Brown v. Louisiana*, 383 U.S. 131 (1966) ............................................... 25

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005)........................................ 11

*Cohen v. California*, 403 U.S. 15 (1971) ................................................. 26

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .............. 17, 22, 23

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)............................................... 31

*Ginsberg v. State of N. Y.*, 390 U.S. 629 (1968) .......................... 16, 18, 22

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*, No. 4:23-CV-00474,
2023 WL 9052113 (S.D. Iowa Dec. 29, 2023)............................... 3, 5

*Hannegan v. Esquire, Inc.*, 327 U.S. 146 (1946) .............................. 26, 27

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)........................... 31

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967)
.................................................................................. 3, 10, 26, 31

*Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992) ................... 11

*Matal v. Tam*, 582 U.S. 218 (2017) ....................................... 23, 27, 31, 33

*Mahanoy Area Sch. Dist. v. B. L. ex. rel. Levy*, 594 U.S. 180 (2021) 13, 25

*Miller v. California*, 413 U.S. 15 (1973)...................................... 15, 16, 20

*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976) 27

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) ................................................................................ 11

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 2024 WL 133213 (N.D. Fla. Jan. 12, 2024).................................................................. 28, 32

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) .......................... 32

*Pope v. Illinois*, 481 U.S. 497 (1987) ...................................................... 26

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982) ................................................................ 12, 13, 14, 19

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997)............. 17, 22, 23

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 893 (1995) ................................................................................ 27

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) .................................... 24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ..9, 23

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ......................... 19

*Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985) .............................................................. 18

*U.S. v. Am. Library Ass'n*, 539 U.S. 194 (2003)...................................... 25

*Virginia v. Hicks*, 539 U.S. 113 (2003).................................................... 15

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200
    (2015) ...................................................................................... 24, 29

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624(1943)
    ........................................................................... 9, 11, 13, 31

**Statutes**
Iowa Code Ann. § 256.11 ....................................................... passim

Iowa Code Ann. § 256.11(19)(a)(2)) .................................... passim

Iowa Code Ann. § 279.50 ....................................................... 7

Iowa Code Ann. § 279.80 ....................................................... 5

Iowa Code Ann. § 280.6 ........................................................ 7

**Other Authorities**
Scottie Andrew, *Book bans are surging — and taking an emotional toll
    on many authors,* CNN.com (Oct. 4, 2023),
    https://www.cnn.com/2023/10/04/style/book-bans-sales-authors-
    impact-cec/index.html. ................................................... 22

Katie Akin and Bill Steiden, *Federal judge blocks enforcement of Iowa
    law banning school books, gender identity instruction*, Des Moines
    Register (Dec. 29, 2023),
    https://www.desmoinesregister.com/story/news/education/2023/12/
    29/iowa-book-ban-injunction-law-senate-file-496-school-libraries-
    books-gender-identity-sexuality/72061486007/. ......................... 6

Sabrina Baêta, et al., *Banned in the USA: Narrating the Crisis*, PEN
    America (Apr. 16, 2024), https://pen.org/report/narrating-the-
    crisis/ ........................................................................ 4, 5

Sabrina Baêta, *Spineless Shelves: Two Years of Book Banning*, PEN
    American Center, Inc. (Dec. 13, 2023), https://pen.org/spineless-
    shelves/. ....................................................................... 4

Katie Blankenship & Sophia Brown, *Cracks in the Facade: Lessons Learned from Florida's Ongoing Censorship Campaign*, PEN America (March 2024), http://www.pen.org/report/cracks-in-the-facade/ ............................................................................... 6

Marlaina Cockcroft, *Book Challenges Are Having a Chilling Effect on School Librarians Nationwide*, SLJ (Aug. 24, 2023), https://www.slj.com/story/Book-Challenges-Are-Having-a-Chilling-Effect-on-School-Librarians-Nationwide-SLJ-Survey .................... 8

Althea Cole, *Iowa's 'book ban' blocked for now. Now what?*, The Gazette (Jan. 7, 2024), https://www.thegazette.com/staff-columnists/iowas-book-ban-blocked-for-now-now-what/ ....................................... 5, 6

Stephen Gruber-Miller, *ACLU of Iowa, Lambda Legal sue to block Iowa law that bans LGBTQ teaching, explicit books,* The Des Moines Reg. (Nov. 28, 2023), https://www.desmoinesregister.com/story/news/politics/2023/11/28/senate-file-496-aclu-lambda-legal-sue-block-iowa-law-that-restricts-lgbtq-teaching-bans-books/71724264007/. .................... 5, 6

Chris Higgins and Samantha Hernandez, *Poll: Half say new law requiring schools to ban books depicting sex acts goes too far,* Des Moines Reg. (Mar. 17, 2024), https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/03/17/iowa-poll-half-say-new-book-ban-law-for-public-schools-goes-too-far-senate-file-496-lgbtq/72775250007/. .............. 7

Samantha LaFrance, *It's Not Just Florida: 4 New "Don't Say Gay" Laws Passed in 2023*, PEN America (Aug. 31, 2023), https://pen.org/4-new-dont-say-gay-laws-passed-in-2023/ ....................................... 5

Samantha LaFrance, *These Books Are Banned in Urbandale*, PEN America (Aug. 3, 2023), https://pen.org/iowa-book-bans/ ....... 3, 5, 8

PEN America, *PEN America Index of Educational Gag Orders*, https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO . 2

Jonna Perrillo, *Today's book bans might be more dangerous than those from the past*, Wash. Post (Sep. 12, 2022), https://www.washingtonpost.com/made-by-history/2022/09/12/todays-book-bans-might-be-more-dangerous-than-those-past/ ...............................................................................4

Whitney Strub, *Book banning has a long and homophobic history*, N.J. Star-Ledger (Dec. 21, 2021), https://www.nj.com/opinion/2021/12/book-banning-has-a-long-and-homophobic-history-opinion.html ....................................................6

Lisa Tolin, PEN America, *These 450 Books Were Banned in Iowa* (Oct. 19, 2023), https://pen.org/books-banned-in-iowa/. .........................21

Tim Webber & Samantha Hernandez, *Library books removed in Iowa school districts*, The Des Moines. Reg. (Dec. 20, 2023), https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/ ...........................................3

## STATEMENT OF INTEREST

*Amicus Curiae* submits this brief pursuant to Fed. R. App. P. 29(b). All parties consent to the filing of the brief pursuant to Fed. R. App. P. 29(a)(2).

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights. PEN America advocates for free expression and the interests of writers in the United States and abroad. Its membership includes more than 5,000 writers and literary professionals, including over 100 members in the states comprising the Eighth Circuit.

As an advocate for free expression and the interests of writers, PEN America has a particular interest in opposing the suppression of ideas in literature. Thus, as educational censorship has ballooned in recent years, PEN America has actively monitored efforts like Senate File 496 ("SF496") to remove books from school libraries, believing that any such effort is damaging to a flourishing democracy. With this brief, *Amicus Curiae* explains the unlawful and deleterious effects of SF496 on it and its constituencies if the injunction is lifted.

## INTRODUCTION AND SUMMARY OF ARGUMENT

PEN America has been at the forefront of tracking the proliferating book bans nationwide and state legislation enacted to codify them.[1] Legislation mandating book bans, including SF496,[2] undermines public education systems through intrusions on First Amendment liberties, including students' right to receive information and authors' free speech rights.

This brief concerns the sections of SF496 limiting school libraries to "age-appropriate materials" which "do[] not include any material with descriptions or visual depictions of a sex act." Iowa Code Ann. § 256.11(9) ("Library Program"). PEN America urges the Court to affirm the preliminary injunction of the Library Program on the grounds that: (1) the Library Program violates students' right to receive information, (2) the restrictions are prohibited under the obscenity doctrine, and (3) the government speech doctrine does not apply.

---

[1] *See* PEN America, *Book Bans*, https://pen.org/issue/book-bans/.
[2] *See PEN America Index of Educational Gag Orders*, https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yo d7l01o0TCk/viw6VOxb6SUYd5nXM?blocks=hide/.

The Library Program has led to sweeping book bans across Iowa[3] and "imposed a puritanical 'pall of orthodoxy' over school libraries." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 2023 WL 9052113, at *19 (S.D. Iowa Dec. 29, 2023) (quoting *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967)). SF496 constitutes grave government overreach that has caused substantial harm to Iowan students, the writers who aim to reach them, and the larger culture of free expression. It is essential that the injunction remain in place until the case can be adjudicated on its merits to prevent further intrusions upon constitutional freedoms and an environment of fear and self-censorship in public schools that would destabilize Iowa's public education system. Neither the Constitution nor the foundations of democracy allow such results.

---

[3] *See* Tim Webber & Samantha Hernandez, *Library books removed in Iowa school districts*, The Des Moines Reg. (Dec. 20, 2023), https://www.desmoinesregister.com/story/news/education/2023/10/16/database-banned-books-removed-from-iowa-school-libraries-under-new-state-law-senate-file-496/70995919007/; Samantha LaFrance, PEN America., *These Books Are Banned in Urbandale* (Aug. 3, 2023), https://pen.org/iowa-book-bans/.

## ARGUMENT

I. **SF496 is part of a troubling national trend of national educational censorship and has already caused substantial harm.**

Since 2021, state efforts to suppress certain topics and ban books in public school libraries for political and ideological reasons have proliferated.[4] Indeed, from July 2021 to June 2023, PEN America's Index of School Book Bans recorded 5,894 instances of book bans across 41 states and 247 public school districts.[5] In that time, 2,823 unique titles were affected and the work of 2,598 authors, illustrators, and translators was censored.[6] Just since July 2023, there have been an additional 4,349 instances of book bans across the country.[7]

Since January 2021, PEN America has also tracked 362 "educational gag orders"—bills restricting certain topics in both K-12 and higher education curricula— introduced in state legislatures across the

---

[4] *See, e.g.,* Jonna Perrillo, *Today's book bans might be more dangerous than those from the past*, Wash. Post (Sep. 12, 2022), https://www.washingtonpost.com/made-by-history/2022/09/12/todays-book-bans-might-be-more-dangerous-than-those-past/.

[5] Sabrina Baêta, *Spineless Shelves: Two Years of Book Banning*, PEN America (Dec. 13, 2023), http://www.pen.org/spineless-shelves/.

[6] *Id.*

[7] Sabrina Baêta, et al., *Banned in the USA: Narrating the Crisis*, PEN America (Apr. 16, 2024), pen.org/report/narrating-the-crisis.

4

country,   33   of   which   have   been   signed   into   law.[8]

SF496 mirrors many of these bills, such as Florida's HB 1557 and

copycat bills in Indiana, Arkansas, and other states, that are widely

understood as attempts to suppress discussion of LGBTQ+ identities and

have had this damaging effect across the country. [9]

Books with LGBTQ+ characters or themes are being pulled from

shelves in Iowa and beyond.[10] These bills prohibit a broad swath of

---

[8] *See supra* note 2.

[9] In Iowa, SF496's Sec. 16, prohibiting instruction on gender or sexual identity, has led to the removal of books with LGBTQ+ themes and characters. (codified in Iowa Code Ann. § 279.80). *See GLBT Youth in Iowa Sch. Task Force v. Reynolds*, No. 4:23-CV-00474, 2023 WL 9052113, at *5 ("Others have interpreted it, in conjunction with other aspects of Senate File 496, to mean that students in grade six and below cannot have access to books with LGBTQ+ characters"). While this brief focuses on the Library Program, PEN America concurs with Appellees that this section is constitutionally infirm and is yet another reason SF496 should remain enjoined. App. Br., No. 24-1075 at 38.

[10] *See* Althea Cole, *Iowa's 'book ban' blocked for now. Now what?*, The Gazette (Jan. 7, 2024), https://www.thegazette.com/staff-columnists/iowas-book-ban-blocked-for-now-now-what; Stephen Gruber-Miller, *ACLU of Iowa, Lambda Legal sue to block Iowa law that bans LGBTQ teaching, explicit books*, The Des Moines Reg. (Nov. 28, 2023), https://www.desmoinesregister.com/story/news/politics/2023/11/28/senate-file-496-aclu-lambda-legal-sue-block-iowa-law-that-restricts-lgbtq-teaching-bans-books/71724264007/; Samantha LaFrance, *It's Not Just Florida: 4 New 'Don't Say Gay' Laws Passed in 2023*, PEN America (Aug. 31, 2023), https://pen.org/4-new-dont-say-gay-laws-passed-in-2023/; Baêta et al., *supra* note 7;

5

constitutionally-protected expression based on viewpoint, attempting to paint certain content as harmful without any pedagogical justification, based instead on ideology perspective and discomfort. These bills fail to accomplish their supporters' purported goal of "protecting children" from harmful content and instead broadly restrict First Amendment rights.[11]

SF496 denies students access to critical literature and cultural expression. SF496 requires each school district in the state to establish a

---

Katie Blankenship & Sophia Brown, *Cracks in the Facade: Lessons Learned From Florida's Ongoing Censorship Campaign*, https://pen.org/report/cracks-in-the-facade/; Althea Cole, *Iowa's 'book ban' blocked for now. Now what?*, The Gazette (Jan. 7, 2024), https://www.thegazette.com/staff-columnists/iowas-book-ban-blocked-for-now-now-what; Stephen Gruber-Miller, *ACLU of Iowa, Lambda Legal sue to block Iowa law that bans LGBTQ teaching, explicit books*, The Des Moines Reg. (Nov. 28, 2023), https://www.desmoinesregister.com/story/news/politics/2023/11/28/senate-file-496-aclu-lambda-legal-sue-block-iowa-law-that-restricts-lgbtq-teaching-bans-books/71724264007/;

[11] *See, e.g.,* Katie Akin and Bill Steiden, *Federal judge blocks enforcement of Iowa law banning school books, gender identity instruction*, Des Moines Register (Dec. 29, 2023), https://www.desmoinesregister.com/story/news/education/2023/12/29/iowa-book-ban-injunction-law-senate-file-496-school-libraries-books-gender-identity-sexuality/72061486007/; Whitney Strub, *Book banning has a long and homophobic history*, N.J. Star-Ledger (Dec. 21, 2021), https://www.nj.com/opinion/2021/12/book-banning-has-a-long-and-homophobic-history-opinion.html (discussing the history of book bans being used to prevent children from accessing content about LGBTQ+ identities).

K-12 library program that "contains only age-appropriate materials[.]" Iowa Code Ann. § 256.11(9)(a)(2) (the "Library Program"). The statute states that "age-appropriate" material cannot contain "descriptions or visual depictions of a sex act," with only limited carve-outs for "human growth and development curriculum" and "religious books" like the bible. Iowa Code §§ 256.11(19)(a)(2)), § 279.50, § 280.6.

This definition of "age-appropriate," which accounts for neither the pedagogical or cultural value nor the difference in maturity across ages, is so sweeping that it has been used to censor a wide range of literature. Indeed, since July 2023, at least 1,820 books (including 615 unique titles) have been removed from public school library shelves to comply with the Library Program.[12] The far-reaching censorship of books has even included canonical literature and books that are considered rites of passage for middle- and high-schoolers, leading some Iowa school districts to strike such classics as *The Bluest Eye*, *A Farewell to Arms*,

---

[12] Chris Higgins and Samantha Hernandez, *Iowa Poll: Half say new law requiring schools to ban books depicting sex acts goes too far*, The Des Moines Reg. (March 17, 2024), https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/03/17/iowa-poll-half-say-new-book-ban-law-for-public-schools-goes-too-far-senate-file-496-lgbtq/72775250007/.

*The Catcher in the Rye*, *I Know Why the Caged Bird Sings*, and *Madame Bovary*.[13]

Even beyond the formal book removals contemplated by the statute, SF496 has also created a culture of fear that has already led schools to censor their own collections.[14] This censorship deprives Iowa's youth of access to the written word and voices of some of the world's most treasured writers, artists, and thinkers.

Writers, too, are now incentivized to avoid complex topics that may be of critical importance to young readers lest their books no longer make it to the shelves.[15] That self-censorship is disastrous for young adult and children's literature, impeding writers' abilities to confront difficult ideas and truths and to reach their intended audiences. It likewise denies young readers the exposure to diverse perspectives and stories that reflect their lived experiences.

---

[13] LaFrance, *supra* note 3.
[14] *See id.*
[15] Marlaina Cockcroft, *Book Challenges Are Having a Chilling Effect on School Librarians Nationwide*, SLJ (Aug. 24, 2023), https://www.slj.com/story/Book-Challenges-Are-Having-a-Chilling-Effect-on-School-Librarians-Nationwide-SLJ-Survey.

SF496 is not the stuff of democracy, and its impact has already been felt. SF496's attempt to restrict students' access to literature flies in the face of First Amendment values and sets a dangerous precedent for the suppression of art and thought. PEN America urges the Court to consider the harm SF496 has already inflicted, the breadth of its restrictions, and the devastating impact it would have on free expression in Iowa should the preliminary injunction be overturned.

## II.   SF496 intrudes upon First Amendment freedoms and violates Supreme Court precedent.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This has long been a guiding principle for courts considering First Amendment rights in public schools. And, although First Amendment rights must be "applied in light of the special characteristics of the school environment," students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

Targeting all descriptions of sex is precisely the type of abuse of discretion in the name of orthodoxy that the Court has squarely condemned. *See, Keyishian*, 385 U.S. at 603 ("[T]he First Amendment…does not tolerate laws that cast a pall of orthodoxy over the classroom")  As explained below, students have a First Amendment right to information from public school library books that cannot be abridged due to the government's distaste for those books,  and Appellants cannot render their infringement of students' rights valid by relying on the obscenity or government speech doctrines.

A. **Students have the right to receive information in public schools.**

Students have a right to receive the information that SF496 seeks to censor. The Supreme Court addressed students' First Amendment rights to receive information with respect to school library materials in *Board of Education, Island Trees Union Free School District v. Pico*, 457 U.S. 853 (1982). *Pico* concerned the removal of books from a school district's libraries on the basis that school board members found them "anti-American, anti-Christian, [anti-Semitic], and just plain filthy." *Id.* at 857. Justice Brennan's plurality opinion there, joined by Justices

Marshall and Stevens, and in part by Justice Blackmun,[16] set forth the standard that local school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Id.* at 872. In drafting the plurality opinion, Justice Brennan reasoned that students' right to receive information is an "inherent corollary" of their right to free speech, *Id.* at 867, and that school boards may not remove books to "prescribe what shall be orthodox in politics, nationalism, religion, and other matters of opinion." *Id.* at 871 (quoting *Barnette*, 319 U.S. at 642).

### 1. The standards established in *Pico* and *Pratt* should control.

While circuits around the country are split on adopting *Pico*'s standard,[17] its plurality is consistent with preexisting Eighth Circuit

---

[16] Justice Blackmun accepted the standard set forth by the plurality but wrote separately. In his view, the ban was improper not due to a right to receive information, but rather because the "State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." *Id.* at 878-89.

[17] *Compare, e.g., ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (declining to apply *Pico*) *and Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) (same) *with Arce v. Douglas*, 793 F.3d 968, 981-82 (9th Cir. 2015) (applying *Pico*); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) (same); *and Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992) (same).

precedent. *Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670 F.2d 771 (8th Cir. 1982), which was decided before *Pico*, concerned the decision of a Minnesota school district to remove films from a high school curriculum due to "the alleged violence in the films and their purported impact on the religious and family values of students." *Id.* at 773. *Pratt* held that the removals violated students' First Amendment right to receive information because the board justified them on the grounds that "the films' ideological and religious themes [were] offensive." *Id. Pratt* held that school boards must establish a "substantial and reasonable government interest" for interfering with this right, a version of intermediate scrutiny. *Id.* at 777. *Pratt* recognized schools' discretion in choosing their curricula but noted that the First Amendment "precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Id.* at 776.

*Pratt* predates the Supreme Court's decision in *Pico* by just a few months. However, the standard established in *Pratt* is largely similar to the one articulated by Justice Brennan in the *Pico* plurality. Like *Pico*, *Pratt* draws explicitly from the lineage of caselaw on free speech in public

schools, which consistently affirms rights of students to certain free speech protections and access to information while recognizing the discretion of local school boards to make certain curricular decisions. *Compare id.* at 775-76 *and Pico*, 457 U.S. at 871-72 (citing the same line of cases).

In the Eighth Circuit, *Pratt* remains the law of the land: school districts must show a "substantial and reasonable government interest" for restricting students' right to receive information. 670 F.2d at 777. However, even absent the binding authority of *Pratt*, the principle articulated in *Pico* that removing books in a "a narrowly partisan or political manner" "stand[s] inescapably condemned by our precedents" and is the logical conclusion of decades of caselaw on the First Amendment and public education. 457 U.S. at 870.

*Pico*, *Pratt*, the lineage of caselaw on which they draw (such as *Barnette, Tinker, Shelton, Keyishian*) and subsequent cases all emphasize the importance of students' right to receive information and the dangers of state intervention to "strangle the free mind at its source." *Barnette*, 319 U.S. at 637. *See, e.g., Arce*, 793 F.3d at 981-84 (9th Cir. 2015); *see also cf. Mahanoy Sch. Dist. v. B.L. ex. rel. Levy*, 594 U.S. 180,

190 (2021) (holding that schools have "an interest in protecting a student's unpopular expression").

### 2. The Library Program fails to withstand the standard of scrutiny that *Pratt* requires.

SF496's Library Program does not withstand the standard of scrutiny articulated in *Pratt* or the Supreme Court's free expression jurisprudence more generally, which requires that any interference with students' right to receive information be related to a "substantial and reasonable government interest." *Pratt*, 670 F.2d at 777. The Library Program's restrictions are anything but reasonable, failing to differentiate among grade levels and applying the same restrictions uniformly for 5-year-olds through 18-year-olds.

Instead, SF496 imposes a blanket ban of all "descriptions or visual depictions of a sex act," Iowa Code Ann. § 256.11(19)(a)(1), regardless of context or consideration of artistic, intellectual, or cultural value. This has resulted in books that have been regarded for decades as classics of youth literature being pulled from the shelves. In short, the Library Program does not ensure that students are accessing age-appropriate content; rather, it hinders access to age-appropriate content by preventing students from reading literature that grows alongside them,

failing to recognize that as readers mature, they need access to books with more mature and complex ideas.

## B. The restrictions on sexual content go beyond school districts' discretion and fail to appropriately apply an obscenity standard for minors.
### 1. The obscenity doctrine does not give the government carte blanche to trample students' First Amendment rights.

The prohibition of library materials that contain any "sex act" is far too broad[18] an intrusion into student and author First Amendment rights and substantially intrudes on constitutionally protected speech and access to information without properly applying an obscenity test for minors.

Obscenity, of course, is not protected speech. Under the general test for obscenity, articulated in *Miller v. California*, a work is obscene— and thus unprotected—if (1) the "'average person, applying contemporary community standards would find that the work, taken as

---

[18] While PEN America focuses primarily on SF496's violation of the obscenity doctrine for minors, the inherent violations of the overbreadth clause are an important factor for the Court's consideration. SF496 violates the overbreadth doctrine, which prevents enforcement of a law that "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal citations omitted).

a whole, appeals to the prurient interest," (2) it "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law", and (3) the work, "taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24 (internal citations omitted).

The Court has clarified that because of the state interest in preventing minors' access to harmful material, the state may adjust standards of obscenity based on the recipient: "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined." *Ginsberg v. State of N. Y.*, 390 U.S. 629, 636 (1968). The *Ginsberg* Court explained that "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed." *Id*.

The Court has continued to interpret the First Amendment rights of minors through the lens of *Ginsberg* even after *Miller*. For instance, in *Erznoznik*, the Court struck down a local ordinance banning all movies with nudity from drive-in theaters, finding that "[c]learly all nudity cannot be deemed obscene even as to minors." *Erznoznik v. City of*

*Jacksonville*, 422 U.S. 205, 213-14 (1975. The Court held that "minors are entitled to a significant measure of First Amendment protection" and the legislature cannot ban minors from access to constitutionally protected information or speech simply because it finds it "unsuitable" for them. *Id.* at 212-14.

In *Reno v. ACLU*, the Court struck certain provisions of the Communications Decency Act, decrying the "unacceptably heavy burden on protected speech" because it was not narrowly tailored to serve the statute's stated interest in protecting minors from harmful information on the internet. 521 U.S. 844, 882 (1997). In so doing, the Court specifically identified the lack of consideration of *Miller*'s third prong— the literary, artistic, political, or scientific value of the censored works.[19] *Id.*

The Eighth Circuit has adopted an obscenity test for minors that aligns with Supreme Court precedent. In a case considering an ordinance prohibiting display of material "harmful to minors," the Eighth Circuit

---

[19] The Court also acknowledged *Ginsberg*'s continuing force in *Brown v. Ent. Merchants Ass'n*, where it explained that the State "possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." 564 U.S. 786,794 (2011) (internal citations omitted).

defined "harmful to minors" by weighing representations of sexual conduct through the *Miller* test as applied to minors. *See Upper Midwest Booksellers Ass'n v. City of Minneapolis,* 780 F.2d 1389, 1390–91 (8th Cir. 1985). The Eighth Circuit relied on *Ginsberg*, explaining that it is "an adaptation of the pre-*Miller* obscenity standard to require an assessment of whether the material was suitable for minors under prevailing community standards." *Id.* at 1392. The court upheld the ordinance in part because it was "limited to only those materials that are obscene as to minors." *Id.* at 1393–94.

Appellants argue that this line of caselaw should be disregarded because it does not deal with materials and information in public schools. *See* App. Br., No. 24-1075 at 60-61. Appellants misapply critical precedent. The above line of Supreme Court and Eighth Circuit cases shows that, in restricting minors' access to speech and information, courts must consider an obscenity standard tailored to minors rather than an all-out ban of sexual content. *See. e.g., Ginsberg*, 390 U.S. at 634-40 (1968), *Upper Midwest Booksellers Ass'n*, 780 F.2d at 1393–94.

Appellants can cite to no source siphoning this standard off from consideration of public school restrictions. To the contrary, the progeny

of *Ginsberg*, including *Miller*, *Reno, Erznoznik, Brown,* and *Upper Midwest Booksellers*, makes clear that public school students are entitled to First Amendment protections that cannot be restricted at the whim of the state.

> **2. Appellants advocate for a distorted reading of the obscenity doctrine that would infringe on students' rights to information with serious literary, artistic, political, or scientific value.**

Iowa students' right to receive information cannot be subverted based on the state legislature's ideological, political, or religious viewpoints. *See Pratt,* 670 F.2d at 776. Appellants claim that the restrictions are viewpoint-neutral, as they simply prohibit books that contain depictions of "sex acts" defined neutrally with respect to gender and sexual orientation. App. Br., No. 24-1075, at 50-55. However, not considering literary and educational value has the effect of deeming all descriptions of sex inappropriate and harmful. *Cf. Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994) ("Our cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys."). As *Erznoznik* and *Brown* remind us, disgust and discomfort with sex are not

valid justifications for infringing on minors' First Amendment freedoms by failing to consider the literary, artistic, political, or scientific value of the books and materials affected by the Library Program.

The state's failure to apply an appropriate obscenity standard for minors has real and devastating effects. Students who are denied critical access to literature and information are not the only ones harmed; this impact reaches across the borders of Iowa to every author whose works are implicated in the state's schools.

Writers count on robust First Amendment freedoms and the value our culture places on free expression when writing about new ideas and experimenting with form and style. *See Miller*, 413 U.S. at 23 (noting the "inherent dangers of undertaking to regulate any form of expression"). As members of a pluralistic society, we, in turn, depend on writers to share their voices, perspectives, and ideas, broaden our own horizons, and shape the fabric of our culture.

Already, the Library Program has resulted in more than 1,820 books pulled from shelves across multiple school districts.[20] Young Iowans have been denied access to classic works such as:

---

[20] *See* Des Moines Reg., *supra* note 12.

- *1984* and *Animal Farm* by George Orwell
- *Beloved*, *The Bluest Eye*, *Song of Solomon and Sula* by Toni Morrison
- *Brave New World* by Aldous Huxley
- *The Color Purple,* by Alice Walker
- *The Handmaid's Tale*, by Margaret Atwood
- *I Know Why the Caged Bird Sings*, by Maya Angelou
- *Invisible Man* by Ralph Ellison
- *Maus* by Art Spiegelman
- *Night* by Elie Wiesel
- *The Picture of Dorian Gray* by Oscar Wilde
- *Slaughterhouse Five* by Kurt Vonnegut
- *Their Eyes Were Watching God* by Zora Neale Hurston[21]

The Library Program has also led to the removal of contemporary literature, such as *The Kite Runner* and *The Fault in Our Stars*, and educational texts about safe sex and sexually transmitted diseases.[22]

The Library Program's complete ban of "descriptions or visual depictions of a sex act," Iowa Code Ann. § 256.11, subverts access to key works without ever considering a lawful obscenity standard. The result is that countless books have and will be labeled "inappropriate" for minors.[23] It will harm students, who will not have the opportunities for

---

[21] Lisa Tolin, *These 450 Books Were Banned in Iowa, PEN America*, https://pen.org/books-banned-in-iowa/; The Des Moines Reg., *supra* note 12.

[22]*See* Tolin, *supra* note 21 *and* Des Moines Reg., *supra* note 12 (reporting that *Genital Herpes*, published by the Library of Sexual Health, has been banned in Iowa).

[23] *See* Des Moines Reg., *supra* note 12.

free thinking and inquiry that are hallmarks of a thriving democracy. And it will harm authors, financially and emotionally, preventing them from reaching their intended audiences and chilling their speech as they grapple with the emotional toll of knowing their voices may be targeted and expunged from school libraries.[24]

"Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. The Library Program's blanket discrimination against sexual content is exactly the kind of censorship the *Miller* test and obscenity standards for minors were designed to avoid. *See Brown*, 564 U.S. at 798; *Reno*, 521 U.S. at 865; *Ginsberg*, 390 U.S. at 636. The law requires courts to consider the literary, artistic, political, or scientific value of books before they are banned under the guise of obscenity, and it requires the same consideration for material for

---

[24] *See* Scottie Andrew, *Book bans are surging — and taking an emotional toll on many authors,* CNN.com, Oct. 4, 2023, https://www.cnn.com/2023/10/04/style/book-bans-sales-authors-impact-cec/index.html ("I still don't think most people grasp just how financially devastating this book banning era is to queer authors and authors from marginalized communities . . . [or] the emotional toll it's having on the authors in the crosshairs.").

minors, who continue to enjoy First Amendment freedom in public school. *See Reno*, 521 U.S. at 865; *Tinker*, 393 U.S. at 506. SF496 fails to do so and should remain enjoined.

### C. The government speech doctrine does not save SF496's Library Program; finding otherwise would create a dangerous precedent.

The government speech doctrine, which protects the government's own speech, is not applicable to the plethora of diverse books included in public school libraries. Appellants' novel argument to the contrary contravenes decades of Supreme Court jurisprudence and threatens to create a dangerous precedent that undermines First Amendment liberties.

The government's own speech "is exempt from First Amendment scrutiny," *Matal v. Tam*, 582 U.S. 218, 234 (2017), but Appellants conflate that exemption with the standard governing the State's discretion in administering a public school system.

Appellants also neglect the consistent rule throughout educational jurisprudence that state and local discretion in educational decisions is not without its limits, and that those limits lie within the First Amendment. *See Erznoznik*, 422 U.S. at 209 ("[W]hen the government,

acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power.").

### 1. The viewpoint-based removal of library books fails to meet the definition of government speech.

Determining what is and is not government speech is a "holistic inquiry that is driven by a case's context rather than the rote application of rigid factors." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Nevertheless, courts typically consider three questions: (1) whether there has been a history of this type of speech being used to convey the government's own message, (2) whether the public would associate that speech with the government or a private person, and (3) whether the government has direct control over the messages conveyed. *See id.*; *Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209-14 (2015). In weighing these factors, it is clear that the government speech doctrine is inapplicable to SF496's Library Program.

### a) There is no history of applying the government speech doctrine to school libraries.

First, there is no history of public school libraries being used to convey the government's own message. It is wholly illogical to suggest that the hundreds, and often thousands, of books included in a public school library collection convey the government's message. There is a long history of Supreme Court precedent consistently recognizing the importance of libraries in providing access to diverse points of view. *See, e.g., Pico*, 457 U.S. at 868-69 ("In the school library, a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum") (internal citation omitted); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203-04 (2003) ("Public libraries pursue the worthy missions of facilitating learning and cultural enrichment"); *Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (the school library is "a place dedicated to quiet, to knowledge, and to beauty").

The history of the Court's treatment and appreciation of libraries and their importance in providing access to diverse and multitudinous perspectives dovetails with its treatment of public education. The Supreme Court has called public schools "the nurseries of democracy," *Mahanoy Area Sch. Dist. v. B. L. ex. rel. Levy*, 594 U.S. 180, 181 (2021), and there is a strong interest in schools building an informed citizenry

capable of independent thought and critical inquiry. *See Keyishian*, 385 U.S. at 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'") (internal citations omitted). The Supreme Court has recognized libraries as laboratories for this kind of independent learning. *See Pico*, 457 U.S. at 868-69, quoted *supra* at 25.

By necessity, the government does not convey its own message through public school libraries and the books that fill their shelves—it is, rather, intentionally making space for other people's views. Finding otherwise would also contravene the Court's repeated insistence that the government is not in the business of restricting and evaluating creative expression. *See, e.g.*, *Pope v. Illinois*, 481 U.S. 497 (1987) (Scalia, J., concurring) ("For the law courts to decide 'What is Beauty' is a novelty even by today's standards."); *Cohen v. California*, 403 U.S. 15, 24 (1971) (the Constitution is "designed and intended to remove governmental restraints from the arena of public discussion"); *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 158 (1946) ("[A] requirement that literature or art

conform to some norm prescribed by an official smacks of an ideology foreign to our system.").

### b) The public does not perceive public school libraries as government speech.

Second, no member of the public would assume that the government is speaking through the books and materials made available in a public school library. Libraries are widely understood as a public good and a "mighty resource in the free marketplace of ideas." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). School libraries are thus expected not to disseminate the viewpoint of the government, but to provide access to a wide range of constitutionally protected speech and expression. *See discussion supra* section II.C.1.b. *Cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) (noting that the government speech doctrine does not permit viewpoint-based restrictions in universities when its activities are meant to "encourage a diversity of views from private speakers").

The proposition that members of the public would understand the books in a school library to convey the government's message is meritless. Under that reading, Appellants would have the Court believe that the public would associate the government with both communism and

capitalism if a school library housed *The Communist Manifesto* and *The Wealth of Nations*. The public is smarter than that—in large part due to the historic role of school libraries in educating a well-informed and free-thinking public. *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.,* 2024 WL 133213, at *2 (N.D. Fla. Jan 12, 2024) ("the Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves").

### c) The control factor also shows that the government speech doctrine does not apply to the Library Program.

Finally, while states are afforded discretion and granted control administering public schools, which includes school libraries, that discretion is not without its limits. The third factor of control is arguably the single factor that supports Appellants arguments, but a closer look shows that even this factor decries the application of government speech doctrine to school library books.[25]

---

[25] It is also worth noting that even if the control factor did weigh in favor of Appellants, the doctrine requires a delicate balancing of factors, and the strength of the other two factors requires the same conclusion— that books in public libraries are not government speech.

In considering the control factor, the Court has considered the government's intent to control and impart its own message to the public. In *Walker*, the Court found control applicable to Texas license plates because "Texas maintains direct control over the messages conveyed on its specialty plates . . . This final approval authority allows Texas to choose how to present itself and its constituency." *Walker*, 576 U.S. at 213. School libraries are distinct from the state choosing designs for state license plates. It would be illogical to believe that the government is intending to represent its own message and viewpoint in the numerous books made available to students.

It is also critical that students *choose* whether to visit and utilize a school library and to read or check out books. While the state requires that all vehicles have license plates, *see id.*, library books are optional; it strains credulity that the government intends to control and impart its own viewpoint and message in the variety of books and materials available in school libraries. The viewpoints contained in these texts are the authors', not the State's. The very purpose of the school library is to provide resources and access to a wide variety of information for students' benefit, which students utilize as they so choose.

A statewide diktat forcing the removal of a large portion of material from school libraries on ideological grounds cuts against the principles that justify the discretion and control schools are granted. It does not further the proper functioning of schools and libraries, which are intended to expose students to a diversity of ideas so that they can become free-thinking citizens of a democracy. In short, the government does not seek or intend to control the speech of every library book in Iowa's public schools. Finding otherwise runs contrary to the very nature and purpose of a school library.

### 2. Finding that the government speech doctrine applies to SF496's Library Program would set a novel and dangerous precedent.

While the factors discussed above demonstrate the failure of the Appellants' government speech argument, it is also important for this Court to note the novelty of the Appellants' argument and the dangerous precedent that would be created if the Court should adopt it.

Ruling that a state can remove books from school libraries for any ideological or partisan content or viewpoint-based discrimination, as Appellants request, is novel, unprecedented nationwide, and dangerous. Contrary to their argument, the rise of the government speech doctrine

does not represent a departure from the principles in First Amendment jurisprudence concerning public education dating back to the 1940's. App. Br., No. 24-1075, 36-42; *see also Barnette*, 319 U.S. 624. Instead, it is imperative to heed the instruction of *Matal*, that courts "must exercise great caution before extending our government-speech precedents." 582 U.S. at 235.

In this context, it is critical to consider the government speech doctrine not only through the factors discussed above, but also through the special consideration required for considering First Amendment freedoms in public education.

The Supreme Court has consistently carved out special exceptions for education and prioritized principles of "academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment[.]" *Keyishian*, 385 U.S. at 603. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (noting that the Court's consideration did "not raise questions of academic freedom that may or may not involve 'additional' First Amendment 'interests' beyond those captured by this framework.") (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006)).

The carve-outs in *Kennedy* and *Garcetti* are important. They illustrate how public education, and preventing orthodoxy from intruding into public education, holds a special place and priority in the pillars of the First Amendment. Even if the government speech doctrine applied in this case, the line of government speech cases reminds us that "this does not mean that there are no restraints on government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009). The recognition of these important values of the First Amendment reflects the special place that public education holds in the very fabric of American democracy.

The novelty of this argument also urges caution. *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) ("The Court is not persuaded that decisions regarding the content of school libraries is 'government speech' that is not subject to any constitutional constraints[,]" noting such a holding "only garnered 4 votes at the Supreme Court in *Pico*, and as far as the Court can discern, no court since *Pico* has adopted that view."); *see also Arce v. Douglas*, 793 F.3d 968, 982 (9th Cir. 2015) (distinguishing the removal of school materials from other government speech cases noting that none of those "holdings involved a student's First Amendment rights, and are

accordingly inapplicable to the instant case."); *see also Matal*, 582 U.S. at 235.

The "transcendental imperatives" of the First Amendment, *Pico* 457 U.S. at 864, prohibit the blanket restrictions on wide swaths of content that the Library Program imposes. These restrictions go beyond the discretion necessary to ensure functional school libraries, and they are not applicable to the government speech doctrine. Rather, the law's provisions are limitations on students' constitutional rights and should remain enjoined.

## CONCLUSION

State mandated prohibitions of books are anathema to the First Amendment and its interest in public education's important role in American society. SF496 is nothing short of an intrusion on key liberties, harming Iowans and authors from around the world in violation of the First Amendment. We respectfully encourage this Court to affirm.

Respectfully submitted,

By: */s/ Katherine H. Blankenship*
Katherine H. Blankenship (FL Bar No. 1031234; TN Bar No. 33208)
PEN AMERICAN CENTER
250 Catalonia Ave., Ste. 405
Coral Gables, Florida 33134
Telephone: 786-330-9672
kblankenship@pen.org
*Attorney for Amicus Curiae*

## CERTIFICATION OF COMPLIANCE
## PURSUANT TO FED. R. APP. 32(g)

I certify that, pursuant to Fed. R. App. P. 32(g) and Fed. R. App. P. 29(a)(5),), the attached amicus brief is proportionally spaced, has a typeface of 14 points and contains 6500 words.

Dated: April 18, 2024
By: */s/ Katherine H. Blankenship*
Katherine H. Blankenship

## CERTIFICATION OF COMPLIANCE
## WITH EIGHTH CIRCUIT RULE 28A(h)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of Amicus Curiae PEN America in

support of Appellee and Affirmance has been scanned for viruses and is

virus-free.

Dated: April 18, 2024
By: */s/ Katherine H. Blankenship*
Katherine H. Blankenship