IN THE
# United States Court of Appeals for the Eighth Circuit

GLBT YOUTH IN IOWA SCHOOLS TASK FORCE *ET AL.*,
*Plaintiffs-Appellees*

*v.*

KIMBERLY REYNOLDS *ET AL.*,
*Defendants-Appellants*

PENGUIN RANDOM HOUSE LLC *ET AL.*,
*Plaintiffs-Appellees*

*v.*

JOHN ROBBINS *ET AL.*,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Southern District of Iowa, Nos. 4:23-cv-474, 4:23-cv-478,
(The Hon. Stephen H. Locher)

## BRIEF OF THE NATIONAL EDUCATION ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

Alice O'Brien
Jason Walta
Keira McNett
Nicole Carroll
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7182
aobrien@nea.org

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(4)(a), Amicus Curiae National Education Association ("NEA") states that it is a nonprofit corporation chartered by an Act of Congress and headquartered in Washington, D.C. *See* 36 U.S.C. § 151101. Amicus NEA states further that it is not a subsidiary of any corporation, and that it does not have any stock that can be owned or held by a publicly held corporation.

/s/ Jason Walta

April 18, 2024

# TABLE OF CONTENTS

Table of contents..........................................................................i

Table of authorities ..................................................................iii

Statement of Amicus Curiae.................................................... 1

Argument ...................................................................................... 2

    I.    The Gender Identity/Sexual Orientation Ban and Library Ban are both void for vagueness ............................................ 5

        A.    This Court's standards for evaluating vagueness......... 5

        B.    Both the Gender Identity/Sexual Orientation Ban and Library Ban are subject to heightened scrutiny for vagueness ........................................................................ 7

                1.    Both provisions implicate First Amendment freedoms.............................................................. 7

                2.    Violations of these provisions result in severe penalties for educators ........................................ 10

                3.    The Gender Identity/Sexual Orientation Ban contains no scienter requirement ....................... 12

        C.    The Gender Identity/Sexual Orientation Ban is impermissibly vague...................................................... 14

                1.    The terms of the Gender Identity/Sexual Orientation Ban fail to provide clear notice of what is prohibited................................................ 14

2.      Compliance with the Gender Identity/Sexual Orientation Ban is made even more impossible by the need for educators to comply with other existing state laws ................................................. 19

3.      The vague terms of the Gender Identity/Sexual Orientation Ban invite arbitrary and discriminatory enforcement ................................ 22

D.      The Library Ban is also impermissibly vague ............ 24

1.      The terms of the Library Ban fail to provide clear notice of what is prohibited................................. 24

2.      The vague terms of the Library Ban invite arbitrary and discriminatory enforcement ........ 26

II.      Allowing the Gender Identity/Sexual Orientation Ban and Library Ban to go into effect will harm students and the quality of education in the state ........................................... 27

A.      Harms to LGBTQ+ students ........................................ 28

B.      Harms to the state's ability to retain educators ......... 30

C.      Harms to the quality of education in the state ........... 32

Conclusion................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Am. Amusement Mach. Ass'n v. Kendrick,*
  244 F.3d 572 (7th Cir. 2001) ......................................... 33, 34

*Barcomb v. Gen. Motors LLC,*
  978 F.3d 545 (8th Cir. 2020) ............................................ 16

*Board of Educ. v. Pico,*
  457 U.S. 853 (1982) ........................................................ 10

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.,*
  519 U.S. 316 (1997) ..................................................... 16–17

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ..................................................... 14, 24

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ......................................................... 2

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ........................................................ 32

*Horn v. Burns & Roe,*
  536 F.2d 251 (8th Cir. 1976) ........................................ 7, 14

*Johnson v. United States,*
  576 U.S. 591 (2015) ........................................................ 10

*Keyishian v. Bd. of Regents,*
  385 U.S. 589 (1967) ........................................................ 32

*Local 8027, Am. Fed'n of Teachers-N.H. v. Edelblut,*
  No. 21-cv-1077, 2023 WL 171392 (D.N.H. Jan. 12, 2023) ............. 12, 13

*Mahanoy Area Sch. Dist. v. B.L.*,
 594 U.S. 180 (2021) ............................................................ 33

*Minarcini v. Strongsville City Sch. Dist.*,
 541 F.2d 577 (6th Cir. 1976) ............................................ 8

*NAACP v. Button*,
 371 U.S. 415 (1963) ...................................................... 6, 22

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
 83 F.4th 658 (8th Cir. 2023)....................... 6, 9, 13, 18–19, 22

*Pratt v. Indep. Sch. Dist. No. 831*,
 670 F.2d 771 (8th Cir. 1982) .................................... 8, 9–10

*Sessions v. Dimaya*,
 138 S. Ct. 1204 (2018) ............................................ 6, 10, 12

*Speech First, Inc. v. Cartwright*,
 32 F.4th 1110 (11th Cir. 2022)........................................... 9

*Stahl v. City of St. Louis*,
 687 F.3d 1038 (8th Cir. 2012) ........................... 5–6, 7, 12, 13

*Stephenson v. Davenport Cmty. Sch. Dist.*,
 110 F.3d 1303 (8th Cir. 1997) ......................................... 7

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
 393 U.S. 503 (1969) ...................................................... 7, 18

*United States v. Davis*,
 139 S. Ct. 2319 (2019) ..................................................... 2

*Video Software Dealers Ass'n v. Webster*,
 968 F.2d 684 (8th Cir. 1992) .......................................... 13

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
 455 U.S. 489 (1982) ......................................................... 6

**Statutes, Rules, and Regulations**

Fed. R. App. P. 29 ................................................................ 1
Iowa Admin. Code § 282-25.3(6) .......................................... 21
Iowa Admin. Code § 282–25.3(272) ...................... 4, 11, 13, 20
Iowa Code § 216.1 ......................................................... 3, 17
Iowa Code § 256.11 ....................... 4, 5, 11, 13, 15, 24
Iowa Code § 256.146 ............................................. 4, 5, 11
Iowa Code § 279.27 ............................................ 5, 11, 13
Iowa Code § 279.80 ......................... 3, 13, 15, 16, 17
Iowa Code § 298A ................................................... 15
U.S. Const. amend. 1 ............................... 7, 8, 9, 10

**Other Authorities**

Margaret Atwood, THE HANDMAID'S TALE (1985).................................... 26

Caitlin M. Clark et al., *The 2021 National School Climate Survey*,
    GLSEN (2022) ...................................................... 28, 29

Adina C. Cooper et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9 LGBT HEALTH 43 (2022) ....................... 29

Rev. Susan Fredrick-Gray, *Transphobic and Anti-Abortion Policies are a Direct Threat to My Religious Freedom*, RELIGION DISPATCHES (June 6, 2022) ........................................... 32

Iowa Dep't of Educ., *Core Literacy Standards, Grade 11–12*, RL.11-12.7 (2016) .................................................... 25

Anna Merod, Survey: 37% of teachers will likely quit if K-12 censorship laws reach them, K-12 DIVE (Jan. 24, 2022) ......... 30–31

George Orwell, 1984 (1949)............................................... 26

Justin Richardson, AND TANGO MAKES THREE (2005) ............................ 27

William Shakespeare, THE TAMING OF THE SHREW ........................... 25–26

William Shakespeare, *Venus and Adonis,* in THE COMPLETE POEMS OF
    SHAKESPEARE (Cathy Shrank & Raphael Lyne eds., 2017) .......... 25

Lisa Tolin, *New "Educational Intimidation Laws" Lead to Classroom
    Censorship,* PEN AMERICA (Aug. 22, 2023) .................................... 23

The Trevor Project, *2022 National Survey on LGBTQ Youth Mental
    Health* (2022) .................................................................. 30

U.S. Ctr. for Disease Control & Prevention, *LGBTQ-Supportive
    School Policies and Practices Help All Students Thrive* (June
    2022).............................................................................. 29

U.S. Ctr. for Disease Control & Prevention, *Youth Risk Behavior
    Survey Data Summary & Trends Report: 2009–2019* (2020)........ 30

Tim Webber & Samantha Hernandez, *Library books removed in Iowa
    school districts*, DES MOINES REGISTER (Dec. 20, 2023)................. 27

Ashley Woo et al., *The Diverging State of Teaching and Learning
    Two Years into Classroom Limitations on Race or Gender*,
    RAND Corp. (Mar. 12, 2024) ......................................... 31

Ashley Woo et al., *Policies Restricting Teaching About Race and
    Gender Spill Over into Other States and Localities: Findings
    from the 2023 State of the American Teacher Survey*, RAND
    Corp. (Feb. 15, 2024) .................................................... 23

## STATEMENT OF AMICUS CURIAE

This amicus curiae brief is submitted by the National Education Association ("NEA").[1] NEA is the nation's largest labor organization, representing approximately three million members who serve as educators, counselors, and education support professionals in our nation's public schools and institutions of higher education. Thousands of those members work every day in Iowa's K-12 public schools.

NEA has an abiding interest in seeing that its members— including those in Iowa—are not threatened with potential discipline or job loss for alleged violations of vague state laws that invite arbitrary or discriminatory enforcement. In addition, since its founding over a century-and-a-half ago, NEA has worked to create, expand, and strengthen the quality of public education available to all children. NEA believes that public education is the cornerstone of our social, economic, and democratic structures, and that students of all backgrounds have

---

[1] Amicus NEA submits this brief with the consent of all the parties. *See* Fed. R. App. P. 29(a)(2). NEA states that no party's counsel authored the brief in whole or in part, no party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than NEA, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. *See id.* 29(a)(4)(E).

the right to excellent public schools. NEA therefore has a deep interest in ensuring that public schools create safe, inclusive, and welcoming learning environments for all students.

NEA submits this brief in support of Plaintiffs-Appellees to emphasize and amplify that the District Court below was correct in holding that the two provisions of Iowa's SF496 at issue in these appeals are void for vagueness and that their operation should remain enjoined.

## ARGUMENT

A "vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). That is because vague enactments defy the "first essential of due process of law," which is that every person is entitled to "fair notice of what the law demands of them." *Id*. at 2325 (cleaned up). If a law cannot satisfy this baseline constitutional requirement, it is void and unenforceable. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). These appeals concern two provisions of Iowa SF496 that the District Court determined to be impermissibly vague.

*First*, SF496 contains a provision that we refer to in this brief as the "Gender Identity/Sexual Orientation Ban." It states that a "school

district shall not provide any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." Iowa Code § 279.80(2). This provision expressly incorporates the neutral definitions of "gender identity" and "sexual orientation" from the Iowa Civil Rights Act—namely, that "gender identity" means "a gender-related identity of a person, regardless of the person's assigned sex at birth," and "sexual orientation" means an individual's "'actual or perceived heterosexuality, homosexuality, or bisexuality." *Id.* §§ 279.80(1), 216.1(10), (14). The ban therefore presents educators with an impossible task: to conduct the entire range of K-6 elementary instruction and programs without referencing anything that relates to any person's gender identity (even if it corresponds to the person's sex assigned at birth) or sexual orientation (even if it refers to heterosexual relationships).

Violations of this ban carry dire consequences for educators. The State Board of Educational Examiners' Code of Professional Conduct and Ethics provides that licensed educators are "required to abide by all federal, state, and local laws applicable to the fulfillment of professional

obligations." Iowa Admin. Code § 282–25.3(272). Violations of such laws are deemed "unprofessional and unethical conduct," which may result in disciplinary action by the Board, including reprimand, suspension, and even permanent revocation of an educator's license. *Id.*; *see also* Iowa Code § 256.146(13). Any discipline issued by the Board may also trigger further discipline—up to and including discharge—by the school district that employs the educator. *See* Iowa Code § 279.27.

*Second*, SF496 contains a provision that we refer to in this brief as the "Library Ban." It prohibits any K-12 public school from maintaining a "library program" containing "any material with descriptions or visual depictions" of a "sex act," as defined in the state's criminal code. *Id.* § 256.11(9)(a)(2), (19)(1). Thus, even for a classroom library that serves high-school seniors who have attained the age of majority, this ban requires educators to purge works containing any kind of description of an enumerated sex act—regardless of how fleeting or veiled that description might be, and regardless of the work's literary merit or relevance to a legitimate topic of study.

Violations of the Library Ban also carry grave consequences. The Department of Education is charged with investigating alleged

infractions by individual educators. *Id.* § 256.11(9)(a)(3). And, after an initial warning, the Department "shall" refer any other "knowing[]" violations of the ban to the Board of Educational Examiners for potential "disciplinary action," including suspension or revocation of the educator's teaching license. *Id.* §§ 256.11(9)(a)(3), 256.146(13). That discipline can, in turn, trigger further discipline or discharge by the school district that employs the educator. *See id.* § 279.27.

As we explain in greater detail below, the District Court correctly held that these two bans are impermissibly vague and pose an intolerable threat to the livelihoods of the educators obligated to comply with them. Allowing these provisions to go back into effect would exacerbate harms to an already vulnerable population of LGBTQ+ students, drive educators out of the profession, and damage the quality of education in the state.

## I. THE GENDER IDENTITY/SEXUAL ORIENTATION BAN AND LIBRARY BAN ARE BOTH VOID FOR VAGUENESS

### A. This Court's Standards for Evaluating Vagueness

There are two grounds on which a law can be found void for vagueness. First, a law offends constitutional due process where it fails to provide "the kind of notice that will enable ordinary people to

understand what conduct it prohibits." *Stahl v. City of St. Louis*, 687 F.3d 1038, 1040 (8th Cir. 2012) (cleaned up). Second, a law may be impermissibly vague if it authorizes or even encourages "arbitrary enforcement." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023) (citation omitted). Accordingly, a law survives a vagueness challenge only when it can be shown to provide both reasonable notice of what is prohibited and explicit standards for the law's enforcement. *See id.*

While the "degree of vagueness the Constitution tolerates . . . depends in part on the nature of the enactment," *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), "standards of permissible statutory vagueness are strict in the area of free expression," *NAACP v. Button*, 371 U.S. 415, 432 (1963). Heightened scrutiny is triggered, as well, where violations of the challenged law take on a "grave nature" or result in "particularly severe" penalties—such as laws imposing criminal penalties, laws that result in deportation, and laws that revoke professional licensure. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (plurality opinion); *id.* at 1228–31 (Gorsuch, J., concurring). Also, more exacting scrutiny

applies when the challenged law has no scienter requirement that could otherwise guard against unwitting violations. *See Stahl*, 687 F.3d at 1041. Even in the absence of heightened scrutiny, a law will still be unconstitutional if it is "so vague and indefinite as really to be no rule or standard at all." *Horn v. Burns & Roe*, 536 F.2d 251, 254 (8th Cir. 1976) (cleaned up).

### B. Both the Gender Identity/Sexual Orientation Ban and Library Ban are Subject to Heightened Scrutiny for Vagueness

#### 1. *Both provisions implicate First Amendment freedoms*

Neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Thus, even in a "public school setting"—where "a lesser standard of scrutiny" normally applies to claims of vagueness—a regulation that "reaches the exercise of free speech" is still subject to a "proportionately greater level of scrutiny." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1309 (8th Cir. 1997). Such heightened scrutiny is fitting here because both of the challenged provisions of SF496 trench on important First Amendment interests.

The Gender Identity/Sexual Orientation Ban implicates the First Amendment rights of students to receive information. *See Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (recognizing the "right of students to receive information which they and their teachers desire them to know" as "firmly" established). That is, the ban withholds information from students based on vague and sweeping restrictions that apply to virtually every aspect of the elementary educational experience. Worse yet, the State has taken a consistent position throughout this litigation that these restrictions should be enforced in a discriminatory manner that singles out LGBTQ+ identities and perspectives for disparagement and marginalization. *See* Add. 44 (summarizing the State's arguments to mean that "the law only forbids programs, promotion, and instruction relating to transgender people and non-heteronormative relationships"). As this Court has explained, the First Amendment precludes government authorities from imposing such a "'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular . . . ideological viewpoint." *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 776 (8th Cir. 1982).

A similar principle applies to the chilling effect that the Gender Identity/Sexual Orientation Ban exerts on students, who may decide to forgo the "open exchange of ideas" in class because school officials could object to—or even punish—efforts to discuss a banned topic. *Parents Defending Educ.*, 83 F.4th at 667. In an educational environment, neither "formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights— indirect pressure may suffice." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1123 (11th Cir. 2022). Even college students are prone to being "cowed by subtle coercion," *id,* and that concern is much more acute here. Not only does the ban affect younger and more impressionable students at the K-6 level, but teachers and administrators face professional consequences for allowing violations to occur, *see supra* at 3–5, and therefore have strong incentives to over-enforce the ban by curtailing student expression.

The Library Ban also implicates students' First Amendment right to receive information. As this Court explained in *Pratt*, students have a First Amendment interest in challenging "the removal of books from libraries," and "a cognizable First Amendment claim exists if the book

was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed." 670 F.2d at 776; *see also Board of Educ. v. Pico*, 457 U.S. 853, 866 (1982) (plurality opinion) ("[T]he First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library.").

> ### 2. *Violations of these provisions result in severe penalties for educators*

The Gender Identity/Sexual Orientation Ban and Library Ban are also subject to heighted scrutiny for vagueness because violations take on a "grave nature" and result in "particularly severe" penalties for educators. *Dimaya*, 138 S. Ct. at 1213 (plurality opinion); *see also id.* at 1228–31 (Gorsuch, J., concurring). Although this extra degree of scrutiny is generally reserved for criminal laws, *see Johnson v. United States*, 576 U.S. 591, 595 (2015), it applies in certain civil contexts as well, *see Dimaya*, 138 S. Ct. at 1212–13 (plurality opinion); *see also id.* at 1226 (Gorsuch, J., concurring) (noting the Founding Era history and tradition of declining to enforce vague civil laws).

SF496's Gender Identity/Sexual Orientation Ban and Library Ban both present a clear risk to the livelihoods of educators in Iowa public

schools. As the District Court recognized, the bans apply to a wide range of school settings and activities. *See* Add. 14–17, 21, 41, 44 (explaining, for example, that the bans reach individual classroom libraries, classrooms discussions, participation in student GSA groups, and "virtually every book ever written"). Moreover, a violation of either provision can result in discipline, termination, or even the permanent loss of one's teaching license. *See* Iowa Code §§ 256.11(9)(a)(3), 256.146(13), 279.27; Iowa Admin. Code § 282–25.3(272).

These risks are amplified by the fact that SF496 gives school administrators strong incentives to over-enforce the two bans against educators. That is because superintendents and other administrators are themselves subject to potential revocation of their professional licenses for allowing violations to occur. *See* Iowa Admin. Code § 282–25.3(272). Indeed, the Library Ban explicitly provides that a district's superintendent may be referred to the Board of Educational Examiners for discipline for a school's "knowing[]" violation of the ban. Iowa Code § 256.11(9)(a)(3). Faced with such costly repercussions for themselves, superintendents and other administrators will naturally take a broad

view of what the bans prohibit and a harsh view of how severely to punish violators.

Because a violation of either ban poses such serious professional consequences—including, in essence, the "death penalty" for an educator's chosen career—the law's contours must be clearly defined to pass constitutional muster. *See Local 8027, Am. Fed'n of Teachers-N.H. v. Edelblut*, No. 21-cv-1077, 2023 WL 171392, at *12 (D.N.H. Jan. 12, 2023) (applying "the most exacting vagueness review" to an enactment similar to the SF496 because violators could "be stripped of their teaching credentials and thus deprived of their livelihoods"); *see also Dimaya*, 138 S. Ct. at 1212–13 (Gorsuch, J., concurring) (noting that heightened vagueness scrutiny is appropriate for laws that may "strip persons of their professional licenses and livelihoods").

### 3. *The Gender Identity/Sexual Orientation Ban contains no scienter requirement*

Finally, one of the challenged provisions is subject to heightened vagueness scrutiny because it lacks a scienter requirement. *See Stahl*, 687 F.3d at 1041. The absence of such an element encourages unscrupulous enforcement and chills otherwise lawful speech and

conduct. *See id.* at 1041–42; *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690–91 (8th Cir. 1992).

This is the case with the Gender Identity/Sexual Orientation Ban. While the Library Ban expressly provides that only "knowing[]" violations will result in discipline by the Board of Educational Examiners, *see* Iowa Code § 256.11(9)(a)(3), the Gender Identity/Sexual Orientation Ban contains no such limitation. Instead, even "inadvertent statements that are later deemed to advocate a banned concept can violate the [law]." *Local 8027*, 2023 WL 171392, at *12. In other words, *any* violation—regardless of the educator's knowledge or intent—can lead to an educator being branded "unprofessional and unethical," disciplined, discharged, and stripped of her professional license. Iowa Code §§ 279.27, 279.80(2); Iowa Admin. Code § 282–25.3(272). As a result, the "exacting vagueness standard applied in criminal cases should apply here as well." *Local 8027*, 2023 WL 171392, at *12.

## C.    The Gender Identity/Sexual Orientation Ban is Impermissibly Vague

### 1.    *The terms of the Gender Identity / Sexual Orientation Ban fail to provide clear notice of what is prohibited*

"[V]agueness permeates the text" of the Gender Identity/Sexual Orientation Ban so thoroughly as to be paralyzing to anyone attempting to comply with its terms. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999). Indeed, even in the absence of heightened scrutiny, this ban would fail the minimum demands of due process because it is so "indefinite as really to be no rule or standard at all." *Horn*, 536 F.2d at 254 (cleaned up).

At the outset, there is insoluble confusion over which aspects of the school environment are even subject to the ban. The State, looking to head off vagueness concerns with a narrowing construction of the law, claims that the ban applies only to a school's "mandatory" or "compulsory" "instructional" functions that do not include such things as the school's libraries or its extracurricular student activities and clubs.  *See* State Br. 62–66 (No. 24-1075); State Br. at 48–53 (No. 24-1082). But this narrowing construction must be rejected because the

"plain meaning" of the Gender Identity/Sexual Orientation Ban "is not so limited." *Parents Defending Educ.*, 83 F.4th at 669.

That is, while the ban does indeed apply to "instruction," the language of the statute contains no further limitation to only that instruction that is "compulsory" or "mandatory." In addition, the ban sweeps beyond just "instruction" and reaches any K-6 "program, curriculum, test, survey, questionnaire, promotion, *or* instruction." Iowa Code § 279.80(2) (emphasis added). And contrary to the State's argument on appeal, other references in SF496 and the Iowa Education Code confirm that libraries and extracurricular activities should be considered "programs" of a school covered by the Gender Identity/Sexual Orientation Ban. *See id.* § 256.11(9)(a)(2) (requiring schools to "establish a kindergarten through grade twelve library *program*") (emphasis added); *id.* § 298A (regulating a school's use of funds for its "extracurricular *program*") (emphasis added). Accordingly, the State's proposed narrowing construction fails.

The question therefore remains: Given the broad and open-ended language of the statute, how is an educator to know what conduct or aspects of the job qualify as a "program," "instruction," or "promotion"

subject to the Gender Identity/Sexual Orientation Ban? In real-life schools, students have access to a broad range of events, programs, clubs, and activities. And in real-life classrooms, teachers have considerable discretion to determine which readings and materials to assign, how to conduct class discussion and participation, and what kinds of projects and assignments students will be asked to complete. The language of the statute, however, gives educators and schools no reliable guidance to determine whether the ban's coverage of any "program," "instruction," or "promotion" will extend to such commonplace features of the school environment as student drama performances, book fairs, student publications, after-school clubs, or student-chosen reading assignments.

Even more vexing is the question of how an educator can decipher the phrase "relating to gender identity or sexual orientation." *Id.* § 279.80(2). The term "relating to" is famously "broad" and "indeterminate." *Barcomb v. Gen. Motors* LLC, 978 F.3d 545, 550 (8th Cir. 2020); *see also Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]s many a curbstone philosopher has observed, everything is related

to everything else."). And, as noted earlier, the ban adopts neutral definitions of "gender identity" and "sexual orientation." Iowa Code §§ 279.80(1), 216.1(10), (14). The end result, as the District Court observed, is a law that defies reasoned application because it amounts to "a 'don't say anything' bill" that "prohibits school districts and teachers from providing any program, promotion, and instruction that relates to gender identity (cisgender or transgender) or sexual orientation (gay, straight, or otherwise) in any way." Add. 9; *see also id.* at 43 (explaining that a teacher is "theoretically subject to discipline no matter what he does"). Worse yet, because the ban contains no scienter requirement, even an unwitting mention or reference to the prohibited topic could expose educators to career-ending consequences. *See Local 8027*, 2023 WL 171392, at *12.

The State's brief on appeal offers no real answer to this conundrum. Instead, it essentially retreats to an imagined world where difficult compliance issues would never arise. *See* State Br. at 65–66 (No. 24-1075). As a result, the State's effort to defend the law ignores the realities that teachers must face in managing a real-life classroom. What are a teacher's options, for example, when a fifth-grade student

asks whether people of the same sex are allowed to get married? Or if their students are having a classroom discussion about what it means for a person to be "nonbinary"? Must the teacher halt the discussion and tell the students it is a forbidden topic? May a sixth-grade student select a book about Harvey Milk for an open reading assignment and deliver a report on it to the class? Because the State seems to regard students as "closed-circuit recipients of only that which the State chooses to communicate," *Tinker*, 393 U.S. at 511, its facile explanations for how the ban operates provide no meaningful answers or guidance for those who must comply with the ban under real-world conditions and on pain of expulsion from their chosen profession.

The vagueness permeating the Gender Identity/Sexual Orientation Ban is far beyond what this Court tolerates in matters dealing with sexuality and gender identity in public schools. Most notably, in *Parents Defending Education*, this Court held that a district court abused its discretion by failing to enjoin a public-school policy requiring students to "respect" the gender identity of other students because the term created too much uncertainty as to whether students could "express[] discomfort about sharing a bathroom with someone who

is transgender, argue[] that biological sex is immutable during a debate in social studies class, or express[] an opinion about the participation of transgender students on single-sex athletic teams." 83 F.4th at 668–69. Here, the Gender Identity/Sexual Orientation Ban would not only make students and educators fearful to express the importance of respecting the humanity of LGBTQ+ people or admiration for the bravery of transgender athletes, it would call into question whether they could even acknowledge their own families and identities. No one should be expected to comply with such a hopelessly confused standard, particularly under threat of dire professional consequences.

2. *Compliance with the Gender Identity/Sexual Orientation Ban is made even more impossible by the need for educators to comply with other existing state laws*

As explained above, it is virtually impossible for Iowa K-6 educators to determine what is prohibited or permitted by the terms of Gender Identity/Sexual Orientation Ban. But that task becomes even more treacherous and confusing in light of other, seemingly conflicting laws on the books that educators must still obey.

For example, Iowa's Intellectual Freedom Law requires each school district to "protect the intellectual freedom of the school district's

students and practitioners," and it provides that a licensed educator or administrator who "discriminate[s] against a student or employee in violation" of such protections shall be referred to the Board of Educational Examiners for potential disciplinary action and termination. Iowa Code § 279.73. Thus, when it comes to the ability of K-6 educators and students to express certain views about sexuality or gender identity, the Gender Identity/Sexual Orientation Ban categorically says "stop," while the Intellectual Freedom Law clearly says "go."

Likewise, efforts to comply with the Gender Identity/Sexual Orientation Ban seemingly place educators in danger of violating several of their obligations under the Code of Professional Conduct and Ethics, which could in turn lead to professional discipline. *See* Iowa Admin. Code. § 282-25.3(272). The Code makes it a punishable breach of ethics to:

- deny a student, "without just cause, access to varying points of view";

- suppress or distort "subject matter for which the educator bears responsibility";

- create "conditions harmful to student learning";

- repeatedly expose "students or other practitioners to unnecessary embarrassment or disparagement"; or

- deny "a student . . . the benefits of any program on the grounds of . . . sexual orientation [or] gender identity."

*Id.* § 282-25.3(6).

It would be impossible to comply with the Gender Identity/Sexual Orientation Ban—that is, to teach a child from kindergarten through sixth grade without ever referring or alluding to anyone's gender identity or any sexual orientation in any way—*without* conducting class in a way that denies students access to varying points of view, suppresses or distorts subjects of teaching, and results in "conditions harmful to student learning." *Id.* Likewise, the stigma that such teaching would attach to LGBTQ+ identities would surely expose students who share those identities "to unnecessary embarrassment or disparagement" and deny them "the benefits of any program on the grounds of . . . sexual orientation [or] gender identity." *Id.*

3. *The vague terms of the Gender Identity / Sexual Orientation Ban invite arbitrary and discriminatory enforcement*

One of the main evils of vague law is that it invites arbitrary or discriminatory enforcement. *See Parents Defending Educ.*, 83 F.4th at 668. Such standardless laws "easily become a weapon of oppression, however evenhanded [their] terms appear," and their burdens fall disproportionately on members of minority communities (be they racial, religious, or sexual) and on those who espouse "unpopular causes." *Button*, 371 U.S. at 435–36; *accord Stahl*, 687 F.3d at 1041.

This is the case with the hopelessly indeterminate Gender Identity/Sexual Orientation Ban. Indeed, the State has essentially admitted as much in its efforts to keep the law on the books. As the District Court explained, the State repeatedly took the position that the ban would prohibit readings at the K-6 level that contain any reference to gay characters—but would allow readings that contain identifiably heterosexual characters. *See* Add. 10, 42; *see also id*. at 44 ("[The State's] briefing and argument leave the unmistakable impression that they believe the law only forbids programs, promotion, and instruction

relating to transgender people and non-heteronormative relationships.").

This impulse to disparage and marginalize LGBTQ+ identities is consistent with the larger context in which the Gender Identity/Sexual Orientation Ban was passed. By the time Iowa passed SF496, 18 other states had passed policies focused on restricting instruction around "divisive concepts," many aimed at some type of restrictions on gender identity and sexual orientation. These efforts have left teachers in the affected states hesitant to address topics specifically related to LGBTQ+ issues.[2]

Despite the State's efforts to rescue the Gender Identity/Sexual Orientation Ban through narrowing constructions and argumentative

---

[2] Ashley Woo et al., *Policies Restricting Teaching About Race and Gender Spill Over into Other States and Localities: Findings from the 2023 State of the American Teacher Survey*, RAND Corp., at 1–2 (Feb. 15, 2024); *see also* Lisa Tolin, *New "Educational Intimidation Laws" Lead to Classroom Censorship,* PEN AMERICA (Aug. 22, 2023) (describing the impact on teachers and school librarians of state laws ranging from explicit classroom censorship to "inspection" laws, and a climate of threats and intimidation, such as a Virginia school librarian of 30 years, who a Facebook commenter said should be "stoned to death").

sleight-of-hand, the law is beyond salvage. The District Court was right to find it impermissibly vague and to enjoin its operation.

### D. The Library Ban is Also Impermissibly Vague

#### 1. *The terms of the Library Ban fail to provide clear notice of what is prohibited*

Vagueness also "permeates the text" of the Library Ban. *Morales*, 527 U.S. at 55. This is particularly true of its requirement that educators in every grade must—on pain of expulsion from the profession—root out any book in a school or classroom library that has a "description" or "depiction" of a specified "sex act." Iowa Code § 256.11(9)(a)(2). As the District Court correctly concluded, the law does not provide adequate guidance as to the "level of detail a book passage must have before it constitutes a description or visual depiction," and these terms are "elastic enough to leave considerable uncertainty about what crosses the line." Add. 39.

On appeal, the State makes essentially no effort to address the indeterminacy of what qualifies as a "description" or "depiction" for purposes of the law, choosing to focus instead on the undisputed issue of whether a reasonable person would understand the definitions of the enumerated "sex act[s]" the Library Ban borrows from the criminal

code. *See* State Br. 46–48 (No. 24-1082). The State's failure to engage on the key issue betrays, yet again, its lack of appreciation for how SF496's restrictions would play out under real-world classroom conditions.

Determining whether a book "describes" or "depicts" a particular act will be especially difficult when it comes to works of fiction that rely extensively on imagery and other literary devices to convey ideas. Take, for example, the works of Shakespeare—the only author whose works are required reading under Iowa's Core Literacy Standards.[3] Would a high-school librarian face potential discharge or expulsion from the profession for stocking THE COMPLETE POEMS OF SHAKESPEARE because it contains this couplet from *Venus and Adonis*: "Graze on my lips; and if those hills be dry/Stray lower, where the pleasant fountains lie"? The same question holds for THE TAMING OF THE SHREW, which contains the following exchange between its protagonists:

> Petruchio: Who knows not where a wasp does wear his sting? In his tail.

> Katherine: In his tongue.

> Petruchio: Whose tongue?

---

[3] *See* Iowa Dep't of Educ., *Core Literacy Standards, Grade 11–12*, RL.11-12.7 (2016).

Katherine: Yours, if you talk of tales, and so farewell.

Petruchio: What, with my tongue in your tail?

Act 2, sc. 1, ll. 226–31. The unhelpful text of the Library Ban provides no meaningful guidance allowing educators to determine if they face career-ending discipline for giving students—even high school seniors who have reached the age of majority—access to these timeless works.

2. *The vague terms of the Library Ban invite arbitrary and discriminatory enforcement*

Because the Library Ban's key terms are so open-ended, it is no wonder that its implementation by individual school districts has been, in the words of the District Court, "all over the map," with some districts removing hundreds of books (including modern classics like Orwell's 1984 and Atwood's THE HANDMAID'S TALE) while others have not. Add. 39. This is a tell-tale sign of an impermissibly vague law, and this Court has warned that such laws are often used for discriminatory ends. See *Stahl*, 687 F.3d at 1041.

The Library Ban has been and would undoubtedly continue to be used to marginalize and disparage LGBTQ+ voices. Throughout this litigation, the State has been candid in saying that facially neutral

provisions of SF496 should be construed and applied to target representations of gay and transgender individuals. *See*, *e.g.*, Add. 42–44. And it is no coincidence that the books removed from the shelves pursuant to the Library Ban are frequently ones that depict gay and transgender characters—including Justin Richardson's AND TANGO MAKES THREE, a book that contains no sexual content whatsoever and merely depicts a same-sex relationship between two penguins.[4] A law that is so poorly crafted and easily weaponized cannot stand under the vagueness doctrine.

## II. ALLOWING THE GENDER IDENTITY/SEXUAL ORIENTATION BAN AND LIBRARY BAN TO GO INTO EFFECT WILL HARM STUDENTS AND THE QUALITY OF EDUCATION IN THE STATE

Laws as incorrigibly vague as the Gender Identity/Sexual Orientation Ban and Library Ban cause broad and lasting damage. If implemented, these laws will exacerbate harms to an already vulnerable population of LGBTQ+ students, drive educators from the profession, and damage the quality of education in the state.

---

[4] *See* Tim Webber & Samantha Hernandez, *Library books removed in Iowa school districts*, DES MOINES REGISTER (Dec. 20, 2023).

## A.    Harms to LGBTQ+ Students

In an existing climate that is often hostile to LGBTQ+ people, the Gender Identity/Sexual Orientation Ban and Library Ban will further stigmatize LGBTQ+ identities and undermine tolerance for gender diversity. For students who are outside of the dominant cultural expressions of gender identity, who have same-sex parents, or who are themselves lesbian, gay or bisexual, the message of these laws is clear: "it is unacceptable to talk about who you are."

When this message is widely communicated to students, it increases the risks of harassment and bullying of LGBTQ+ classmates. Survey studies show that, in schools without LGBTQ+-inclusive curricula, 30% of student respondents reported being victimized on the basis of sexual orientation and 29% on the basis of gender identity. By contrast, in schools with inclusive curricula, those number fall to 16.2% and 17.6%, respectively.[5] Moreover, studies demonstrate that inclusive policies that affirm the equality and dignity of all students benefit—not

---

[5] Caitlin M. Clark et al., *The 2021 National School Climate Survey*, GLSEN, at 64 (2022).

only LGBTQ+ students—but also their cisgender and heterosexual peers.[6] In other words, school climates that are safe and inclusive for LGBTQ+ students are good for all students.

Failure to support and include LGBTQ+ youth can have devastating consequences. An overwhelming majority (83%) of LGBTQ+ youth report being harassed or assaulted during the 2021–22 academic year, and more than four out of five (81.8%) LGBTQ+ students reported feeling unsafe in school because of their actual or perceived personal characteristics.[7] LGBTQ+ youth report high levels of depression and suicidal ideation—many times higher than their cisgender, heterosexual peers. One survey found that 45% of LGBTQ+ youth (ages 13–24) seriously considered attempting suicide in the past year,

---

[6] *See* U.S. Ctr. for Disease Control & Prevention, *LGBTQ-Supportive School Policies and Practices Help All Students Thrive* (June 2022) ("All young people do better in LGBTQ-inclusive schools."); Adina C. Cooper et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9 LGBT HEALTH 43, 43–53 (2022) (finding that "LGBTQ-supportive policies and practices are significantly associated with improved psychosocial health outcomes among both LGB and heterosexual students").

[7] *2021 National School Climate Survey*, supra note 5, at 10–11, 19.

including half (50%) of LGBTQ+ children age 13–17 seriously

considering and 18% attempting suicide.[8] Experiencing discrimination

is a significant factor in this increased risk of harm: 19% of youth who

had experienced discrimination based on sexual orientation or gender

identity attempted suicide in the past year, whereas 7% of LGBTQ+

youth who did not report experiencing discrimination attempted

suicide.[9]

### B.      Harms to the State's Ability to Retain Educators

Educators place a premium on their expertise and professional

autonomy. The overwhelming majority of them also believe in the

importance of teaching students to "value and respect the humanity of

---

[8] *See* The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* at 5 (2022). The Centers for Disease Control and Prevention found even higher rates: 23.4% of lesbian, gay and bisexual high school students attempted suicide one or more times during 2019, compared with only 6.4% of their heterosexual peers. *See* U.S. Ctr. for Disease Control & Prevention, *Youth Risk Behavior Survey Data Summary & Trends Report: 2009–2019* at 100 (2020). Lesbian, gay and bisexual high school students were more than three times as likely to have made a suicide plan as their heterosexual peers (40% compared to 12%). *Id.* at 99.

[9] The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* at 18.

every person."[10] So it is predictable that, in a recent nationwide study of teachers, 37% of the respondents indicated that they would be more likely to leave the profession within a year if "a push for laws that 'prevent honest teaching and conversations' reaches their classrooms."[11]

Many teachers and other school employees believe that these kinds of restrictions on affirmative inclusion of historically marginalized people are detrimental to the educational environment.[12] And they believe that the marginalization of vulnerable LGBTQ+ students conflicts with their ethical and professional obligation to treat *all* students with dignity and acceptance for who they are and to foster learning environments based on respect and inclusion. For some, this is

---

[10] Anna Merod, Survey: 37% of teachers will likely quit if K-12 censorship laws reach them, K-12 DIVE (Jan. 24, 2022).

[11] *Id.*

[12] Across the country in states that have laws restricting teaching about race or gender related topics, "one-third of teachers are put in a position to carry out policies that they believe are negative for student learning." Ashley Woo et al., *The Diverging State of Teaching and Learning Two Years into Classroom Limitations on Race or Gender* at 22 (Mar. 12, 2024). This RAND Corporation study further found that "even in very conservative to conservative-leaning communities, very few teachers (1 to 4 percent) considered limitations to be positive." *Id* at 22–23.

even a matter of religious conviction.[13] So, when a law like SF496 asks educators to choose between their jobs and their conscience, many will opt for the latter.

## C. Harms to the Quality of Education in the State

Allowing the Gender Identity/Sexual Orientation Ban and Library Ban to go into effect will do an enormous disservice to the state's public-school students, who will be left less prepared to participate in both the workplace and the polity. "Nothing less than the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." *Grutter v. Bollinger*, 539 U.S. 306, 324 (2003) (cleaned up). Yet, as we have detailed above, the challenged provision of SF496 will drastically limit what educators are willing to teach, will drive accomplished teachers out of the state, and will "cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

---

[13] *See* Rev. Susan Fredrick-Gray, *Transphobic and Anti-Abortion Policies are a Direct Threat to My Religious Freedom*, RELIGION DISPATCHES (June 6, 2022) (describing tenets of Unitarian Universalism that compel acceptance and affirmation of LGBTQ+ individuals and citing research indicating that 97% of Unitarian Universalists support nondiscrimination protections for LGBTQ+ people).

"[T]he skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330. The challenged provisions of the SF496, however, are incompatible with developing those skills. An emaciated educational experience that steers far clear of the SF496's vague restrictions will leave graduates of Iowa public schools at sea and unable to compete with their peers from across the country.

The same will be true for their roles as citizens and voters. The Supreme Court has long recognized that "America's public schools are the nurseries of democracy," where students benefit from being taught that "[o]ur representative democracy only works if we protect the 'marketplace of ideas.'" *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190, 141 (2021). Conversely, "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.). Yet that is precisely how the SF496 would operate. Not only will individual educators be reluctant to expose students to matters that could violate

the law's commands, but officials will also deploy the law in arbitrary and politicized ways to censor a broad range of speech and ideas.

Iowa students will suffer as a result. Before today's students become tomorrow's electorate, they "must be allowed the freedom to form their political views on the basis of uncensored speech . . . , so that their minds are not a blank slate when they first exercise the franchise." *Am. Amusement Mach. Ass'n*, 244 F.3d at 577. Affirmance of the preliminary injunction is therefore required.

## CONCLUSION

For the foregoing reasons, judgement of the District Court should be affirmed.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Alice O'Brien
Alice O'Brien
Jason Walta
Keira McNett
Nicole Carroll
NATIONAL EDUCATION
ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7182
aobrien@nea.org
*Counsel for Amicus Curiae*

</div>

April 18, 2024

## CERTIFICATE OF COMPLIANCE WITH
## TYPE VOLUME LIMITATION AND
## TYPEFACE AND TYPESTYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,410 words from the Statement of Interest through the Conclusion, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Century Schoolbook 14-point font.

<u>/s/ Jason Walta</u>

April 18, 2024

## CERTIFICATE OF COMPLIANCE
## WITH EIGHTH CIRCUIT RULE 28A(h)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of Amicus Curiae National Education Association has been scanned for viruses and is virus-free.

/s/ Jason Walta

April 18, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

<div align="center">

<u>/s/ Jason Walta</u>

</div>

April 18, 2024