No. 24-1075

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

GLBT YOUTH IN IOWA SCHOOLS TASK FORCE, d/b/a
IOWA SAFE SCHOOLS, ET AL.,
Plaintiffs-Appellees,

v.

KIMBERLY REYNOLDS, in her official capacity as
GOVERNOR OF THE STATE OF IOWA, ET AL.,
Defendants-Appellants,

JULIE MITCHELL, in their official capacities as BOARD MEMBERS OF THE
URBANDALE COMMUNITY SCHOOL DISTRICT, ET AL.,
Defendants.

No. 24-1082

PENGUIN RANDOM HOUSE, LLC, ET AL.,
Plaintiffs-Appellees,

v.

JOHN ROBBINS, in his official capacity as President of the
Iowa State Board of Education, ET AL.,
Defendants-Appellants.

On Appeal from the United States District Court
for the District of Iowa

**BRIEF OF AMICI CURIAE FREEDOM TO READ
FOUNDATION, IOWA LIBRARY ASSOCIATION, and
AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

(Counsel Listed Inside Cover)

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 218-3389
Fax: (917) 344-1394
owolfe@seyfarth.com

Cathryn M. Johns
Seyfarth Shaw LLP
2 Seaport Lane, Suite 1200
Boston, Massachusetts 02210
Tel: (617) 946-4800
Fax: (617) 946-4801
cjohns@seyfarth.com

*Attorneys for Amici Curiae Freedom to Read Foundation, Iowa Library Association, and American Association of School Librarians*

Dated: April 17, 2024

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* disclose as follows:

1. Freedom to Read Foundation is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

2. Iowa Library Association is a not-for-profit organization under Section 501(c)(6) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

3. American Association of School Librarians is a not-for-profit organization and a division of the American Library Association, which is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES ............................................................. iii

I.   STATEMENT OF INTEREST OF AMICI CURIAE ....................................1

II.  STATEMENT OF CONTRIBUTIONS ........................................................3

III. INTRODUCTION ............................................................................4

IV.  ARGUMENT...................................................................................6

    A.   Libraries are crucial to American democracy ......................................6

    B.   School libraries are critical to our democracy.....................................7

    C.   Robust school libraries result in better outcomes for students .............9

    D.   Iowa has previously recognized the importance of school libraries ........................................................................10

    E.   SF496's top-down approach ignores the training and standards relied upon by certified local librarians ..............................................11

    F.   SF496 is not government speech.......................................................15

        1.   The school library is extracurricular.......................................16

        2.   The government does not speak through library shelves..........20

    G.   SF496 is improper viewpoint discrimination.....................................25

    H.   The purported availability of books from other sources does not save SF496 .........................................................................28

V.   CONCLUSION...............................................................................29

CERTIFICATE OF COMPLIANCE....................................................31

CERTIFICATE OF SERVICE .............................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Arce v. Douglas,*
    793 F.3d 968 (9th Cir. 2015) ...................................................................17, 19

*Bd. of Educ. v. Pico,*
    457 U.S. 853 (1982)...................................................................17, 26, 27, 28

*Brown v. Entertainment Merchants Ass'n,*
    564 U.S. 786 (2011)...................................................................16, 19

*Campbell v. St. Tammany Parish Sch. Bd.,*
    64 F.3d 184 (5th Cir. 1995) ...............................................................17

*Case v. Unified Sch. Dist. No. 233,*
    908 F. Supp. 864 (D. Kan. 1995).........................................................17

*Chiras v. Miller,*
    432 F.3d 606 (5th Cir. 2005) ...................................................................18, 19

*Epperson v. State of Ark.,*
    393 U.S. 97 (1968).........................................................................27

*Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas,*
    2023 WL 4845636 (W.D. Ark. July 29, 2023)........................................7, 11, 26

*Gay & Lesbian Students Ass'n v. Gohn,*
    850 F.2d 361 (8th Cir. 1988) ...............................................................28

*González v. Douglas,*
    269 F. Supp. 3d 948 (D. Az. 2017)....................................................17

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001).........................................................................25

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988).......................................................................19

*Johanns v. Livestock Mktg. Ass'n,*
    544 U.S. 550 (2005).......................................................................24

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)..........................................................26

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993)..........................................................25

*Martin v. City of Struthers*,
319 U.S. 141 (1943)..........................................................26

*Matal v. Tam*,
582 U.S. 218 (2017)..............................................16, 20, 21, 22

*Mech v. Sch. Bd. of Palm Beach Cnty.*,
806 F.3d 1070 (11th Cir. 2015) .......................................24

*Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*,
938 F.3d 424 (3d Cir. 2019) .............................................25

*PETA v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005).............................................22

*Pleasant Grove City, Utah v. Summum*,
550 U.S. 460 (2009)..........................................................22

*Right to Read Def. Comm. v. Sch. Comm.*,
454 F. Supp. 703 (D. Mass. 1978).....................................18

*Roberts v. Madigan*,
702 F. Supp. 1505 (D. Colo. 1989)..................................4, 26

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)..........................................................18

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006)............................................................24

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)....................................................16, 20

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)..........................................................26

*U.S. v. Am. Library Ass'n*,
    539 U.S. 194 (2003).....................................................................23

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015).....................................................................22

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).....................................................................27

**Statutes**

Iowa Code § 256.11 (2023) ......................................................10, 27

Iowa Code § 279.80 .........................................................................14

Iowa Code § 280.6.............................................................................27

**Other Authorities**

*AASL Standards Framework for Learners*, Am. Ass'n of Sch.
    Librarians (2017), available at AASL-Standards-Framework-for-
    Learners-pamphlet.pdf.................................................................13

Abigail Weaver, *Establishing an Institution: The Public Library
    Movement in Iowa 1900-1920*, 7 Iowa Historical Review
    (2017), available at https://pubs.lib.uiowa.edu/iowa-historical-
    review/article/1619/galley/110616/view/ ....................................7

*Access to Resources and Services in the School Library: An
    Interpretation of the Library Bill of Rights*, Am. Libr. Ass'n
    (2014), available at
    http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/
    accessresources ......................................................................12, 13

Benjamin Franklin, The Collection of Biography and
    Autobiography (1961) ...................................................................6

Blanche Woolls, Encyclopedia of Library and Information
    Sciences, School Libraries (4th ed. 2017)............................8, 9, 28

Briana Hovendick Francis, et al., *School Librarians Continue to Help Students Achieve Standards: The Third Colorado Study*, LIBRARY RESEARCH SERVICE (2010), available at https://files.eric.ed.gov/fulltext/ED514556.pdf ..................................................9

*Code of Ethics*, AM. LIBR. ASS'N (2021), available at https://www.ala.org/tools/ethics .................................................11, 12

*Diverse Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2019), available at http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/ diversecollections..................................................13

Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008), available at https://digital.library.unt.edu/ark:/67531/metadc9800/ .......................................9

*IFLA Guidelines for Library Services to Children aged 0-18*, INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018), available at https://www.ifla.org/wp-content/uploads/2019/05/assets/libraries-for-children-and-ya/publications/ifla-guidelines-for-library-services-to-children_aged-0-18.pdf..................................................14

*Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017), available at https://www.ala.org/advocacy/intfreedom/librarybill/interpretations ..................................................12

IOWA DEPARTMENT OF EDUCATION, IOWA SCHOOL LIBRARY PROGRAM STANDARDS 3 (2019), available at https://educate.iowa.gov/media/4782/download?inline=.............................10,11

Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381 (2012)..................................................6

Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001), available at https://files.eric.ed.gov/fulltext/ED456861.pdf ..............................................9, 10

Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012), available at https://files.eric.ed.gov/fulltext/ED543418.pdf ................................9

Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (Mar. 26, 2018), available at http://kappanonline.org/lance-kachel-school-librarians-matter-years-research/ ............................................9

Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993) ..........................................9

Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012), available at https://files.eric.ed.gov/fulltext/ED572250.pdf ................................9

*Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), available at https://www.ala.org/advocacy/intfreedom/librarybill ...................12

Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, INFO. & CULTURE A J. OF HIST. 1,1 (2012), available at https://www.researchgate.net/profile/Michael-Kevane/publication/265724905_The_Development_of_Public_Libraries_in_the_United_States_1870-1930_A_Quantitative_Assessment/links/549f133a0cf257a635fe7233/The-Development-of-Public-Libraries-in-the-United-States-1870-1930-A-Quantitative-Assessment.pdf?_sg%5B0%5D=started_experiment_milestone&origin=journalDetail&_rtd=e30%3D ..............................................7, 8

Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU Educ. & L.J. 103 (2005) ..........................6, 8

STATE LIBRARY OF IOWA & IOWA DEPARTMENT OF EDUCATION, IOWA
SCHOOL LIBRARY GUIDELINES: LIBRARIES, LITERACY AND
LEARNING FOR THE 21ST CENTURY 4 (2007), available at
https://publications.iowa.gov/20503/1/0708_pk12_schoollibrarypr
oguidelineshandout.pdf...................................................................................10

STATE LIBRARY OF IOWA, IOWA PUBLIC LIBRARY STATISTICS: JULY 1,
2021 – JUNE 30, 2022 4 (2022), availabe at
https://www.statelibraryofiowa.gov/application/files/9616/9031/76
70/IOWA_PUBLIC_LIBRARY_STATISTICS_big_book_fy22_fi
nal_updated_25JUL23.pdf ..........................................................................7

Tamara G. Halle, et al., *Family Influences on School Achievement in
Low-Income, African American Children*, J. OF EDUC. PSYCH. 89
(1997).............................................................................................................28

U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL
LIBRARIES: 1953-2000 1 (2005), available at
https://nces.ed.gov/pubs2005/2005324.pdf .................................................8

# I.  STATEMENT OF INTEREST OF AMICI CURIAE

The Freedom to Read Foundation ("FTRF") was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available to the public, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The Iowa Library Association ("ILA") fosters a community of library-related innovation and advocacy in Iowa, supporting and strengthening its members to promote libraries as an essential resource for all Iowans.  ILA endeavors to defend challenges to intellectual freedom and the freedom to read, while also advocating for critical funding, access to information, local control, and the importance of teacher-librarians in every school.

The American Association of School Librarians ("AASL") is the preeminent national professional association for school librarians.  All aspects of the association's work reflect its core values: learning; innovation; equity; diversity; inclusion; intellectual freedom; and collaboration.  AASL is committed to ensuring

that all learners have a school library collection that is physically and intellectually accessible and where access is best met at the time of need.

FTRF, ILA, and AASL believe that viewpoint censorship violates the core value of preserving intellectual freedom and thus have a strong interest in the outcome of this case.

Appellants and Appellees consent to the filing of this amici curiae brief.

## II. <u>STATEMENT OF CONTRIBUTIONS</u>

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, FTRF, ILA, and AASL state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the amici curiae, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

# III.   INTRODUCTION

"The school library is a mirror of the human race, a repository of the works of scientists, leaders, and philosophers.  It is the locus where the past meets tomorrow, embellished by the present.  The school library offers the student a range of knowledge, from the world's great novels and plays to books on hobbies and how-to-do-it projects." *Roberts v. Madigan*, 702 F. Supp. 1505, 1512-13 (D. Colo. 1989).

Senate File 496 ("SF496") undermines the purpose of the school library, and hurts Iowa students, by restricting libraries' ability to include certain viewpoints in their collections.[1]  Defendants-Appellants (collectively, the "State") misleadingly suggest that the law is limited to restricting depictions of "sex acts."[2]  The law bans all books deemed not to be "age appropriate," a vague, State-invented standard not utilized by professional librarians, the extent and reach of which are intentionally unclear and which does not distinguish between elementary, middle, and high school.

SF496 resulted in the removal of hundreds of books from school library shelves.  The law includes an exception for the Bible, the Torah, and the Koran, however, and thereby expressly promotes three particular religious viewpoints at the

---

[1] Amici only address those portions of SF496 relating to school libraries.

[2] Because the State raises similar arguments in Case Nos. 24-1075 (the "GLBT Appeal") and 24-1082 (the "PRH Appeal"), amici address both here.  Citations to "GLBT State Br." are to the State's brief in the GLBT Appeal, and citations to "PRH State Br." are to the State's brief in the PRH Appeal.

expense of all others. SF496 also prohibits books that discuss "gender identity" or "sexual identity" in elementary school libraries. The State admitted in the District Court that this portion of SF496 targets LGBTQ+ characters and issues—another form of improper viewpoint discrimination. GLBT State Addendum 10.

The State disingenuously attempts to depict this case as presenting a complicated issue, requiring analysis under multiple different standards. These arguments are an attempt at obfuscation. In reality, the analysis is straightforward. SF496's library restrictions are not government speech. They are viewpoint discrimination, which is impermissible in any forum. Accordingly, SF496 violates the First Amendment.

To argue that SF496's library restrictions are "government speech," the State conflates school libraries with school curriculum, arguing that the government can essentially restrict whatever speech it would like in connection with the curriculum. There are limits to the government's powers even in the curriculum setting, but the school library collection is *not* the curriculum: although *librarians* provide crucial academic support for the entire school community, the school library *collection* is an extracurricular place of study where students engage in *optional* reading.

The State also conflates library shelves with traditional forms of government speech. Curating a library is not the same as placing a monument or issuing a license plate. No one believes that the government speaks through authors such as John

Irving or Zora Neale Hurston. The point of school libraries is to enable students to explore a diverse range of knowledge and viewpoints.

Decisions about what books are in a school library should be made at the local level by certified, trained librarians. Every student is different and there is no "one-size-fits-all" approach as to when a student is developmentally ready to read a particular book. SF496 interferes with these personal, local decisions by banning hundreds of books from library shelves. SF496's top-down approach of restricting speech based upon viewpoint, at the expense of Iowa students' education and information needs, violates the First Amendment. The District Court's injunction should be affirmed.

## IV.  ARGUMENT

### A.  Libraries are crucial to American democracy.

Public libraries predate our country's establishment, with Benjamin Franklin often credited with founding the first American subscription library in 1731. Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381, 394 (2012) (quoting BENJAMIN FRANKLIN, THE COLLECTION OF BIOGRAPHY AND AUTOBIOGRAPHY 62-63 (1961)). Colonial libraries developed as early as 1770. Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU Educ. & L.J. 103, 112 (2005). "After the British burned Washington's congressional

library during the War of 1812, Thomas Jefferson sold his personal collection…to start what is now the Library of Congress." *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 2023 WL 4845636, at *3 (W.D. Ark. July 29, 2023). "He famously said, 'I have often thought that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county….'" *Id.*

In 1901, the Iowa Library Commission was founded to promote the growth of public libraries in the state. Abigail Weaver, *Establishing an Institution: The Public Library Movement in Iowa 1900-1920*, 7 IOWA HISTORICAL REVIEW 7, 10 (2017). Money from private citizens, and local advocacy, led to the establishment of community libraries throughout Iowa. *Id.* Today, Iowa supports 544 public libraries, ranked fourth nationally behind New York, Illinois, and Texas. STATE LIBRARY OF IOWA, IOWA PUBLIC LIBRARY STATISTICS: JULY 1, 2021 – JUNE 30, 2022 4 (2022).

**B. School libraries are critical to our democracy.**

The emergence of public libraries coincided with the rise of public education and, with it, school libraries. "[P]ublic libraries…were originally conceived as part of the nation's broader educational movement, and it was their educational function that provided the principal justification for public support." Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States,*

*1870-1930: A Quantitative Assessment*, Info. & Culture A J. of Hist. 1,1 (2012). In many locations, the concept of a school library predated the public library, as "libraries run by local school districts were often intended to make reading materials available not only to school children but to adults as well." *Id.* at 7.

In an 1896 speech, Melvil Dewey, inventor of the library cataloging system, asserted that:

> [a] collection of books in every schoolroom for everyday use is coming to be considered an essential part of a school building's furniture. These books introduce children to the best literature of the world; they interest them in other phases of any subject they may be studying ***than those set forth in their text-books***…. [T]hey familiarize the children with books and their use; and, in any subject, they permit the beginning of that laboratory method which is now considered so essential in all educational work.

Peltz, *supra*, at 114 (emphasis added).

Professional school libraries as we now know them began to emerge in the 1900s and were developed further in the 1960s. Blanche Woolls, Encyclopedia of Library and Information Sciences, School Libraries 4000 (4th ed. 2017). Since the early 1950s, almost 30,000 school libraries have been established, and thousands of federally-funded development and collection-expansion projects have enhanced existing libraries in public schools. U.S. Department of Education, America's Public School Libraries: 1953-2000 1 (2005).

**C.    Robust school libraries result in better outcomes for students.**

School libraries' impact on students' lives and education has been well-documented. "Research studies served to point out student success when schools had libraries, librarians, and resources." WOOLLS, *supra*, at 4004. The quality of, and access to, books at a school library is a powerful predictor of academic achievement. *See, e.g.*, Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012); Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012); Briana Hovendick Francis, et al., *School Librarians Continue to Help Students Achieve Standards: The Third Colorado Study*, LIBRARY RESEARCH SERVICE (2010); Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008); Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993).

Research consistently confirms that strong library programs increase student achievement. Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (Mar. 26, 2018); *see also, e.g.*, Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School*

*Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001).

**D.  Iowa has previously recognized the importance of school libraries.**

Historically, Iowa agreed that school libraries are critical to students. "Good school library programs help students learn and help teachers teach. The best school libraries are centers of learning in their schools. They are permeated by a 'culture of literacy,' where the development of skills and interest in reading, writing, listening, speaking and thinking are promoted and practiced." STATE LIBRARY OF IOWA & IOWA DEPARTMENT OF EDUCATION, IOWA SCHOOL LIBRARY GUIDELINES: LIBRARIES, LITERACY AND LEARNING FOR THE 21ST CENTURY 4 (2007).

Under Iowa law, "each school district shall employ either a qualified teacher librarian licensed by the board of educational examiners or a person previously employed as a librarian by a public library." IOWA CODE § 256.11(9) (2023). "The state board shall establish…standards for school district library programs, which shall be designed to…improve library collections to meet student needs, [and] include a current and diverse collection of fiction and nonfiction materials in a variety of formats to support student curricular needs…." *Id.*

Having a teaching librarian "maximizes access to and promotes the use of high-quality and high-interest literature that reflects the diverse developmental, cultural, social, and linguistic needs of all learners." IOWA DEPARTMENT OF

EDUCATION, IOWA SCHOOL LIBRARY PROGRAM STANDARDS 3 (2019). School librarians are empowered to "select[] high-quality and high-interest literature in formats that reflect the diverse developmental, cultural, social, and linguistic needs of the range of learners and their communities." *Id.* at 11.

### E. SF496's top-down approach ignores the training and standards relied upon by certified local librarians.

The American Library Association ("ALA") is the sole accrediting body for library and information science schools in the United States. *Fayetteville*, 2023 WL 4845636, at *4. "Professional librarians hold advanced degrees from ALA-accredited institutions, and…are taught to adhere to the ALA's Code of Ethics and Library Bill of Rights in their professional lives." *Id.*

The ALA's Code of Ethics "guide[s] the work of librarians" with a focus on "the values of intellectual freedom that define the profession of librarianship." *Code of Ethics*, AM. LIBR. ASS'N (2021). Chief among these ethical obligations is the librarian's duty not to limit access to information based on viewpoint:

> 1. We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.
>
> 2. We uphold the principles of intellectual freedom ***and resist all efforts to censor library resources***.
>
> \*\*\*
>
> 6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.

7. We distinguish between our personal convictions and professional duties *and do not allow our personal beliefs to interfere* with...the provision of access to their information resources.

*Id.* ¶¶ 1-2, 6-7 (emphasis added).

The ALA's Library Bill of Rights sets forth the "basic policies [that] should guide [library] services." *Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble). The Library Bill of Rights is unequivocal in its condemnation of censorship and attempts to limit information based on viewpoint:

Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

*Id.* §§ II, III. "'[A]ll people' and 'all points of view' should be included in library materials and information," with "no limiting qualifiers for viewpoint, origin, or politics." *Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017).

These policies apply to school libraries. *Access to Resources and Services in the School Library: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2014). Consistent with pre-SF496 Iowa law, the ALA recognizes that the school library "serves as a point of voluntary access to information and ideas and as a learning laboratory for students as they acquire critical thinking and problem-solving skills needed in a pluralistic society." *Id.* The criteria for selection of materials for school libraries should be "unfettered by...personal, political, social, or religious

views" so that "[s]tudents and educators served by the school library have access to resources and services free of constraints resulting from personal, partisan, or doctrinal disapproval." *Id.*

In this same vein, and consistent with pre-SF496 Iowa law, amicus curiae AASL follows the National School Library Standards, which emphasize the importance of the school library as an essential part of the learning community that prepares students for college, career, and life. *See generally AASL Standards Framework for Learners*, AM. ASS'N OF SCH. LIBRARIANS (2017). School librarians are trained to curate collections in an inclusive, not exclusive, process. *See generally Diverse Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2019). School librarians do not exclude materials because they are controversial or represent a viewpoint with which they may disagree, but include books that reflect a diversity of political, economic, religious, and social issues. *See id.* School librarians curate the library collection, and also provide resources and learning tools for an entire school.

When following these principles, librarians are guided by the principle that there is no "one-size-fits-all" approach to what books are appropriate for children and teenagers in a particular school and community. Accordingly:

> [c]hildren's libraries should provide a variety of ***developmentally appropriate materials*** in a variety of formats and to meet the needs of all age groups. There are no universal standards for the size and content of children's library collections. Collections and services should

13

include all types of appropriate…materials. A wide range of opinions, values and views should be reflected in the library stock and online accessible materials.

*IFLA Guidelines for Library Services to Children aged 0-18*, INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018) (emphasis added).

SF496 ignores all of the foregoing. It employs a wholly invented "age appropriate" standard that is not used by librarians, and is unnecessary where those professionals are already employing the well-established "developmentally appropriate" standard and following the Code of Ethics and similar principles. Worse, the "age appropriate" standard does not differentiate between elementary, middle, and high schools. In curating school library collections, every professional librarian would take into account the grade level of the students at the school, and include materials that are developmentally appropriate for the range of ages for either the elementary, middle school, or high school students for which the collection is intended. SF496's blanket standard eviscerates this type of discretion.

SF496 also prohibits "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation" for K-6 students. Iowa Code § 279.80(2). Although school libraries are not expressly referenced, one Iowa legislator stated that the law would "prohibit schools from making books with gay or transgender characters available to" K-6 students and

schools have interpreted the law as applying to libraries. *See* GLBT State Addendum 8, 10. Again, this blanket prohibition eviscerates the discretion of local librarians: even if the books do not depict anything remotely resembling a "sex act," and even if the books are otherwise developmentally appropriate and of educational merit, librarians are barred from "making [those] books…available."

The net effect of SF496 is to undermine school libraries and curtail librarians from curating diverse collections for their particular school communities, contrary to the history, purpose, and function of school libraries.

## F.    SF496 is not government speech.

The State attempts to justify SF496's restrictions through a dangerous argument: SF496 is "government speech" that is not subject to any First Amendment restrictions. *See* GLBT State Br. 35-49; PRH State Br. 16-34. The State advances two main assertions in support of this position: *first*, that the State's selection of items for a school curriculum is government speech, so taking books off school library shelves must be as well; and *second*, that selecting what books go on or off library shelves is akin to selecting a public monument or issuing a license plate for a vehicle. *See id.* These arguments ignore the actual and historical role of school libraries, and the significant limitations on the government speech doctrine.

The Supreme Court has cautioned that whether a government's action constitutes government speech "is driven by a case's context rather than the rote

application of rigid factors." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). "[T]he real question in government-speech cases [is] whether the government is *speaking* instead of regulating private expression." *Id.* at 262 (Alito, J., concurring).

Justice Alito warned that courts must look at the overall context when analyzing government speech arguments because "it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint'" and "the government-speech doctrine becomes 'susceptible to dangerous misuse.'" *Id.* at 262-63; *see also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints").

SF496's library restrictions are not government speech.

## 1. The school library is extracurricular.

The State's argument (GLBT State Br. 39-40; PRH State Br. 18-19, 38) that selecting school curriculum is government speech, and therefore curating a school library collection must be as well, fails. While the State can act to protect the welfare of children, that power has significant limitations: "[n]o doubt a State possesses legitimate power to protect children from harm…. [T]hat does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794-95 (2011).

Even where the government is acting in connection with curriculum, its powers to restrict other viewpoints are limited. "Students have a First Amendment right to receive information and ideas," and that right "applies in the context of school curriculum design." *See González v. Douglas*, 269 F. Supp. 3d 948, 972-73 (D. Ariz. 2017). Accordingly, the removal of "materials otherwise available in a local classroom" is unconstitutional unless the school's action is "reasonably related to legitimate pedagogical concerns." *Id.*; *see also Arce v. Douglas*, 793 F.3d 968, 982-83 (9th Cir. 2015) ("remov[al of] materials otherwise available in a local classroom" is not government speech).

In any event, although the State's power over curriculum may come into play in settings like the classroom, it is not relevant to school libraries. School libraries are ***extracurricular***. Library books are not required reading, but are available for students to explore with the guidance of certified, trained librarians who select books that are developmentally appropriate for the particular school community they serve: elementary, middle school, or high school. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 862 (1982) (Brennan, J.) ("the only books at issue in this case are *library* books that by their nature are optional rather than required reading"); *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 185, 189-90 (5th Cir. 1995) (students "not required to read" books in school library; library not a "curricular matter"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875-76 (D. Kan. 1995) (school officials do not have

"absolute discretion beyond the compulsory environment of the classroom into the school library," where "the regime of voluntary inquiry…hold[s] sway"). As another court put it:

> The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment. That student learns that a library is a place to **test or expand upon ideas** presented to him, **in or out of the classroom**. The most effective antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control. The Committee's ban of the anthology Male & Female is enjoined.

*Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978) (emphasis added).

School libraries are not part of the curriculum, and their curation is not government speech. Selecting books for libraries is a situation where the government "expends funds to encourage a diversity of views from private speakers." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 833-34 (1995). That conduct is *not* government speech. *Id.* at 833-86.

The State's heavy reliance on *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) is misplaced. *See, e.g.,* GLBT State Br. 38, 45; PRH State Br. 2, 5, 14, 19, 21, 24-26, 33, 35, 38, 47. *Chiras* involved the selection of textbooks for use **in the classroom**. *See Chiras*, 432 F.3d at 615-16. The Fifth Circuit explained that "[a]lthough the state may utilize private textbook authors, it does so to facilitate transmission of its own approved message, not a message of the authors' choosing."

*Id.* That context is significantly different than the facts here, which involve a student's right to explore **optional** books of their choosing **outside the classroom,** where the message in the books **is** "of the authors' choosing," not the government's approved message. *Cf. Arce*, 793 F.3d at 982 (*Chiras* does not apply to situations involving "a *student's* First Amendment rights" as it does in the context of a school library (italics in original)).

The State also relies upon *Hazelwood Sch. Dist. v. Kuhlmeier* (*see* GLBT State Br. 42, 52, 58; PRH State Br. 14, 19, 25, 37, 38), which involved articles in a school-created and school-sponsored newspaper integrated into "the educational curriculum" at the school and controlled by the school's journalism teacher. 484 U.S. 260, 268 (1988). The State has not demonstrated that the books on Iowa school library shelves were printed by the government, or that the government exercised editorial control over the content of the books on library shelves. Cases like *Hazelwood* have no application in the library context.

The State's attempt to restrict books available to students under a nebulous "age appropriate" standard goes far beyond its power to protect children "from harm," and is instead what Justice Scalia stated was forbidden: a "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95. SF496's library restrictions are not government speech.

## 2. The government does not speak through library shelves.

The State's attempt to equate a certified, trained librarian's decisions about what books go on library shelves to other forms of government speech similarly fails. *See* GLBT State Br. 36-40, 47; PRH State Br. 17-20, 24. Courts have articulated three factors to determine whether an action is government speech: "[1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; and [3] the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 244. Based upon those factors and the overall context, curating school library shelves is not government speech.

In *Matal*, the Supreme Court held that the government's registration of trademarks is not government speech. 582 U.S. at 235-39. The Court reasoned that "[t]he Federal Government does not dream up these marks, and it does not edit marks submitted for registration." *Id.* at 235. If the marks were government speech, then "the Federal Government is babbling prodigiously and incoherently," "saying many unseemly things," and "unashamedly endorsing a vast array of commercial products…." *Id.* at 236. The Court further held that "[t]rademarks have not traditionally been used to convey a Government message…[a]nd there is no evidence that the public associates the contents of trademarks with the Federal Government." *Id.* at 238; *see also, e.g., Shurtleff*, 596 U.S. at 254-56 (city did not

control messages on flags on government property and public would not believe city endorsed those messages).

Here, the government did not "dream up" the books in the school library and did not "edit" those books. *See Matal*, 582 U.S. at 235. It has no editorial control over James Joyce's novels or Langston Hughes' poems. If putting books on a shelf is government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things": as one example, Iowa's libraries cannot rationally endorse both the vile ranting of Adolf Hitler in *Mein Kampf* and books celebrating Jewish faith and identity. *See id.* at 236.[3]

Nor has the government traditionally conveyed messages to the public through books written by private actors, or through what books appear on library shelves. *See id.* at 238. In fact, as set forth above at pgs. 6-15, *supra*, SF496's broad restrictions on certain books are antithetical to school libraries' history and mission.

Nor would the public reasonably perceive that the government speaks through books on library shelves. No one thinks that Toni Morrison or Kurt Vonnegut are conveying government messages, or that the government has endorsed every word

---

[3] *See Mein Kampf*, Des Moines Public Library, https://catalog.dmpl.org/Record/153913?searchId=5917665&recordIndex=1&page=1&referred=resultIndex; *Judaism Is About Love*, Des Moines Public Library, https://catalog.dmpl.org/Record/389251?searchId=5938906&recordIndex=6&page=1&referred=resultIndex.

of their works.  Again, no coherent, discernible "message" is being conveyed by the books that are or are not on library shelves.

Other cases cited by the State underscore the point.  *See* GLBT State Br. 35-37, 40, 46; PRH State Br. 17-18, 21, 24, 26, 33.  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.* involved license plates, which have long been used by the state to convey messages and are controlled and managed by the government.  576 U.S. 200, 209-12 (2015).  *Pleasant Grove City, Utah v. Summum* involved the placement of a monument on government property, and "[g]overnments have long used monuments to speak to the public."  555 U.S. 460, 470-71 (2009).

Putting or not putting a book on a library shelf is not the same as a direct form of expression like printing a license plate, placing a monument in a town square, or airing a television program.  The government has not traditionally communicated through library shelves; no comprehensible message is conveyed by the government through books written by private actors on library shelves; and no one would reasonably perceive the books as constituting government speech.[4]

---

[4] The State relies heavily on the D.C. Circuit's dicta in *PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005).  *See* GLBT State Br. 36, 38; PRH State Br. 19, 20, 33.  *Gittens* involved placement of statues around Washington, D.C.—a practice akin to the placement of monuments, as in *Pleasant Grove*.  *See* 414 F.3d at 28.  Moreover, *Gittens* was decided before, and its dicta statements are obviously contrary to, *Matal*.  The Court should not find this dicta persuasive.

The State never cited any evidence or supporting authority in the District Court or on appeal showing that the government speech factors identified by the Supreme Court are met here. With respect to historical usage, the State relies (GLBT State Br. 41-42) primarily upon a plurality opinion in *U.S. v. Am. Library Ass'n*, ("*ALA*"), which is inapposite. 539 U.S. 194 (2003). The plurality in *ALA* never held that the government historically speaks through library shelves. *See id.* at 206. The case involved filters on Internet-enabled computers in libraries meant to block "'visual depictions' that constitute 'obscenity' or 'child pornography,' and [to] protect[] against access by minors to 'visual depictions' that are 'harmful to minors.'" *See, e.g., id.* at 201, 208-09. In response to concerns that library filters "overblocked" and filtered protected speech, the plurality noted that "[w]hen a patron encounters a blocked site, he need only ask a librarian to unblock it or…disable the filter," while the library could "permanently unblock any erroneously blocked site" or disable the filters "to enable access for bona fide research or other lawful purposes." *Id.* at 209 (internal quotation marks omitted).

Not only does the plurality opinion not stand for the proposition claimed by the State, it has nothing to do with this case. SF496 goes far beyond targeting unprotected speech such as child pornography—it requires removal of a wide range of books that are deemed not to be "age appropriate." Moreover, unlike a website filter that can be disabled on demand, if a book is removed from a library shelf and

banned, a student cannot obtain the book by asking the librarian. In short, *ALA* says nothing about whether library shelves constitute "government speech."

With respect to government control over the contents of the speech, the State relies upon similarly inapposite cases. *See* GLBT State Br. 41. In *Johanns v. Livestock Mktg. Ass'n*, "the government set[] the overall message to be communicated and approve[d] every word that [was] disseminated," 544 U.S. 550, 562 (2005), *i.e.*, an actual, comprehensible message, in which the government controlled every word, was transmitted to the public. So too with government-sponsored parades (*Rumsfeld v. FAIR*, 547 U.S. 47, 63-64 (2006)) and banners pre-approved by a principal and hung on school property (*Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1078 (11th Cir. 2015)). Here, the government is not setting ***any*** comprehensible message through library shelves and is certainly not exercising editorial approval over "every word" in *Ulysses*, *Moby Dick*, or any other book on the shelves. *See Johanns*, 544 U.S. at 562.

When addressing the public's perception, the State provides no support of any kind. *See* GLBT State Br. 42. It simply asserts that "the public would reasonably believe the government endorses (or disagrees with) the speech" in books placed or removed from library bookshelves. There is a reason the State could not find any support for that assertion: it defies common sense, as set forth above.

The State has not come close to demonstrating that library bookshelves constitute "government speech." The State's argument is the sort of "dangerous misuse" of the doctrine about which Justice Alito warned. It should be rejected.

### G. SF496 is improper viewpoint discrimination.

SF496 is *not* government speech; it *is* viewpoint discrimination. Although the State argues that the school library is a nonpublic forum (*see, e.g.,* GLBT State Br. 50; PRH State Br. at 36-37), the Court need not decide that issue. Viewpoint discrimination is improper in any forum. *See, e.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (in limited public forum, state cannot "discriminate against speech on the basis of viewpoint"); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-93 (1993) ("'[c]ontrol over access to a nonpublic forum'" is constitutional "so long as the distinctions drawn…are viewpoint neutral"); *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 436 (3d Cir. 2019) ("the type of forum sheds no light…. [V]iewpoint discrimination is impermissible in any forum").[5]

---

[5] SF496 is unconstitutional regardless of whether the school library is a nonpublic forum, limited public forum, or designated public forum. At a bare minimum, to pass constitutional muster, SF496's restrictions would need to be "reasonable" and "viewpoint neutral." *See Lamb's Chapel*, 508 U.S. at 392-93. Even setting aside viewpoint discrimination, SF496's restrictions are facially unreasonable, as they require the removal of, *inter alia*, classic works of literature and history, regardless of their educational suitability and value. *See, e.g.,* GLBT State Addendum 28 (books including *Ulysses* by James Joyce and *Native Son* by Richard Wright removed).

"Our founding fathers understood that 'novel and unconventional ideas might disturb the complacent'; yet in authoring the First Amendment, they sought "to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Fayetteville*, 2023 WL 4845636, at *5 (W.D. Ark. July 29, 2023) (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)). In the context of schools, "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

Accordingly, "to justify prohibition of a particular expression of opinion, [the State] must…show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969). Otherwise, SF496-style viewpoint discrimination could be used to restrict viewpoints from any part of the political, religious, or social spectrum. *See, e.g., Roberts*, 702 F. Supp. at 1512-13 (rejecting attempts to remove "religiously oriented books" from a "classroom library").

This is true for school libraries: "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a

school library." *Pico*, 457 U.S. at 866. "Access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868. "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (plurality) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

SF496 is improper viewpoint discrimination. SF496 bars books that depict "sex acts" or are otherwise not "age appropriate," while exempting the Bible, the Torah, and the Koran. IOWA CODE § 256.11(19); IOWA CODE § 280.6. The State is permitting three particular religious viewpoints that depict "sex acts," while banning non-religious or other religious viewpoints that depict "sex acts." That type of viewpoint discrimination is particularly inappropriate. "There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson v. State of Ark.*, 393 U.S. 97, 106 (1968).

Moreover, as discussed at pgs. 14-15, *supra*, SF496 prohibits schools from "making books with gay or transgender characters available to" K-6 students, which, based on the vagueness of the statutory language, has been interpreted to apply to school libraries. *See* GLBT State Addendum 10. The State's discrimination against

a particular viewpoint relating to LGBTQ+ issues is also unconstitutional. *See, e.g., Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 362 (8th Cir. 1988) (university engaged in viewpoint discrimination by funding student groups while denying funding to group advocating for gay and lesbian rights).

Library bookshelves have limited space and cannot include every book in existence. Certified, trained librarians make decisions about which developmentally-appropriate books should or should not be included based upon the needs of the students and communities they serve. SF496 forces those librarians to remove books containing certain viewpoints from the shelves, however, while requiring them to keep other viewpoints on the shelves. That type of viewpoint discrimination is a clear-cut violation of the First Amendment.

### H. The purported availability of books from other sources does not save SF496.

The District Court properly rejected the State's argument that SF496's viewpoint discrimination is harmless because books removed from school library shelves are purportedly available elsewhere. *See* GLBT State Addendum 34. The State's only response is a citation to a dissenting opinion in *Pico*—a case that the State spends much of its briefs belittling. *See* GLBT State Br. 67; PRH State Br. 36, 56-57. For the reasons articulated by the District Court, the State's position is wrong as a matter of law.

The State is also wrong as a matter of fact because not every child has the means or ability to visit public libraries or bookstores. "[G]etting to the public library may be difficult for children and for those who live in homes without Internet access, the school library may be their only access to the digital world." WOOLLS, *supra*, at 4004. Getting to, and knowing how to use, the public library may also depend on a family's individual financial resources. "Because many families cannot afford to purchase children's books, it becomes all the more important to make community resources…easily and readily available within disadvantaged communities." Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89, 527-37 (1997).

School libraries and librarians are a critical resource for children. For many students, the school library may be their primary or only means of access to books. The fact that public libraries and bookstores ***might*** carry a book barred by SF496 is not a substitute for children's access to books in a school library.

## V. CONCLUSION

It is no mere rhetorical flourish to say that school libraries are citadels of American democracy. SF496's restrictions on libraries undermine those citadels and bar certain viewpoints in violation of the First Amendment. The District Court's preliminary injunction should be affirmed.

Respectfully submitted,

**FREEDOM TO READ FOUNDATION, IOWA LIBRARY ASSOCIATION, AND AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS**

By their attorneys,

*s/Owen R. Wolfe*

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Tel:  (212) 218-3389
Fax:  (917) 344-1394

Cathryn M. Johns
Seyfarth Shaw LLP
2 Seaport Lane, Suite 1200
Boston, Massachusetts 02210
Tel:  (617) 946-4800
Fax:  (617) 946-4801

cjohns@seyfarth.com

*Attorneys for Amici Curiae,*
*Freedom to Read Foundation, Iowa Library*
*Association, and American Association of*
*School Librarians*

Dated:  April 17, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS AND VIRUS-FREE CERTIFICATION

1. This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7) because the brief contains 6,483 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface; footnotes appear in 14-point Times New Roman typeface.

*s/ Owen R. Wolfe*
Owen R. Wolfe

Dated: April 17, 2023

## CERTIFICATE OF SERVICE

I certify that on April 17, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*s/ Owen R. Wolfe*
Owen R. Wolfe