No. 24-1082

# United States Court of Appeals

for the

# Eighth Circuit

———————◆———————

PENGUIN RANDOM HOUSE LLC, ET AL.,

*Plaintiffs-Appellees,*

*v.*

JOHN ROBBINS, ET AL.,

*Defendants-Appellants,*

On appeal from the United States District Court
for the Southern District of Iowa, 4:23-cv-00478,
Honorable Stephen H. Locher, Presiding

**BRIEF OF *AMICUS CURIAE* FOUNDATION FOR
INDIVIDUAL RIGHTS AND EXPRESSION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

GREG HAROLD GREUBEL*
AARON TERR
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St.
Suite 900
Philadelphia, PA 19106
greg.greubel@thefire.org
(215) 717-3473

ROBERT CORN-REVERE
JOSHUA A. HOUSE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue,
SE
Suite 340
Washington, DC 20003
(215) 717-3473

*\*Counsel of Record*

*Attorneys for* Amicus Curiae *Foundation for Individual Rights and Expression*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE* ....................................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ............................................................................................ 5

    I.   The First Amendment Prohibits Imposing a Pall of Orthodoxy in Iowa's Public Schools. ...................................... 5

        A.   The First Amendment limits arbitrary political control of libraries. .......................................... 6

        B.   Iowa legislators degrade the purpose of public-school libraries by imposing top-down restrictions. .................................................................. 11

    II.   Local School Boards, Not State Legislators, Must Determine Age Appropriateness Using Clear Standards. .............................................................................. 14

        A.   SF496 disturbs local communities' longstanding prerogative to determine which books go into their school libraries. ............................ 15

        B.   SF496 turns local control into local confusion. .................................................................. 17

CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Chiras v. Miller,*
    432 F.3d 606 (5th Cir. 2005) ................................................................ 9

*Community-Service Broad. of Mid-America, Inc. v. FCC,*
    593 F.2d 1102 (D.C. Cir. 1978) ........................................................ 11

*FCC v. Fox Television Stations,*
    567 U.S. 239 (2012) ........................................................................ 21

*FCC v. League of Women Voters of Cal.,*
    468 U.S. 364 (1984) ........................................................................ 11

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982) ......................................................................*passim*

*Kincaid v. Gibson,*
    236 F.3d 342 (6th Cir. 2001) .......................................................... 11

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ................................................................ 3, 6, 10

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ............................................................................ 5

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) .......................................................................... 5

*Pratt v. Indep. Sch. Dist. No. 831,*
    670 F.2d 771 (8th Cir. 1982) .................................................. 12, 14, 15

*Rust v. Sullivan,*
    500 U.S. 173 (1991) .......................................................................... 5

*Stanley v. Magrath,*
719 F.2d 279 (8th Cir. 1983) ............................................................... 10

*Texas v. Johnson,*
491 U.S. 397 (1989). ............................................................................. 4

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ............................................................................. 2

*United States v. Am. Libr. Ass'n,*
539 U.S. 194 (2003) ............................................................................ 9, 11

*Whitney v. California,*
274 U.S. 357 (1927) ............................................................................. 6

## Statutes

Iowa Code § 256.11 ............................................................................... 18

Iowa Code § 256.11(19)(a)(1) ................................................. 12, 13, 16, 18

Iowa Code § 256.11(9)(a)(2) ................................................................. 16

Iowa Code § 256.11(9)(b) ...................................................................... 8

Iowa Code § 274.1 ................................................................................ 15

Iowa Code § 274.3 ................................................................................ 15

Iowa Code § 277.1 ................................................................................ 15

Iowa Code § 702.17 .............................................................................. 18

## Other Authorities

Iowa Admin. Code r. 281-12.3(12)(a-c) ............................................. 15, 16

Bridgette Exman, *This Summer, I Became the Book-Banning Monster of Iowa*, N.Y. Times, Sept. 3, 2023 ........................................................ 17

Forrest Spaulding, *Board and Committee reports—Intellectual Freedom*, 35 Am. Library Assoc. Bulletin (No. 15) 622 (Oct. 15, 1941) ............. 22

George Orwell, *1984* (Signet Classics ed. 1950) .................................... 19

*Library Bill of Rights*, Am. Libr. Assoc. (1939) ................................... 3, 8

*Pieces of Iowa's Past: Spaulding's Library Bill of Rights*, Iowa Legislative Services Agency (Apr. 4, 2018) ................................... 2

## Treatises

Frederick Schauer, *Principles, Institutions and the First Amendment*, 112 Harv. L. Rev. 84 (1998) ................................................................. 5

Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377 (2001) ................................. 5

**INTEREST OF *AMICUS CURIAE*[1]**

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the rights of all Americans to the freedoms of speech, expression, and conscience—the essential qualities of liberty. Founded in 1999 as the Foundation for Individual Rights in Education, FIRE's sole focus before the expansion of our mission in 2022 was defending student and faculty rights at our nation's colleges and universities. Given our decades of experience combating campus censorship, FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing minority or dissenting viewpoints. FIRE strongly opposes attempts to restrict access to information—both on- and off-campus. Informed by our unique history, FIRE has a keen interest in ensuring the censorship we fight on campus is not fostered in our public K-12 schools.

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person other than *amicus*, its counsel, and its members contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

Iowans have a long, proud history of standing up to censorship. As a junior high school student in Des Moines, Mary Beth Tinker made history wearing a black armband to protest the Vietnam War. In finding Mary Beth's expression to be protected by the First Amendment, the Supreme Court declared that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Thirty years before *Tinker*, as armies marched through Europe, Des Moines Public Library Director Forrest Spaulding opposed calls to remove Hitler's *Mein Kampf* from his library, declaring "we should fear the tendency of small minds in these days of stress."[2] Spaulding understood that removing *Mein Kampf* to restrict access to disfavored ideas would be a step toward the authoritarianism the book glorifies. He instead made his mark by drafting the Library Bill of Rights.

_____

[2] *Pieces of Iowa's Past: Spaulding's Library Bill of Rights*, Iowa Legislative Services Agency (Apr. 4, 2018), https://www.legis.iowa.gov/docs/publications/TB/961350.pdf.

Modern library policies on intellectual freedom and access to information are founded on Spaulding's Library Bill of Rights. Those rights include that "materials should not be proscribed or removed because of partisan or doctrinal disapproval" and "libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment."[3]

As Spaulding recognized, public libraries are critical to our system of limited government, which especially limits the government's power to control ideas. Libraries are designed to include even unorthodox and unpopular views and to serve all members of the community. Partisan decisionmakers cannot, therefore, "distort [their] usual functioning." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Just as the government "could not elect to use a broadcasting network or a college publication structure in a regime which prohibits speech necessary to the proper functioning of those systems," *id*. at 544, the First Amendment prevents the government from subjecting a public library's book removal decisions to the vagaries of political whims. This principle likewise

---

[3] *Library Bill of Rights*, Am. Libr. Assoc., https://www.ala.org/advocacy/intfreedom/librarybill (last visited Mar. 28, 2024).

applies to public-school libraries, which are constitutionally sheltered from "officially prescribed orthodoxy." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) (plurality op.). A "bedrock principle underlying the First Amendment" is that officials cannot limit expression "simply because society finds [it] offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Here, Iowans again seek to defend our unique national commitment to freedom of expression. This time, students, teachers, and book publishers have challenged vague, top-down mandates from the State legislature to remove a vast array of books from public-school libraries. Recognizing that school libraries exist to educate, not indoctrinate, the district court correctly held that SF496 violates the First Amendment. It also correctly held that SF496 unconstitutionally forces local educators to pull a shocking number of titles from shelves, including classic works of literature, to comply with the State's rigid, one-size-fits-all notion of "age-appropriateness." SF496's politicized, top-down approach is the antithesis of Iowa's proud history of standing against censorship. It is unconstitutional, and this Court should affirm the ruling below.

## ARGUMENT

### I. The First Amendment Prohibits Imposing a Pall of Orthodoxy in Iowa's Public Schools.

Government involvement in expressive activities can take many forms—as speaker, regulator, custodian of a public forum, or sponsor of independently chartered speech enterprises—and that form determines the applicable constitutional rule. *See generally* Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377, 1384–87 (2001). Where the government is delivering its own message, the First Amendment does not constrain "government speech." *E.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 481 (2009); *Rust v. Sullivan*, 500 U.S. 173, 193–94 (1991). But certain government institutions—such as public universities, public museums, public media, and public libraries—are imbued with a "First Amendment aura" that limits political machinations concerning their operation. Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 116 (1998).

Thus, where the government opens a forum for citizen speech, either by tradition or by designation, it must respect the forum's purpose. *E.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–

46 (1983). And where the government creates institutions vested with independent editorial judgment or a mandate to make information widely available to the public, it cannot then arbitrarily limit access to information "necessary to the proper functioning of those systems." *Velazquez*, 531 U.S. at 544.

Public-school libraries are precisely the type of government entity imbued with a First Amendment aura. They are "the principal locus" of students' freedom to explore the world of ideas beyond the curriculum, *Pico*, 457 U.S. at 868–69, and courts have consistently recognized the First Amendment's application to school libraries. *See, e.g.*, Br. of Plaintiffs-Appellees *Penguin Random House, LLC, et al.* 14–15 (collecting cases). Because school libraries are designed to foster thought by exposing students to a wide range of materials, state legislators overstepped their bounds by imposing top-down, vague restrictions on local schools to force the removal of a vast array of titles.

## A. The First Amendment limits arbitrary political control of libraries.

"Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary."

*Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). Removing books from public libraries under vague, political mandates leaves students far less free to arrive at their own conclusions, and no exercise of state power is more arbitrary than broadly framed, top-down restrictions on which books may remain on library shelves.

The State ignores libraries' core purpose and claims that they exist for the government to communicate "its own message." Defendants-Appellants' Br. 19. But neither public community libraries nor public-school libraries engage in "government speech" because they do not exist to deliver government messages. As Spaulding recognized in the Library Bill of Rights, libraries are not meant to be repositories for government views, and no reader expects each book in a library to communicate a government-approved message. Such a position cannot be squared with common sense; libraries should (and do) contain books with varying viewpoints on, for example, the proper form of government, like John Stuart Mill's *On Liberty* or Karl Marx's *Communist Manifesto*. The inclusion of these books on Iowa's library shelves does not mean they represent the officially endorsed positions of local officials. Rather, access to this diversity of views prepares young Iowans for a lifetime of

considered thought on the role of government. It is incoherent to argue otherwise.

Public libraries exist "for the interest, information, and enlightenment of all people of the community the library serves."[4] The government bore no obligation to establish a system of public libraries. But having done so, the unique purpose and function of libraries requires the government to play by the appropriate constitutional rules. Iowa law mandates that public-school libraries "include a current and diverse collection of fiction and nonfiction materials." Iowa Code § 256.11(9)(b). A public-school library cannot fulfill its objective of giving students access to a wide range of ideas and perspectives if the government proscribes or limits materials "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870.

This institutional purpose both defines and limits the government's authority. School libraries play an important role in affording "access to discussion, debate, and the dissemination of information and ideas," and accordingly, "the First Amendment rights of students may be directly and

_____

[4] *Library Bill of Rights*, Am. Libr. Assoc., https://www.ala.org/advocacy/intfreedom/librarybill (last visited Mar. 28, 2024).

sharply implicated by the removal of books from the shelves of a school library." *Id.* at 866 (citation omitted).

Defendants miss this point in arguing libraries are not public forums, citing *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), and the plurality opinion in *United States v. American Library Ass'n*, 539 U.S. 194, 205–06 (2003). *See* Defendants-Appellants' Br. 22–25. Those cases are inapposite. *Chiras* concerned a school board's control over curricular materials used in class, not the books on a school library's shelves— "books that by their nature are optional rather than required reading," and thus implicate different interests. *Pico*, 457 U.S. at 862. And both cases dealt with initial acquisition decisions for *inclusion* of materials, not the issue presented here—decisions to *remove* books already acquired (*i.e.,* censorship decisions). *See Chiras*, 432 F.3d at 610 (addressing "selecting materials for inclusion in the public school curriculum"); *Am. Libr. Ass'n*, 539 U.S. at 205 (addressing "a public library's exercise of judgment in selecting the material it provides to its patrons"). Book removal presents a different question, and the constitutional principles limiting book removal decisions derive from the purposes for which libraries exist. *Pico*, 457 U.S. at 871–72 ("we are concerned . . . with the

suppression of ideas, [and] our holding today affects only the discretion to *remove* books").

In this respect, as governmentally owned or sponsored institutions, libraries are neither "government speakers" that transmit the state's message, nor "public forums" that exist as open platforms that indiscriminately host speech by citizens. Instead, libraries are governed by constitutional doctrine defined by their purpose. As the Supreme Court observed in *Velazquez*, 531 U.S. at 543, "[w]here the government uses or attempts to regulate a particular medium, we have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations." The First Amendment does not permit the government "to suppress speech inherent in the nature of the medium" or to "distort its usual functioning." *Id*.

This principle protects institutions dedicated to First Amendment purposes from government interference and political manipulation. It is why the government cannot censor print publications it has vested with independent editorial judgment. *See, e.g.*, *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983) (cutting student newspaper's funding because of

disfavored content violates the First Amendment); *Kincaid v. Gibson*, 236 F.3d 342, 355 (6th Cir. 2001) (en banc) (confiscation of student yearbook violated the First Amendment). And it is why the government may not prohibit public media from running editorials, *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 375–76 (1984), nor second-guess programming choices, *Community-Service Broad. of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1108–09 (D.C. Cir. 1978) (en banc).

And this principle means today's political victors may not subvert the purpose of public-school libraries—institutions meant to enrich the learning environment for students by offering a wide spectrum of ideas free of censorship—just because they hold temporary positions of power.

## B. Iowa legislators degrade the purpose of public-school libraries by imposing top-down restrictions.

School librarians necessarily evaluate content when deciding what books to acquire. *Am. Libr. Ass'n*, 539 U.S. at 208. But once they do so, book removal decisions cannot proceed on a partisan basis. Iowa's vague, top-down restrictions on school library materials represent an expression of political disapproval that cannot be squared with the libraries' basic purpose of facilitating students' exploration of the vast landscape of ideas.

*Pico* and *Pratt* recognize the core purpose of libraries to provide information to students even if officials "dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Pico*, 457 U.S. at 871–72 (quoting *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). That is why a government official seeking to remove a book "must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 777 (8th Cir. 1982). Iowa cannot establish that a substantial and reasonable governmental interest justifies SF496's vague and sweeping restrictions.

SF496 erodes the purposes of public-school libraries. Unlike the careful analysis for book removals required by *Pratt*, SF496 forces local officials to exclude "any material with descriptions or visual depictions of a sex act," which is in turn defined as a number of forms of "sexual contact between two or more persons." Iowa Code §§ 256.11(19)(a)(1), 702.17. This vague categorical ban applies to all public-school libraries *regardless* of the age of the students they serve, leaving local officials no discretion

to determine if a novel meeting its criteria is appropriate even for 18-year-old high school seniors.

The law has forced school librarians from about 37 school districts to remove over 500 books. App. 485 R. Doc. 65, at 7. Considering that Iowa has about 300 school districts in total, the number of books the law has forced from the shelves is likely far greater.

Attempting to comply with the law's long reach, school librarians have been forced to purge their shelves of classic works of fiction by Oscar Wilde, William Faulkner, and James Joyce. *Id.* They've also been forced to remove non-fiction history books simply because those books acknowledge that war is often accompanied by sexual assault. *Id.* Moreover, school librarians can no longer point students to books "designed to help students avoid being victimized by sexual assault." *Id.* at 481. Not only are these books removed from public-school libraries *en masse*, but students cannot even engage with the ideas in these books because SF496 prohibits students from using them for "a book report, essay, or other project." App. 504 R. Doc. 65, at 26.

Confronted with these examples at oral argument, the State conceded that "there has been an overremoval." App. 455 R. Doc. 62, at

82:2. But, as explained more fully below, the State's problem is that the law forced this result by removing discretion normally afforded to local officials. *Pratt*, 670 F.2d at 777. By seeking to impose broad top-down restrictions on local school board's decisions, the State has "used a bulldozer where school boards in prior cases merely employed a scalpel." App. 506 R. Doc. 65, at 28.

## II. Local School Boards, Not State Legislators, Must Determine Age Appropriateness Using Clear Standards.

Iowa has an interest in ensuring public-school library materials are age appropriate. But SF496's across-the-board ban on a broad category of content, which strips schools of the authority to make individualized, contextual evaluations of age appropriateness, does not serve that interest.

Public-school libraries must consider a book's suitability for their curricular aims and students' ages. *Pratt*, 670 F.2d at 775. Schools, therefore, may consider the materials' content, quality, and how they support the school's educational goals. *Id.* Yet SF496 destroys this considered decision-making. Rather than respecting local decisions about libraries, tailored to each school's goals and made democratically by each community, the law imposes statewide criteria that local officials must

enforce or be penalized. Worse, the law gives those officials no guidance, setting forth unconstitutionally vague standards and then holding schools liable if they are incorrectly applied.

### A. SF496 disturbs local communities' longstanding prerogative to determine which books go into their school libraries.

This Court has recognized that "[l]ocal authorities are the principal policymakers for the public schools." *Pratt*, 670 F.2d at 775. The Supreme Court has likewise said that "local school boards have broad discretion in the management of school affairs." *Pico*, 457 U.S. at 863. Those boards "have a substantial legitimate role to play in the determination of school library content," subject to constitutional limitations. *Id.* at 869.

In Iowa, each school district is its own corporation and is controlled by an elected board of directors. Iowa Code §§ 274.1, 274.3, 277.1. Boards are required "to establish a K–12 library program" directed by a licensed "teacher librarian." Iowa Admin. Code r. 281-12.3(12)(a). "The teacher librarian" will bring "special expertise in identifying resources and technologies to support teaching and learning." *Id.* The school board also must regularly review the library program, ensuring it "include[s] a current and diverse collection of fiction and nonfiction materials in a

variety of formats to support student and curricular needs." *Id.* r. 281-12.3(12)(b)(6). And it must "adopt policies to address selection and reconsideration of school library materials." *Id.* r. 281-12.3(12)(c).

Traditionally, then, library materials are selected by librarians, who are selected by boards of directors, who are selected by the local community. These local entities have the "broad discretion" to determine whether a library's materials support the school's educational goals. *Pico*, 457 U.S. at 863. This is as it should be.

But SF496 commandeers this local control. It requires libraries to stock only books that the State deems appropriate. It replaces local community decision-making with a ham-fisted, top-down ban on any "material with descriptions or visual depictions of a sex act." Iowa Code § 256.11(9)(a)(2), (19)(a)(1). Locally accountable educators are thus transfigured into bureaucrats imposing vague, statewide mandates. (*See* Part II.B., *infra*.) Before the district court, the State refused to answer questions about specific books because that might "usurp the role of, like, a school board in evaluating these." App. 444 R. Doc. 62, at 71:5–6. On that, the State is correct: Usurping local control is just what SF496 does.

One Iowa superintendent's op-ed describes her metamorphosis from schoolteacher to state censor.[5] Her school district had not had a book challenged in decades. Yet SF496 turned her into the "book-banning monster." "I have a million better things to do with my time than keep kids from books," the superintendent wrote. But instead, she spent part of her summer searching for books in the school library to decide "whether they would remain on the shelves for our students or be boxed up and stored in my office."

By imposing broad, inflexible, state-level restrictions on school library content, SF496 bulldozes the nuanced local policies and procedures Iowans have long used to curate their communities' school libraries.

### B. SF496 turns local control into statewide confusion.

After bulldozing local schools' decision-making process, SF496 abandons local decision-makers, providing them no guidance on what is or is not banned. It then adds injury to insult by leaving local teachers

---

[5] Bridgette Exman, *This Summer, I Became the Book-Banning Monster of Iowa*, N.Y. Times, Sept. 3, 2023, at SR-4, https://www.nytimes.com/2023/09/01/opinion/book-ban-schools-iowa.html.

personally liable if their enforcement of the state's book ban deviates from the state's unclear expectations.

Under the statute, material must be removed if it is not "age-appropriate," which is defined to exclude all works with "descriptions or visual depictions of a sex act," encompassing a number of forms of "sexual contact between two or more persons." Iowa Code §§ 256.11(19)(a)(1), 702.17.

But "[s]chool districts in Iowa," the district court found, "are all over the map" on "what constitutes a description of a sex act." App. 517 R. Doc. 65, at 39 (quotation marks omitted). Some districts have even removed books that are "commonly covered on high school Advanced Placement exams, such as *The Color Purple*, *Native Son*, *The Handmaid's Tale*, *As I Lay Dying*, *Beloved*, *1984*, and *Brave New World*." App. 516 R. Doc. 65, at 38. Lest one fault those districts, the State fares no better. The trial court asked the State whether the 567 banned books proffered in evidence was a reasonable number: "From the State's perspective, does that number sound about right? Is it too high? Or is it too low?" App. 444 R. Doc. 62, at 71:19–20. The State responded: "Apologies, Your Honor.

From the State's perspective, I have no idea." App. 444, R. Doc. 62 at 71:21–22.

That's because the statute gives little idea. As the district court noted, it's unclear what is meant by both "description" and "sex act." As to the former, how vivid must the writing be to become a "description"? App. 517–18 R. Doc. 65, at 39–40. In George Orwell's *1984*, one paragraph implies that two characters had sex with language like "He had pulled her down onto the ground," and "The youthful body was strained against his own."[6] Is that enough for this classic work of fiction to be banned from Iowa public-school libraries, including high school libraries? Apparently so, at least according to some school districts. Indeed, SF496 is so vague that—*before the statute even took effect*—the State proposed additional administrative rules to aid schools' interpretations.[7] App. 484, 518 R. Doc. 65, at 6, 40. And as to "sex act," does that require describing "what the characters look like, or what clothes they were wearing, or . . . the

---

[6] George Orwell, *1984* 120 (Signet Classics ed. 1950).

[7] App. 518 R. Doc. 65, at 40 ("The Proposed Rules . . . state that a 'reference or mention of a sex act in a way that does not describe or visually depict a sex act' is not forbidden.").

room they were in? *Perhaps not.*" App. 518 R. Doc. 65, at 40 (emphasis added).

Riding on that "perhaps not" are the livelihoods of hundreds of Iowa teachers and librarians. The State may say it does not want to "usurp" local decision-making, App. 444 R. Doc. 62, at 71:5, but it has no problem imposing professional discipline against librarians and teachers who make the wrong decisions. Little wonder, then, that staff feel forced to over-censor.

Notably, SF496 threatens school employees with discipline not only for failing to remove library books that have "descriptions" of a "sex act," but for failing to remove *any* books that do not meet the state's vague definition of "age-appropriate." The law thus incentivizes school districts and their staff to clear library shelves of any books that touch on any potentially controversial or mature themes, such as drugs, violence, war, mental illness, social injustice, family dysfunction, or death. Librarians now face potential discipline for giving students access to classic works like *Lord of the Flies*, *All Quiet on the Western Front*, *The Bell Jar*, *To Kill a Mockingbird*, and *The Death of Ivan Ilyich*, should state investigators ultimately determine these works are inappropriate.

As the district court found, "[t]he law is incredibly broad and has resulted in the removal of hundreds of books from school libraries." App. 481 R. Doc. 65, at 3. Before the district court, the State proffered a "relatively small number of books," while the plaintiffs identified "dozens—if not hundreds—of books that have been removed from one or more school districts despite undeniable political, artistic, literary, and/or scientific value." App. 516 R. Doc. 65, at 38. Given that teachers' licenses are on the line, could one blame them for taking the more conservative course?

A state statute violates due process when, as here, it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012). The vagueness doctrine applies with no less vigor because SF496 imposes no criminal penalties. In fact, "rigorous adherence" to vagueness doctrine is required "to ensure that ambiguity does not chill protected speech." *Id*. at 253–54. And chilling speech is precisely what is at stake: "[A] student likely would be prohibited from using a book that contains a 'sex act' for a book report, essay, or other

project," which therefore "limit[s] the student's ability to engage in an open exchange of ideas and to express beliefs that others might find disagreeable or offensive." App. 504 R. Doc. 65, at 26 (quotation marks omitted).

Due process requires "fair notice." *Fox Television Stations*, 567 U.S. at 253. But SF496 turns teachers into censors and then leaves them on their own without any clear guidance. And if, by the state's whims, it thinks they've applied the state's vague standards incorrectly, it can strip those teachers of their livelihoods. There's nothing "fair" about that.

## CONCLUSION

In 1941, a school superintendent wrote to Forrest Spaulding, asking "how best to curb the activities" of people "advocating censorship of library shelves or suppression of particular books."[8] More than 80 years later, it's now the State of Iowa that is advocating censorship—backed by threats of legal sanctions against teachers who fail to comply. Spaulding

---

[8] Forrest Spaulding, *Board and Committee reports—Intellectual Freedom*, 35 Am. Library Ass'n. Bulletin (No. 10) 622 (Oct. 15, 1941), https://archive.org/details/sim_american-library-assoc-ala-bulletin_1941-10-15_35_10.

took a principled stand against censorship. This Court should do the same. The district court's preliminary injunction should be affirmed.

Dated: April 23, 2024

/s/ Greg H. Greubel
GREG HAROLD GREUBEL*
AARON TERR
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 WALNUT ST.
SUITE 900
PHILADELPHIA, PA 19106
GREG.GREUBEL@THEFIRE.ORG
(215) 717-3473

ROBERT CORN-REVERE
JOSHUA A. HOUSE
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 PENNSYLVANIA AVENUE, SE
SUITE 340
WASHINGTON, DC 20003
(215) 717-3473

*Counsel of Record

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 4,238 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Date: April 23, 2024          */s/ Greg H. Greubel*
_____
Greg Harold Greubel
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 23, 2024 an electronic copy of the Foundation for Individual Rights and Expression Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: April 23, 2024        */s/ Greg Harold Greubel*
                                        Greg Harold Greubel

**CERTIFICATION OF COMPLIANCE
WITH EIGHTH CIRCUIT RULE 28A(h)**

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of Amicus Curiae Foundation for Individual Rights and Expression has been scanned for viruses and is virus-free.

Dated: April 23, 2024        */s/ Greg Harold Greubel*
                                        Greg Harold Greubel