IN THE
# United States Court of Appeals for the Eighth Circuit

---

No. 24-1075

GLBT YOUTH IN IOWA SCHOOLS TASK FORCE, d/b/a IOWA SAFE SCHOOLS, ET AL., *Plaintiffs-Appellees*,

v.

KIMBERLY REYNOLDS, in her official capacity as GOVERNOR OF THE STATE OF IOWA, ET AL., *Defendants-Appellants*,

JULIE MITCHELL, in their official capacities as BOARD MEMBERS OF THE URBANDALE COMMUNITY SCHOOL
DISTRICT, ET AL., *Defendants*.

---

No. 24-1082

PENGUIN RANDOM HOUSE, LLC, ET AL., *Plaintiffs-Appellees*,

v.

JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education, ET AL., *Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Southern District of Iowa
Case Nos. 4:23-cv-474, 4:23-cv-478
(The Honorable Stephen H. Locher)

---

**REPLY BRIEF OF STATE DEFENDANTS-APPELLANTS**

---

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

May 6, 2024

DANIEL JOHNSTON
*Assistant Attorney General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov
daniel.johnston@ag.iowa.gov

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................iii

INTRODUCTION..................................................................................1

ARGUMENT ........................................................................................2

    I.    ISS-PLAINTIFFS LACK STANDING.....................................2

        A.    ISS-Plaintiff A.C. Lacks Standing to
              Challenge the Instruction Section. ...............................2

        B.    No ISS-Plaintiff Has Standing to Challenge
              the Library Program. ....................................................7

        C.    ISS Lacks Direct Standing and
              Organizational Standing to Challenge
              Either Provision ............................................................8

    II.    SF496'S LIBRARY PROGRAM IS
           CONSTITUTIONAL. .............................................................9

        A.    SF496 Regulates Government Speech........................10

        B.    *Miller* Does Not Apply..................................................16

              1. Penguin-Plaintiffs' authority does not
                 support *Miller*-obscenity-light review.....................17
              2. Plaintiffs' other authorities support the
                 State's approach .....................................................21
               3. *Miller* does not stop schools from
                 removing inappropriate books................................22

        C.    The Library Program Is Not Overbroad or
               Vague..........................................................................26

    III.    READ NORMALLY, THE INSTRUCTION
            SECTION ADDRESSES ANY
            CONSTITUTIONAL VAGUENESS OR
            OVERBREADTH CONCERNS...........................................27

IV. PLAINTIFFS' LACK OF IMMINENT, IRREPARABLE HARM CUTS AGAINST PRELIMINARY INJUNCTIVE RELIEF ............................ 35

CONCLUSION ......................................................................... 37

CERTIFICATE OF COMPLIANCE ......................................... 38

CERTIFICATE OF SERVICE ................................................. 39

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*281 Care Committee v. Arneson*,
638 F.3d 621 (8th Cir. 2011) ................................................6

*Arc of Iowa v. Reynolds*,
94 F.4th 707 (8th Cir. 2024) ..............................................5

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ..........................................................15

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) ...........................................16, 17, 26

*Bicknell v. Vergennes Union High Sch. Bd. of Directors*,
638 F.2d 438 (2d Cir. 1980) .........................13, 17, 22, 24, 26

*Book People, Inc. v. Wong*,
98 F.4th 657 (5th Cir. 2024) ..............................................19

*Book People, Inc. v. Wong*,
2023 WL 6060045 (W.D. Tex. Sept. 18, 2023) ..................18, 19

*C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*,
619 F.Supp.3d 906 (E.D. Mo. 2022) ..........................12, 13, 23

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) .....................10, 12, 14, 16, 34

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..........................................................8

*Counts v. Cedarville Sch. Dist.*,
295 F. Supp. 2d 999 (W.D. Ark. 2003) ...............................21

*Dolan v. U.S. Postal Serv.*,
546 U.S. 486 (2006) ..........................................................26

*Farkas v. Miller*,
151 F.3d 906 (8th Cir. 1998) .............................................26

*Fayetteville Pub. Libr. v. Crawford Cnty., Ark.*,
2023 WL 4845631 (W.D. Ark. July 29, 2023) .....................21

*FCC v. Pacifica Found.*,
438 U.S. 729 (1978) ..........................................................17

*Grayned v. City of Rockford*,
408 U.S. 101 (1972) ..........................................................29

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ..........................................................8

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988) ................................................. 13, 17, 26

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.,*
    200 F.3d 1122 (8th Cir. 1999) ............................................ 17

*Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson,*
    283 F.3d 969 (8th Cir. 2002) ............................................... 4

*Labrador v. Poe,*
    144 S. Ct. 927 (2024) ...................................................... 28

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
    486 U.S. 8257 (1988) .................................................. 32, 33

*Mailloux v. Kiley,*
    323 F.Supp. 1387 (D. Mass. 1971) ........................... 14, 19, 20

*Matal v. Tam,*
    582 U.S. 218 (2017) ........................................................ 15

*Minarcini v. Strongsville Cnty. Sch. Dist.,*
    541 F.2d 573 (6th Cir. 1976) ............................................. 21

*Morse v. Frederick,*
    551 U.S. 397 (2007) ........................................................ 26

*Org. for Black Struggle v. Ashcroft,*
    978 F.3d 609 (8th Cir. 2020) ............................................. 36

*Parents Defending Education v. Linn Mar Cmty. Sch. Dist.,*
    83 F.4th 658 (8th Cir. 2023) .......................................... 6, 27

*Pico v. Board of Educ., Island Trees Union Free Sch. Dist.,*
    457 U.S. 853 (1982) ........................................................ 13

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009) ........................................................ 16

*Powell v. Noble,*
    798 F.3d 692 (8th Cir. 2015) ........................................ 35, 36

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.,*
    670 F.2d 771 (8th Cir. 1982) ............................................. 11

*Pugin v. Garlan,*
    599 U.S. 607 (2023) ........................................................ 32

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ............................................... 9

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) .............................................. 15, 24, 25

*Shurtleff v. City of Bos., Mass.,*
    596 U.S. 243 (2022) .............................................. 10, 13, 15

*Simmons v. State Pub. Def.*,
 791 N.W.2d 64 (Iowa 2010) ............................................................ 27
*Sisney v. Kaemingk*,
 15 F.4th 1188 (8th Cir. 2021) ........................................................ 27
*State v. Iowa Dist. Ct.*,
 843 N.W.2d 75 (Iowa 2014) ............................................................ 27
*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
 393 U.S. 503 (1969) .................................................................. 14, 17
*United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*,
 857 F.2d 421 (8th Cir. 1988) ..................................................... 27, 35
*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
 455 U.S. 484 (1982) ...................................................................... 34
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
 576 U.S. 200 (2015) .................................................................. 13, 16
*Willson v. City of Bel-Nor, Mo.*,
 924 F.3d 994 (8th Cir. 2019) ............................................ 26, 27, 34
*Wreal, LLC v. Amazon.com, Inc.*,
 840 F.3d 1248 (11th Cir. 2016) ...................................................... 35
*Zykan v. Warsaw Cmty. Sch. Corp.*,
 631 F.2d 1300 (7th Cir. 1980) ........................................................ 11

## Statutes

Iowa Code § 256.11 ............................ 10, 11, 13, 25, 26, 29, 30, 31, 32, 33
Iowa Code § 279.13 ...................................................................... 30
Iowa Code § 279.68 ...................................................................... 30
Iowa Code § 279.79 ...................................................................... 31
Iowa Code § 279.80 .............................................................. 28, 29, 30
Iowa Code § 280.6 ....................................................................... 25
Iowa Code § 702.17 ................................................................. 25, 26

## Regulations

Iowa Admin. Code r. 281–12.2 ........................................................ 14
Iowa Admin. Code r. 281–12.3 .................................................... 12, 14
Iowa Admin. Code r. 282–13.28 ...................................................... 12

# INTRODUCTION

SF496 protects children from age-inappropriate materials in schools. It sets guidelines as to which books are appropriate for school libraries and what subjects are appropriate for elementary school students. Only schools, teachers, and librarians defying the law may face discipline.

The district court invented a First Amendment test that it found SF496 would fail. But that *Miller*-obscenity-light test is unsuitable for education regulations. Plaintiffs have no First Amendment sword to compel descriptions of sex acts in school-library content. Rather, schools communicate an educational message through the Library Program. That is government speech.

Plaintiffs cannot manufacture constitutional defects by resorting to a flawed statutory interpretation. SF496 is constitutional; this Court should lift the injunction and restore the pre-injunction status quo.

# ARGUMENT

## I. ISS-PLAINTIFFS LACK STANDING.

### A. ISS-Plaintiff A.C. Lacks Standing to Challenge the Instruction Section.

ISS-Plaintiffs seek to enjoin SF496's enforcement, even while admitting that "schools and staff"—not ISS-Plaintiffs—"are punished for failure to comply" with SF496. ISS-Plaintiffs' Br. 3. ISS-Plaintiffs instead rely on a three-part theory supporting A.C.'s standing. Each part lacks traceability, redressability, injury-in-fact—or all three.

1. Nothing in the Instruction Section prohibits A.C. from "engag[ing] in an open dialogue with her classmates or teachers about her identity as a transgender girl." ISS-Plaintiffs' Br. 48. Indeed, SF496 assumes the compulsory educational environment will allow students like A.C. to acknowledge gender identity and sexual orientation in a gender-bias-free environment. *See*, *e.g.*, Iowa Code §§ 279.50(2), (10)(*b*)(2).

Even if discipline under policies other than SF496 is possible, A.C.'s harm is not caused by SF496's enforcement but by hypothetical enforcement of a school's disciplinary procedures. ISS-Plaintiffs embrace the unlikely chain of hypotheticals for this implausible scenario, ISS-

Plaintiffs' Br. 39, which is untethered from SF496's enforcement and so not redressable by an injunction against enforcement.

And there is no non-speculative enforcement threat against A.C. ISS-Plaintiffs instead assert that it "naturally follows" that a teacher would prohibit A.C. from discussing transgender identity, that A.C. would become disruptive, and then A.C. would be disciplined. ISS-Plaintiffs' Br. 49. But that did not happen, despite the Instruction Section having been enforceable for the entire Fall semester. *See* App.212, R.Doc.2-10, ¶ 15 (R. Carlson Decl.) (wondering whether SF496 affects A.C.'s "ability to express her gender identity in the future"); App.235–236, R.Doc.2-13, ¶¶ 10–11 (U. Carlson Decl.) (conceding that A.C. continues to express transgender identity in class and has yet to face any discipline).

ISS-Plaintiffs claim A.C. could not discuss A.C.'s transgender identity because "her teacher would not be able to allow such discussion." ISS-Plaintiffs' Br. 49. That retreats from the untenable disciplinary-action theory of standing and it does not suffice to establish an injury-in-fact in a pre-enforcement First Amendment challenge. State's ISS Opening Br. 28–29.

ISS-Plaintiffs then pivot to assert vicarious standing through their teachers who, they contend, may face discipline for discussing transgender identity in class, because the teachers' interests are allegedly so intertwined with A.C.'s interest in a supportive classroom environment that the teachers' harm gives A.C. standing. Not quite.

ISS-Plaintiffs rely on authority finding a city employee's wife had standing to sue the city when its policy allowed her husband to be fired for her political activity. *International Ass'n of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969 (8th Cir. 2002). This chilled the wife's speech, so she had standing. *Id.* at 972–973.

But no teacher here will be disciplined due to student conduct. The city policy allowed discipline for the employee's "indirect" conduct—his wife's advocacy. But the Instruction Section disciplines teachers for providing mandatory educational instruction on forbidden subjects. Teachers would not be disciplined simply because a student might engage in classroom discussion about their transgender identity. Though clever, ISS-Plaintiffs' theory lacks support.

And if A.C. somehow has standing because of school discipline, State Defendants are improper defendants when the decision to impose

discipline is the "result of the independent action of some third party," here the school or employee. *See Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024) (requiring injury "be fairly traceable to the challenged action of the defendant").

2. The Instruction Section creates no "unwelcoming climate" that chills A.C. into self-censorship. *See* ISS-Plaintiffs' Br. 4, 46–51. Although self-censorship can give rise to standing, it must be more than a subjective chill; it must be objectively reasonable. Not even the district court found this theory tenable. App.497, R.Doc.65, at 19 ("Nothing in Senate File 496 prohibits [ISS-Plaintiffs] from expressing themselves at school in the same manner they would have before the law was enacted.").

To succeed on self-censorship, a plaintiff must show the challenged law forbids the chilled speech and the plaintiff's speaking may cause imminent consequences. A.C. expressed A.C.'s transgender identity during the Fall semester, while the Instruction Section was enforceable, without discipline. *See* App.212, R.Doc.2-10, ¶ 15; App.235–236, R.Doc.2-13, ¶¶ 10–11. That reality undercuts any argument that the Section proscribes such expression, or that A.C. may face real, imminent discipline.

ISS-Plaintiffs rely on *Parents Defending Education v. Linn Mar Community School District*, 83 F.4th 658 (8th Cir. 2023), and *281 Care Committee v. Arneson*, 638 F.3d 621 (8th Cir. 2011), to argue that there exists a credible threat of imminent enforcement against A.C. But both cases show why A.C. lacks standing. In *Parents Defending*, the challenged policy expressly applied to students. 83 F.4th at 666. And the plaintiffs in *281 Care* alleged that, "in the past, plaintiffs' speech ha[d] triggered threats and the filing of one complaint." 638 F.3d at 630. A.C.'s chill and self-censorship allegations thus fail to establish Article III injury.

3. ISS-Plaintiffs next contend A.C. has standing because, "under any sensible reading," the Instruction Section applies to extracurricular activities and thus prohibits GSA clubs from meeting. ISS-Plaintiffs' Br. 45. But flawed statutory interpretation cannot manufacture standing. *See* State's ISS Opening Br. 62–65.

A.C. fails to satisfy Article III's traceability, redressability, and injury-in-fact requirements and thus lacks standing to challenge the Instruction Section.

### B. No ISS-Plaintiff Has Standing to Challenge the Library Program.

ISS-Plaintiffs do not dispute that they lack standing if the government-speech doctrine applies. ISS-Plaintiffs' Br. 51. Because the government-speech doctrine applies, ISS-Plaintiffs fail to articulate a constitutionally cognizable injury. And if any harm does exist, ISS-Plaintiffs state it would be "redressable by the injunctive relief Student Plaintiffs seek because schools would" not remove books. ISS-Plaintiffs' Br. 52. That remains true even if some other standard governs this challenge. And it proves the State's point: any harm stemming from the Library Program is neither traceable to nor redressable by State Defendants.

ISS-Plaintiffs seek an injunction against the State's enforcement of SF496, but the harms they allege predate the State's ability to enforce the law. Any injunction against the State's enforcement of the Library Program therefore would not redress the harms ISS-Plaintiffs allege to have occurred before the law was ever even enforceable.

## C. ISS Lacks Direct Standing and Organizational Standing to Challenge Either Provision.

The district court did not address whether ISS had direct or associational standing. ISS-Plaintiffs press the issue as a ground for alternative affirmance. This Court should decline the invitation.

Direct standing requires ISS to establish its own injury, traceability, and redressability. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–379 (1982). A diversion-of-resources theory therefore must relate to the law's enforcement. And to support injunctive relief, standing must be based on "certainly impending" injury and not just past diversions. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

ISS does not assert direct standing to challenge the Library Program on appeal. ISS's standing to challenge the Instruction Section—like A.C.'s standing argument—hinges on an incorrect understanding of the law. ISS alleges State enforcement of the law "continues to discourage the formation of member GSAs" and causes ISS to divert resources to answering GSAs' and students' questions on how to continue their GSA operations. ISS-Plaintiffs' Br. 52–53. But the law does not prohibit GSAs. ISS-Plaintiffs' flawed statutory interpretation cannot manufacture standing.

Associational standing "requires plaintiffs . . . to identify members who have suffered the requisite harm." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022) (cleaned up). ISS fails to carry this burden too, for both its claims. For the Library Program, the ISS members are students who lack standing because they fail to articulate a constitutionally cognizable injury. For the Instruction Section, ISS's argument (again) assumes a flawed statutory interpretation. Because none of its identified members have standing to sue, ISS too lacks standing.

## II.   SF496'S LIBRARY PROGRAM IS CONSTITUTIONAL.

School library curation is government speech. Even if not, this case presents a choice between standards: (1) government-speech; (2) nonpublic-forum; (3) *Hazelwood* (4) *Pico*; and (5) *Pratt*. The Library Program survives each. Plaintiffs focus on government-speech, giving scant attention to these alternatives. Penguin-Plaintiffs instead defend the district court's *Miller*-obscenity-light approach, without citing authority applying that standard to an education regulation. ISS-Plaintiffs cite *Miller* just once. ISS-Plaintiffs' Br. 28 n.11.

**A.    SF496 Regulates Government Speech.**

Determining government speech is a "holistic inquiry;" a court's "review is not mechanical." *Shurtleff v. City of Bos., Mass.*, 596 U.S. 243, 252 (2022). "[I]t is driven by a case's context rather than the rote application of rigid factors." *Id.* Yet traditionally relevant factors also show library curation is government speech. Forum principles are inappropriate.

1. School curriculum is government speech, and library inventory supports school curriculum. *See Chiras v. Miller*, 432 F.3d 606, 618 (5th Cir. 2005); Iowa Code § 256.11(9)(*a*)(2). School library curation—including removal of inappropriate materials—applies "editorial discretion" to compile third party speech in support of schools' educational message; citizens may not compel the government's "own approved [educational] message." State's Penguin Opening Br. 16–25 (collecting authorities). This "is clearly government speech" under "*Rust*, *Rozenberger*, *Forbes*, *Finley*, and *ALA*." *Chiras*, 432 F.3d at 618.

Because the Library Program supports school curriculum, it is government speech. It promotes "educational standards," "support[ing]" the "school curriculum" and "student curricular needs." Iowa Code

§§ 256.11(9)(*a*)(2), 256.11(9)(*b*). It is administered by "teacher librarians" who are "uniquely prepared" to "teach students to think critically and independently to construct new understandings and insights from varied information sources." Iowa School Library Program Standards ("Standards") (Feb. 2019), *available at* https://perma.cc/32Y4-JASE; Iowa Code § 256.11(9)(*a*)(1).

Although the Library Program is not compulsory classroom curriculum, it supports curricular needs. It is "an integral part of the district's instruction and curricula" and "is aligned with the Iowa Core and the classroom curriculum" to provide "challenging and authentic learning opportunities that address the needs and interests of the broad range of learners." Standards at 2. Libraries are a "general resource" "cater[ing] to the needs of . . . diverse student bod[ies] by providing materials that properly supplement the basic readings assigned through the standard curriculum." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980). Library inventory is part of the school's educational message.

The distinction between library-book removal and mandatory curriculum removal is not relevant for First Amendment purposes. *Pratt*

*v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 776 n.6 (8th Cir. 1982) (finding no "principle[]" distinguishing book-removal from classroom-curriculum removal); *C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*, 619 F.Supp.3d 906, 914 (E.D. Mo. 2022) (same, distinguishing *Pico*); Iowa Admin. Code r. 281–12.3(10) (curation "address[es] selection and reconsideration of school library materials"); Iowa Admin. Code r. 282–13.28(21)(*b*)(3), (22)(*b*)(3), (23)(*b*)(3) (same).

Age-appropriate concerns pervade whether books are voluntarily selected from a library or assigned in class. The government's educational messages encompass library inventory and classroom curricula. So in Iowa, the same type of analysis applies to textbooks and library books. *Chiras*, 432 F.3d at 611 (rights not violated when the State Board of Education "declined to place [an author's] textbook" on a list for use in public classrooms).

The primary legal issue is whether the government communicates its own message through the Library Program. It does. Plaintiffs' voluntary/mandatory distinction focuses on the wrong party. "The library is perceived as central to the educational mission of the school." Standards at 10. The State's ability to remove inappropriate speech in

schools is not restricted to captive audiences. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271–272 (1988); *Bicknell v. Vergennes Union High Sch. Bd. of Directors*, 638 F.2d 438, 441 (2d Cir. 1980); *C.K.-W.*, 619 F.Supp.3d at 916–917. Even *Pico v. Board of Education* acknowledged library books could be removed for vulgarity or "educational suitability." 457 U.S. 853, 871 (1982) (plurality op.).

2. The Supreme Court has not created a formal government-speech test; courts instead apply a holistic government-speech analysis. *See Shurtleff*, 596 U.S. at 252.; *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–214 (2015). In some contexts, they consider "the extent to which the government has actively shaped or controlled the expression," the history of the expression, and the public's perception of it—though each under the ultimate rubric of determining "whether the government intends to speak for itself or to regulate private expression." *Shurtleff*, 596 U.S. at 252. Those factors show SF496 regulates government speech.

The State and schools actively shape and control their educational message through the curriculum and Library Program. Iowa Code §§ 256.11(9)(*a*)–(*b*). The State sets educational standards, establishes

rules governing library programs, and publishes Standards and Guidance further defining the library as "integral to the school district's curricula and instructional program." Iowa Admin. Code r. 281–12.2; *see* Iowa Admin. Code r. 281–12.3(10).

The public expects the State and its schools to communicate an educational message in public education. "Most parents, students, school boards, and members of the community usually expect" public schools to "transmit[] basic information, teach[] 'the best that is known and thought in the world,' train[] by established techniques, and, to some extent at least, indoctrinate[e students] in the mores of the surrounding society." *Mailloux v. Kiley*, 323 F.Supp. 1387, 1392 (D. Mass. 1971).

Courts have long recognized the "comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). That includes "the authority to establish public school curricula" to accomplish "the states' educational objectives." *Chiras*, 432 F.3d at 611.

Iowa conforms to that historic expectation and practice of public education, going back to Article IX of its 1857 Constitution. The Library Program is part of Iowa's educational message.

School libraries have never been mere fora for private expression. State and local authorities have always "implement[ed] [the] government's communicative agenda." *Shurtleff*, 596 U.S. at 269 (Alito, J. concurring). This "purposeful communication of a governmentally determined message" hallmarks government speech. *Id.* In the library, the government "adop[ts] a medium of expression created by a private party"—books—"and use[s] it to express a government message." *Id.* at 270. And when government "compiles the speech of third parties," it exercises "discretion in [its] selection and presentation" of its educational message. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).

That is unlike the near-rote approval of trademarks in *Matal v. Tam*, 582 U.S. 218, 235–237 (2017), or flags in *Shurtleff*, 596 U.S. at 256–258, where the government did not adopt the private speech for its own message and "lack[ed] meaningful involvement" in the expression. *Id.* It

is more like the monuments in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472–473 (2009), or the license plates in *Walker*, 573 U.S. at 213, where the government used third-party speech to express its own message, over which it "maintain[ed] direct control." *Id.*

Finally, government speech may express multiple viewpoints. Context matters. Curricular messages—like textbooks—are government speech, *Chiras*, 432 F.3d at 614, yet they often represent diverse viewpoints. *Summum*'s analysis of a "message" clarifies it need not be singular, objective, unchanging, or tied to the speaker's intent. 555 U.S. at 474–476. So this Court should not adopt Plaintiffs' rigid view that when the government speaks as educator, it loses government-speech status the instant it represents diverse viewpoints. "Th[at] argument fundamentally misunderstands the way [schools] convey meaning." *Id.* at 474.

**B.** *Miller* **Does Not Apply.**

Plaintiffs' offer no authority requiring the *Miller*-obscenity-light approach. States may ban speech that is "sexually explicit" where "the audience may include children." *Bethel Sch. Dist. No. 403 v. Fraser*, 478

U.S. 675, 684 (1986). States may regulate speech that is "indecent but not obscene." *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978).

The "special characteristics of the school environment" further diminish First Amendment rights. *Tinker*, 393 U.S. at 506. Schools may regulate speech that is "protected" in other contexts. *Id.* (substantially disruptive speech); *Fraser*, 478 U.S. at 683 (vulgar, lewd, profane, or plainly offensive speech); *Hazelwood*, 484 U.S. at 273 (school-sponsored-speech restrictions "reasonably related to legitimate pedagogical concerns"). "[S]chools need not tolerate speech that is inconsistent with its pedagogical mission, even though the government could not suppress that speech outside of the schoolhouse." *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1132 (8th Cir. 1999).

Schools may remove inappropriate material even when not obscene. Adult-style "[o]bscenity" review is different in schools. *Bicknell*, 638 F.2d at 441 n.3 (upholding a library-book removal and rejecting *Miller*).

### 1. Penguin-Plaintiffs' authority does not support *Miller*-obscenity-light review.

Penguin-Plaintiffs provide no authority applying *Miller*-obscenity-light-review to education regulations in public schools and libraries. Once, they say courts apply "the [*Miller*] standard to evaluate First

Amendment restrictions in school." Penguin-Plaintiffs' Br. 32–33. But their cited authorities do not do so.

*Sheck v. Baileyville Sch. Committee*, 530 F.Supp. 679, 687–688 (D. Me. 1982), did not evaluate obscenity or sexually explicit content. It reviewed a book removed due to "coarse language consisting principally of expletives devoid of prurient connotation." *Id.* at 681 n.2. *Sheck* did not apply *Miller*; it addressed a First Amendment concern absent here—the focus was on the removal having targeted "words [that] convey ideas." *Id.* at 687–677. But SF496 does not target ideas; it restricts depictions of sex acts, regardless of viewpoints, ideas, or beliefs expressed. *Cf. id.* (referencing, but not relying on, *Miller* in dicta).

*Book People, Inc. v. Wong*, 2023 WL 6060045, at *1 (W.D. Tex. Sept. 18, 2023), concerned private speech regulations. The Texas statute failed on compelled-speech grounds, because it required book vendors to rate books for sexual explicitness, and the State could revise the rating and require vendors to republish it. *Id.* Neither government speech nor forum principles applied, because "[t]he space where Plaintiff's speech [was] at issue [was] not the school libraries, but in their private activities as book sellers or distributors outside of a school setting." *Id.* at *15.

The Court agreed States have "strong interest[s] in what children are able to learn and access in schools" but observed Texas "misse[d] the mark" because it "force[d] private individuals and corporations into compliance" with a compelled speech law. *Id.* at 27. Though it applied *Miller* to private vendors, the court "expresse[d] no opinion" on the State's power to rate "sexual content of books [for] public school libraries" or to use such ratings, provided they were done by the State "and not imposed on non-state actors." *Id.* at *22. The State of Iowa embraces its responsibility to protect children here, without compelling any speech.

*Wong* was affirmed but drew sharp dissentals. *Wong*, 98 F.4th 657, 659 (5th Cir. 2024). Although Texas's law went further than SF496, eight judges believed it "should be easy to affirm" because "States have a profound interest in protecting the innocence of children from various adult activities." *Id.* States should "shield them from sexually explicit materials," and "[n]othing in the First Amendment prevents states" from doing so. *Id.*

Finally, *Mailloux v. Kiley*, did not discuss *Miller* in a teacher-discharge context. 436 F.2d at 566. Noting "matters of degree involving judgment" in the use of "socially taboo" language in class, that court

expressed misgivings about giving "carte blanche in the name of academic freedom to conduct which can reasonably be deemed both offensive and unnecessary to the accomplishment of educational objectives." *Id.*

On remand there, the district court highlighted "constitutional considerations of magnitude," which may "warrant a legal conclusion that the secondary school teacher's constitutional right in his classroom is only to be free from discriminatory religious, racial, political and like measures." *Mailloux*, 323 F.Supp. at 1392. This was because "[t]he secondary school more clearly than the college or university acts in loco parentis with respect to minors." *Id.* at 1392. Indeed, "[m]ost parents . . . expect the secondary school to concentrate on transmitting basic information" and, "to some extent at least, indoctrinating the mores of the surrounding society." *Id.* High schools are not "open forums in which mature adults, already habituated to social restraints, exchange ideas on a level of parity." *Id.* The court did not apply or even reference *Miller*. *Id.*

### 2. Plaintiffs' other authorities support the State's approach.

Neither Plaintiffs' brief identifies cases supporting *Miller*-obscenity-light-review of educational standards in school libraries:

- *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188–190 (1995), *Case v. Unified Sch. Dist. No. 233*, 908 F.Supp. 864, 875–876 (D. Kan. 1995), and *Minarcini v. Strongsville Cnty. Sch. Dist.*, 541 F.2d 577, 582–583 (6th Cir. 1976), essentially followed *Pico*.

- *PEN Am. Center, Inc. v. Escambia Cnty. Sch. Board*, 2024 WL 133213, at * 2 (N.D. Fla. Jan. 12, 2024), outlined almost exactly the State's approach here: schools "can make content-based removal decisions based on legitimate pedagogical concerns," including "pornographic or sexual content, vulgar or offensive language, gross factual inaccuracies, and educational unsuitability for certain grade levels."

- *Little v. Llano Cnty.*, 2023 WL 2731089, at *7 (W.D. Tex. Mar. 30, 2023), followed *ALA*, *Campbell*, *Pico*, and *Chiras* observing "the key inquiry in a book removal case is whether the government's substantial motivation was to deny library users access to ideas with which [the government] disagreed." (cleaned up).

- *Fayetteville Pub. Libr. v. Crawford Cnty., Ark.*, 2023 WL 4845636, at *1 (W.D. Ark. July 29, 2023), applied *Miller* to criminal penalties imposed on private parties like book sellers "for making available materials that are deemed" harmful to minors.

- *Counts v. Cedarville Sch. Dist.*, 295 F.Supp.2d 996, 999 (W.D. Ark. 2003), followed *Pico* on standing. It followed *Tinker* on whether an education-environment-exigency applied to whether "Harry Potter books might promote disobedience and disrespect for authority." *Id.* at 1002.

- *Sund v. City of Wichita Falls, Tex.*, 121 F.Supp.2d 530, 548 (N.D. Tex. 2000), followed *Pico* and limited-public-forum principles to a non-school library.

- *Sheck*, evaluated coarse language under *Cohen v. California.*

- *Salvail v. Nashua Bd. of Ed.*, 469 F.Supp. 1269, 1270, 1275–76 (D.N.H. 1979), referenced *Miller* in observing the speech was not obscene, but applied a "substantial and legitimate government interest" standard to remove magazines from a public high school's library.

- *Right to Read Defense Comm. of Chelsea v. School Committee of City of Chelsea*, 454 F.Supp. 703, 713 (D. Mass. 1978), followed *Tinker* and a substantial-and-legitimate-government-interest standard to a school library book removal.

Although these cases post-date *Miller*, none of them adopt the district court's novel *Miller*-obscenity-light approach. Instead, cases support approaches more protective of the State's interests.

This Court should extend recent government-speech doctrinal changes to the circumstances here. Most of Plaintiffs' cases predate important First Amendment developments, and the State asks this Court to apply those, and, to the extent necessary, narrowly construe *Pratt*.

### 3. *Miller* does not stop schools from removing inappropriate books.

Schools may remove books due to their vulgarity or sexual content. *Bicknell*, 638 F.2d at 441. Cases distinguish sexual-content removal from idea- or viewpoint-removal, and do not follow *Miller*.

*C.K.-W.* evaluated a policy that allowed school library-book removal based on the "age-appropriateness of the material" when books "exceed age sensitivity." 619 F.Supp.3d at 910. The policy survived *Pico* and *Pratt*. The court—expressing "serious reservations" about *Pico*'s plurality—took a narrow approach, focusing on preventing suppressing "religious and ideological content" while affirming that schools enjoy substantial discretion to remove books—so long as they do not do so "in a narrowly partisan or political manner." *Id.* (quotations omitted).

*C.K.-W.* highlighted *Pico's* unanimous agreement that "schools can remove books based on their vulgarity." *Id.* at 916. "No one seriously could dispute" that. *Id.* The books removed included "sexually explicit" content, including illustrations of "characters engaging in oral sex." *Id.* at 916–917. Removing age-inappropriate books did not suppress ideas, so the court upheld the removals. *Id.* at 917.

*L.H. v. Indep. Sch. Dist.*, 2023 WL 2192234, at *4 (W.D. Mo. Feb. 23, 2023), followed *C.K.-W.*'s approach. It held schools' book-removal "discretion is limited and 'may not be exercised in a narrowly partisan or political manner,'" with "the focus being on the 'motivation behind' the action." *Id.* (quoting *C.K.-W*, 619 F.Supp.3d at 914). Emphasizing that

schools "decisions on how and when to remove books is entitled to substantial deference," *L.H.* upheld those book removals. *Id.* at *5.

In *Bicknell*, the Second Circuit rejected a *Miller* approach while upholding book removals under *Pico*. 638 F.2d at 441. *Pico*'s concern was the "risk of suppressing ideas." *Id.* at 441. So the Second Circuit distinguished removals due to "vulgar and indecent" content from removal "because of [books'] ideas." *Id.*

*Bicknell* affirmed schools' authority "to regulate vulgarity and explicit sexual content." *Id.* And it distinguished *Miller*, explaining that "'[o]bscenity' in the context" of a school "does not mean the Supreme Court's test of obscenity [in *Miller*], which must be met before general distribution of material may be constitutionally punished." *Id.* at 441 n.3. "It refers, instead, only to that degree of sexual explicitness that renders material inappropriate for availability in a school attended by young children." *Id.*

SF496 does not suppress ideas or viewpoints. Courts distinguish content from viewpoint discrimination. *Rosenberger*, 515 U.S. at 829–830. Viewpoint discrimination happens "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the

restriction." *Id.* at 829. SF496 addresses no system of thought or matter of right belief or opinion. It requires only removing "descriptions or visual depictions" of the "penetration of the penis into the vagina or anus . . . or contact between the mouth and genitalia or mouth and anus . . . of another person . . . [etc.]." Iowa Code §§ 256.11, 702.17.

The religious-books exemption is not viewpoint discrimination. Laws forbid schools from requiring certain religious texts be read and forbid excluding students from reading those texts. Iowa Code § 280.6. And all religious texts are treated the same—no discrimination.

Plaintiffs' disregard (a) the distinction between content and viewpoint discrimination, (b) the nature of the regulation, and (c) the setting. SF496 is a permissible content regulation. It is an education regulation. It does not criminalize private speech. It only restricts what the government may give school-aged students in a school setting where schools may regulate sexual content and many other forms of speech.

SF496 is a valid exercise of the State's role in ensuring appropriate materials exist in schools.

**C. The Library Program Is Not Overbroad or Vague.**

The Library Program only requires removing books that depict sex acts, unless the book is part of the "human growth and development curriculum." Iowa Code § 256.11(19)(*a*)(2). It does not incorporate the Instruction Section—nor does it forbid a book for having a gay character or for discussing sexual orientation or gender identity.

Schools may regulate inappropriate speech at school—even when adults could be part of the audience. *See Morse v. Frederick*, 551 U.S. 393, 397 (2007); *Hazelwood*, 484 U.S. at 273; *Fraser*, 478 U.S. at 683; *Bicknell*, 638 F.2d at 441. Even so, potential adult access to descriptions of "sex acts" in a school library is small "judged in relation to [SF496's] plainly legitimate sweep." *Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 1004 (8th Cir. 2019) (quotations omitted).

And "description" is not vague—especially in context. "Description" cannot be read in isolation from its referent or context. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). The law goes into detail as to what sex acts are prohibited. Iowa Code § 702.17.

Even if the statute were ambiguous, "that in itself does not give rise to a finding of unconstitutional vagueness." *Farkas v. Miller*, 151 F.3d

900, 906 (8th Cir. 1998). Courts construe statutes "to steer clear of 'constitutional shoals,'" *State v. Iowa Dist. Ct.*, 843 N.W.2d 76, 85 (Iowa 2014), when that construction is "fairly possible." *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 74 (Iowa 2010); *see also Sisney v. Kaemingk*, 15 F.4th 1181, 1198 (8th Cir. 2021) (construing a prison policy's prohibition on sexually explicit content so as not to be overbroad).

## III. READ NORMALLY, THE INSTRUCTION SECTION ADDRESSES ANY CONSTITUTIONAL VAGUENESS OR OVERBREADTH CONCERNS.

A statute is "unconstitutionally vague" if it "fails to provide adequate notice of the proscribed conduct and lends itself to arbitrary enforcement." *Parents Defending*, 83 F.4th at 668 (quotations omitted). And it is unconstitutionally overbroad if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Willson*, 924 F.3d at 1004 (quotations omitted).

Courts do not jump to these conclusions, particularly when a limiting construction is available. *United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 431 (8th Cir. 1988) (Federal courts may narrow state statute when a narrow construction is "reasonable and readily apparent."). A facial challenge is inappropriate

when there may be legitimate applications of a law. *See Labrador v. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring) ("Lower courts would be wise to take heed.").

"Context is king" when interpreting Iowa statutes. *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 221 (Iowa 2016). Sometimes-broad words are not overly broad always—a statute's context can provide necessary precision and clarity. *See Grayned v. City of Rockford*, 408 U.S. 104, 110–111 (1972) (no unconstitutional vagueness for a broad ordinance because context makes "clear what the ordinance as a whole prohibits"); *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014) (where Legislature has not defined words, courts give those words "their common, ordinary meaning in the context within which they are used").

In context, a reasonable reading is this: the Instruction Section only forbids schools including certain subjects in certain grades as part of the compulsory instructional environment in which it requires all students to participate. Iowa Code § 279.80.

But Plaintiffs interpret certain terms overexpansively while robbing the Section of its broader context. All to press an interpretation

rendering other parts of Iowa's education statutes superfluous, incoherent, or both. That is not how this Court interprets statutes.

1. Plaintiffs object to a narrow construction because the word "compulsory" is not in the statute. Such a literal approach misunderstands *noscitur a sociis*, which interprets word lists contextually and by what the listed words have in common. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 195–198 (2012). That means the "most common effect of the canon is . . . to limit a general term to a subset of all the things or actions that it covers." *Id.* at 196.

The canon limits broader words like "program" to what they have in common with narrower terms like "test," questionnaire," "survey," "instruction," and "curriculum." Iowa Code § 279.80. These narrower terms are part of schools' compulsory educational functions where student participation is required; it does not include *all* school "programs" like the Library Program. The Library Program "supports" curricular needs, Iowa Code §§ 256.11(9)(*a*)(2), (*b*); unassigned books on the library shelf are not in the Instruction Section's purview.

Contrast the Library Program with a mandatory "[s]ummer reading program," which is required for students who are not up to their grade's reading level. Iowa Code § 279.68(2). Applying *noscitur a sociis* here, the latter subset of "program," which includes only programs that are part of a school's compulsory instructional function, controls "program's" use in the Instruction Section because it shares that narrower understanding with the Section's narrower words like "test," "questionnaire," "survey," "instruction," and "curriculum." Iowa Code § 279.80.

The title-and-headings canon confirms this narrow reading. The subsection is entitled "prohibited instruction," *id.*, and elsewhere the statute differentiates between an "instructor" and a "librarian." *See* Iowa Code § 279.13(4).

Most importantly, reading the law reasonably renders the law constitutional and so comports with the constitutional avoidance canon.

Finally, the Legislature expressly incorporated Section 279.80's requirements throughout SF496, but only in compulsory educational functions. *See* Iowa Code §§ 256.11(2), 256.11(3), 279.50. Notably, when

explaining the Library Program's "design[]," Iowa Code § 256.11(9)(*b*), the Legislature did not incorporate the Instruction Section.

ISS-Plaintiffs argue the Legislature would not have included the broader words "promotion," "survey," or "questionnaire" if the statute was limited only to "compulsory instruction." ISS-Plaintiffs' Br. 40. But the statute's context shows mandatory instruction can include such features in compulsory educational environments where student participation is required. *See, e.g.*, Iowa Code § 279.79 (mandating parental consent be given before a "survey" revealing certain information may be "require[d]" educational content for students).

Plaintiffs read the law so expansively to challenge the whole law as unconstitutional. If their interpretation is right, the Legislature banned gendered bathrooms or basketball teams. App.487, 519–520, R.Doc.65, at 9, 41–42. If true, then why include a list at all? Had the Legislature intended for such broad coverage, it could have banned any mention of gender identity. Instead, the Legislature provided a list—and that list must have meaning. *See Bribriesco-Ledger v. Klipsch*, 957 N.W.2d 646, 650–651 (Iowa 2021) (courts "interpret every word and every provision of a statute to give it effect" and avoid making a section "superfluous").

Plaintiffs, and the district court, fail to give the list meaning. Fortunately, ordinary tools of construction fix that error.

2. Plaintiffs expansively interpret "relating to" to expand the Section's coverage to mere references of male or female characters because, as they would have it, that "relates to" gender identity.

Although "relating to" is a "broad phrase," *Pugin v. Garland*, 599 U.S. 600, 607 (2023), courts still interpret statutes in context. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 835–837 (1988) (construing State law to avoid federal preemption). When a statute includes a "relating to" phrase, courts are "hesitant to adopt an interpretation" that "renders superfluous another portion of that same law." *Id.*

Plaintiffs' overly broad interpretation here would force the Court to render superfluous other parts of education statutes that presuppose that compulsory educational information given to students will acknowledge gender identity and sexual orientation. *See*, *e.g.*, Iowa Code § 279.50(2), (10)(*b*)(2) (requiring "research-based instruction in human growth and development" for grades one through six that is "free of racial, ethnic, sexual orientation, and gender biases"); Iowa Code § 256.11

(setting educational standards for accreditation, including a "gender-fair approach"). Just as in *Mackey*, this Court should not render these other provisions superfluous simply because of the phrase "relating to." 486 U.S. at 837.

The Instruction Section thus does not prohibit references to gender identity or sexual orientation; it prohibits mandatory instruction on those subjects. Acknowledging gender identity and sexual orientation by using the pronoun "she" for Sally in a math problem is not instructing students on gender identity or sexual orientation as a compulsory instructional subject. Nothing in the Instruction Section prohibits library books or classroom discussion acknowledging or referencing gender identity or sexual orientation. Schools only must avoid mandating educational instruction on those subjects until students enter seventh grade.

3. That some school districts have wrongly interpreted the Instruction Section to apply to library books or GSAs does not mean it lends itself to arbitrary or discriminatory enforcement. Plaintiffs must show more than ambiguity in the statute, because a "statute is not necessarily void for vagueness simply because it may be ambiguous or

open to two constructions." *Mumad v. Garland*, 11 F.4th 834, 838 (8th Cir. 2021) (quotations omitted). But they cannot. The statute here has a "reasonable and readily apparent" narrow construction that the court should have applied before finding the state statute unconstitutionally vague. *United Food*, 857 F.2d at 431.

More, because the Section applies only to a school's compulsory educational functions—over which schools have broad discretion, *Chiras*, 432 F.3d at 611, the statute does not "punish[] a substantial amount of protected free speech," and is not overbroad, *Willson*, 924 F.3d at 1004.

Plaintiffs bring facial vagueness and overbreadth challenges, but both are high bars to clear. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503 (1982) (facial challenge improper mechanism to challenge a law when the language is clear, even though "confusion" exists over law's application).

\* \* \*

The district court found that the Instruction Section was unconstitutionally vague. Such a conclusion requires finding that the Section is impermissibly vague in all its applications. Standard tools of construction show that the district court erred and thus abused its

discretion. Because reading the law more narrowly is "reasonable and readily apparent," and reveals that the Section applies only to a school's compulsory instructional functions, this Court should vacate the preliminary injunction. *United Food*, 857 F.2d at 431.

## IV. PLAINTIFFS' LACK OF IMMINENT, IRREPARABLE HARM CUTS AGAINST PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs must show that they face a threat of irreparable harm that is "certain" and "of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quotations omitted). Plaintiffs fail to clear that hurdle.

A few months' delay in seeking preliminary injunctive relief "militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). ISS-Plaintiffs claim the law was not yet "completely effective" by last Thanksgiving, so they did "not understand the effects." ISS-Plaintiffs' Br. 55. *But see* App.204–214, 231–239, R.Docs. 2-10, 2-13. Yet they also contend some schools' "environment" shifted early in the semester. *See* App.235, R.Doc. 2-13, at ¶ 10. Allegedly, Plaintiff A.C. received negative comments early in the year that A.C.'s teacher did not correct as A.C. would have liked because of the Instruction Section. App.235, R.Doc. 2-13, at ¶ 11.

Penguin-Plaintiffs allege they felt harm as books were removed—yet they too chose to wait.

Such delayed understanding is not "certain" harm "of such imminence that there is a clear and present need for equitable relief." *Powell*, 798 F.3d at 702 (quotations omitted). Yet every day under the injunction, the State "suffers a form of irreparable injury." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (quotations omitted).

Even if this Court remands, it should vacate the preliminary injunction. There is no imminent and irreparable injury.

## CONCLUSION

For these reasons, this Court should vacate the preliminary injunction.

May 6, 2024                              Respectfully submitted,

                                         /s/ *Eric Wessan*
BRENNA BIRD                              ERIC WESSAN
Attorney General of Iowa                 *Solicitor General*

                                         /s/ *Patrick C. Valencia*
                                         PATRICK C. VALENCIA
                                         *Deputy Solicitor General*

                                         /s/ *Daniel Johnston*
                                         DANIEL JOHNSTON
                                         *Assistant Attorney General*

                                         Hoover State Office Building
                                         1305 East Walnut Street
                                         Des Moines, Iowa 50319
                                         (515) 823-9117 / (515) 281-5191
                                         (515) 281-4209 (fax)
                                         eric.wessan@ag.iowa.gov
                                         patrick.valencia@ag.iowa.gov
                                         daniel.johnston@ag.iowa.gov

                                         *Counsel for State Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,499 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

May 6, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State Defendants-Appellants*

# CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on May 6, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

May 6, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State Defendants-Appellants*